# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE A-1 TO A-49,<br>JOHN DOE B-1 TO B-91, AND<br>JOHN DOE C-1 TO C-32,<br><br>    Plaintiffs,<br><br>v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA<br>Ministry of Foreign Affairs<br>Jungsong-Dong, Central District,<br>Pyongyang,<br>Democratic People's Republic of Korea,<br><br>    Defendant. | CASE NO. 1:18-CV-00252-DLF |

## FIRST AMENDED COMPLAINT FOR DAMAGES
## FOR STATE-SPONSORED TERRORISM UNDER
## THE FOREIGN SOVEREIGN IMMUNITIES ACT

## I. INTRODUCTION

1. This action is brought against North Korea (formally known as the Democratic People's Republic of Korea) pursuant to the "Terrorism Exception" of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"). It arises from North Korea's attack on the U.S.S. Pueblo on January 23, 1968. North Korea, acting through its officials, employees, service members, and/or agents, caused the wrongful death of one crewman during the attack, hijacked the vessel, and kidnapped the other 82 military personnel and civilian U.S. government employees (collectively "Crew Members"), holding them hostage in North Korean prison camps in horrible conditions for the next 334 days, and subjecting them to repeated physical and mental torture, until their release on December 23, 1968.

2.     The Terrorism Exception affords certain victims of state-sponsored terrorism a private right of action against a designated State Sponsor of Terrorism whose officials, employees, service members, and/or agents have engaged in, or provided material support for, *inter alia*, extrajudicial killing, hostage taking, and acts of torture.  FSIA § 1605A(a)(1), (h).

3.     Plaintiffs include surviving Crew Members, and estate representatives of deceased Crew Members, who seek a judgment against North Korea for money damages including but not limited to:  (1) compensation for severe and lasting or permanent physical injuries and disfigurement and psychological harm (including, for some Plaintiff Crew Members, Post-Traumatic Stress Syndrome ("PTSD") and other mental health issues), extreme mental anguish, intentional infliction of emotional distress and/or loss of solatium; (2) economic losses including sustained lost wages and lost earning potential; (3) in some instances, uncompensated medical expenses; and (4) in at least one instance, wrongful death.  These injuries and losses were caused by North Korea's attack on the U.S.S. Pueblo and by the subsequent kidnapping, physical and mental torture, beating, and detention of its crew in horrible and inhumane conditions for eleven months.

4.     Plaintiffs also include persons who in 1968 were immediate family of Crew Members and estate representatives of deceased immediate family of Crew Members,  who seek a judgment against North Korea for money damages including but not limited to compensation for (1) extreme mental anguish, intentional infliction of emotional distress and/or loss of solatium during their Crew Member's prolonged captivity as a hostage and after his release and return home, and (2) economic losses – all caused by North Korea.

5.      Plaintiffs' personal injury claims correspond to underlying federal common law and applicable state law claims of hostage-taking, assault, battery, torture, false imprisonment, intentional infliction of emotional distress, loss of solatium, and/or wrongful death.

## II.    PARTIES

6.      The Plaintiffs identified in Group A in Appendix I to Plaintiffs' *Ex Parte* Motion to Proceed with Their Civil Action Using Pseudonyms and to Seal Personally Identifying Information (hereinafter, "Appendix I"), and the newly-added Plaintiffs identified in Group A in Appendix II to Plaintiffs' *Ex Parte* Motion for Leave to Amend their Complaint with Additional Pseudonymous Plaintiffs and to Seal Their Personally Identifying Information (hereinafter, "Appendix II"), are all surviving Crew Members who were serving aboard the U.S.S. Pueblo on January 23, 1968, when North Korea, acting through its officials, employees, service members, and/or agents, attacked the vessel while it was located in international waters and on a surveillance mission for the U.S. Government.  At that time, all Crew Members were United States nationals and/or members of the U.S. armed forces, or civilian employees of the U.S. Government, as those terms are defined in FSIA § 1605A(a)(2)(A)(ii).  All were acting within the scope of their employment at the time of the attack.

7.      The Plaintiffs identified in Group B of Appendix I, and the newly-added Plaintiffs identified in Group B in Appendix II, were in 1968 immediate family of Crew Members of the U.S.S. Pueblo.  They were, in 1968, all United States nationals within the definition of that term as used in FSIA § 1605A(a)(2)(A)(ii)(I) or are otherwise qualified plaintiffs under § 1605A.

8.      The Plaintiffs identified in Group C in Appendix I and the newly-added Plaintiffs identified in Group C in Appendix II include estates of deceased Crew Members or deceased persons who, in 1968, were immediate family of Crew Members(designated in Appendix I or II

as "Estate of . . ."); they also include surviving Crew Members or immediate family members who are presently unable to make decisions on their own behalf (their representatives are indicated in the "Representative" column of the Appendices as "Next Friend" ).

9.      Defendant North Korea is a foreign state within the meaning of FSIA §§ 1330(a), 1603(a), and 1605A(a).  On November 20, 2017, North Korea was designated a State Sponsor of Terrorism, pursuant to section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act.  *See* U.S. Dep't of State, "State Sponsors of Terrorism," available at https://www.state.gov/j/ct/list/c14151.htm (last accessed Jan. 22, 2018) (demonstrating that the Department of State recognizes the re-designation of North Korea as a State Sponsor of Terrorism as of November 20, 2017).[1]  Shortly before President Trump announced the re-designation, he promoted a forthcoming effort to "downgrade diplomatic relations with North Korea" in part due to acts such as "[North Korea's] capture and torture of the brave American soldiers of the USS Pueblo."  Remarks by President Trump to the National Assembly of the Republic of Korea (Nov. 7, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-assembly-

---

[1] North Korea was first designated a State Sponsor of Terrorism on February 5, 1988.  Notice, Determination Pursuant to § 6(i) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477 (Feb. 5, 1988).  That designation was due in part to North Korea's actions on which Plaintiffs base their claims.  *See Massie v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 74 (D.D.C. 2008) (concluding that North Korea's designation as a State Sponsor of Terrorism was in part based on its acts herein complained).  North Korea was de-designated as a State Sponsor of Terrorism on October 11, 2008, pursuant to an agreement with the United States (that later failed) in which North Korea undertook to decommission its reactor and reprocessing facilities that produced plutonium for nuclear weapons.  *See* Mark E. Manyin, Emma Chanlett-Avery, Dianne Rennack, Ian Rinehart & John Rollins, Cong. Rep. No. R43865, *North Korea: Back on the State Sponsors of Terrorism Lists?* at 4 (2015).  North Korea remained off of the list of State Sponsors of Terrorism until it was re-designated as such on November 20, 2017.

republic-korea-seoul-republic-korea/ (last accessed Jan. 23, 2018).  For these reasons, North

Korea is a state sponsor of terrorism as described in FSIA § 1605A(a)(2)(A)(i).

## III.    JURISDICTION AND VENUE

10.    Subject matter jurisdiction in this action is based on FSIA § 1330(a), which

provides:

> The district courts shall have original jurisdiction without regard to
> amount in controversy of any nonjury civil action against a foreign state
> as defined in section 1603(a) of this title as to any claim for relief in
> personam with respect to which the foreign state is not entitled to
> immunity either under sections 1605–1607 of this title or under any
> applicable international agreement.

11.    North Korea is not entitled to immunity from suit as to Plaintiffs' claims for

money damages under the "Terrorism Exception", FSIA § 1605A(a)(1).  This section provides,

in relevant part, that

> a foreign state shall not be immune from the jurisdiction of courts of the
> United States . . . in any case . . . in which money damages are sought
> against a foreign state for personal injury or death that was caused by an
> act of torture, extrajudicial killing, . . . hostage taking, or the provision of
> material support or resources for such an act.

12.    Accordingly, this Court has subject matter jurisdiction over Plaintiffs' claims

against North Korea pursuant to FSIA §§ 1330(a) and 1605A.

13.    This Court will have personal jurisdiction over North Korea, once service of

process is completed in accordance with FSIA § 1608(a), by virtue of FSIA § 1330(b), which

provides:

> Personal jurisdiction over a foreign state shall exist as to every claim for
> relief over which the district courts have jurisdiction under [§ 1330]
> subsection (a) where service has been made under section 1608 of this
> title.

14.     Venue is proper in this Court under FSIA § 1391(f)(4), which provides in pertinent part that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

## III.    CLAIMS FOR RELIEF

15.     Plaintiffs re-allege paragraphs 1-13.

16.     Plaintiffs bring this action pursuant to FSIA § 1605A(c), or in the alternative, the law of the District of Columbia, which affords them a private right of action for money damages against North Korea, a State Sponsor of Terrorism on the date this action was commenced, for personal injury caused by North Korea's officials, employees, service members, and/or agents who, while acting within the scope of their office, employment, or agency, engaged in hostage taking and torture, and the provision of material support or resources for such acts.  FSIA § 1605A(c) provides, in relevant part, that

> A foreign sovereign that is . . . a state sponsor of terrorism as described in subsection (a)(2)(A)(i) . . . shall be liable to . . . (1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages.  In any such action, damages may include economic damages, solatium, pain and suffering . . . .

17.     North Korea is liable for "hostage taking," defined in FSIA § 1605A(h)(2) as having "the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages."  Specifically, after North Korea and its officers, employees, service members, and/or agents hijacked the U.S.S. Pueblo and kidnapped its crew, it repeatedly threatened to kill or injure them if (1) they did not sign false confessions and (2) the U.S. Government did not sign a North Korea-drafted public apology, which claimed the U.S.S. Pueblo had intruded into North Korea's territory.  Indeed, during the attack, one Crew Member

had been killed and others injured, giving weight and credence to the repeated and numerous threats to kill or injure Crew Members.

18.     North Korea is also liable for "torture," defined in FSIA § 1605A(h)(7) as having "the meaning given those terms in Section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1350.  The North Korea's kidnappers and captors of the U.S.S. Pueblo and its Crew Members committed such torture by intentionally and repeatedly inflicting physical and psychological pain and suffering upon the Plaintiff Crew Members and Plaintiff Family Members.  For example, in sessions lasting from several hours to several days, and occurring repeatedly during their 11-month captivity, Plaintiff Crew Members were forced to sit on the floor with their legs straightened out in front of them and an iron bar secured to the ankles. Arms, straightened and pulled behind, were secured by ropes or straps which had been laced tightly from the armpits to just below the elbows.  The hostages' heads were then pushed down towards their feet, producing not only severe pain but also causing difficulty with respiration and, for many hostages, a feeling of claustrophobia.  If a prisoner failed to respond to questioning, an interrogator would slowly tighten the ropes while standing on the prisoner's back.  This procedure, which cut off the circulation in the arms, resulted in swelling and excruciating pain.  On numerous occasions, the torturers told the Crew Members they were being tortured to punish them for engaging in U.S. military and/or intelligence agency activities, to obtain information from them about those alleged activities, and to coerce them into compliance with North Korea's orders and demands.  North Korea also threatened Crew Members with severe pain and suffering, including threats of death and/or additional torture of other Crew Members, for failure to comply with North Korea's orders and demands.

19.     Plaintiffs seek a judgment from this Court holding North Korea responsible for the heinous acts of hostage taking and torture, and awarding Plaintiffs money damages for the acts of torture, hostage taking, and personal injury (including assault, battery, false imprisonment, intentional infliction of emotional distress, loss of solatium, and wrongful death) committed against the Crew Members and their immediate family members.  Plaintiffs also seek punitive damages for North Korea's heinous acts.

20.     North Korea has been found liable before for, *inter alia*, its capture of the U.S.S. Pueblo and injuries resulting from its hostage-taking and torture of Crew Members.  In *Massie et al. v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008), Judge Henry H. Kennedy awarded damages to three surviving U.S.S. Pueblo Crew Members and the estate of the vessel's commander, Lloyd Bucher, for kidnapping, imprisonment, torture, beating, prolonged detention and hostage taking.  Judge Kennedy also awarded damages to Cmdr. Bucher's wife, Rose Bucher, for losing and being deprived of the services, support, affection, consortium, companionship, and solatium of and with her husband.

21.     Like Rose Bucher, the Family Member Plaintiffs here missed their Crew Member loved ones' presence, physical touch, and loving words while they were in captivity.  In addition, they suffered the mental torment of not knowing whether they would ever see their loved ones again.  Some Family Member Plaintiffs, like Rose Bucher, had to go through all this while also bearing the burden of caring for their immediate families as well as the immediate family members of the Crew Members.  The Family Member Plaintiffs also lost income and suffered other economic losses due to the lingering negative effect of the hostage-taking and torture on the Crew Members' long term earning potential and employability.

A.    **Facts Common to All Claims**

22.    On January 23, 1968, the U.S.S. Pueblo was patrolling international waters off of the Korea peninsula with its 83 member crew, which included U.S. Navy personnel and several civilians.  A surveillance vessel, the ship lacked armored protection and had only limited arms onboard for defense.

23.    Over the course of several hours on that harrowing afternoon, North Korea's military forces approached the Pueblo, eventually surrounding it with an assortment of heavily-armed attack ships and fighter planes.  North Korea's forces threatened the Pueblo:  comply with North Korea's requests to heave to or else they would open fire.

24.    The U.S.S. Pueblo tried to leave the area and avoid confrontation.  Its exit was blocked by North Korean torpedo boats and other armed vessels and aircraft.  The torpedo boats encircled the ship, threatened it with a torpedo attack, and North Korea forces eventually opened fire on the U.S.S. Pueblo multiple times, raking the ship with machine gunfire and pumping 57mm shells into its forward masts, knocking out its antennas and sending shrapnel spraying across the deck.

25.    One of the rounds North Korea fired while attacking the vessel killed Pueblo Fireman Duane Hodges.  Numerous Crew Members witnessed this horrific event and Duane Hodges death.

26.    Armed North Korea's forces eventually boarded the Pueblo, forcing the Crew Members to sit on the freezing deck, blindfolded and bound.  North Korea's forces beat any Crew Member who failed to immediately comply.

27.    The Crew Members were later forcibly removed to the mainland, where North Korea's forces beat them while demanding confessions that they were U.S. spies.  They were then forcibly transported to Pyongyang by train.

28.    Before and during the train journey, they were beaten, spat upon, cursed, and continually mistreated by an assortment of individuals.  The commander of the U.S.S. Pueblo was interrogated multiple times.

29.    Over the course of the next 11 months, North Korea held the surviving Crew Members hostage in North Korea in depraved and unsanitary conditions in numerous locations. The first semi-permanent location was known as the "Barn," where the hostages were continually tortured, beaten, and not permitted to speak to each other under penalty of additional beating.  The second location, on the outskirts of Pyongyang, was known as the "Farm."  The torture and beatings continued there, often to the point of unconsciousness.  Failure to comply with North Korean orders resulted in severe beatings.  North Korea again tried to coerce Crew Members into confessions that they were U.S. spies.  The coercive techniques used included putting a loaded gun to a captive's head and threatening to kill him or putting a gun to the captive's head and pulling the trigger.  (Regarding the latter, only after the gun failed to fire would the hostage learn the gun was unloaded.)

30.    During the captivity, North Korea engaged in a protracted effort to coerce the United States into issuing an apology for the U.S.S. Pueblo's alleged intrusion into North Korea's territorial waters and spying.  To this end, North Korea held at least two staged press conferences with the hostages.  North Korea also coerced the hostages into writing false letters home to family members and others asking the United States to apologize.  The hostages were

10

also forced to be in at least two propaganda films supportive of North Korea. After completing

the films, the hostages feared that they had served their purpose and would be killed.

    31.    In December 1968, North Korea advised the Crew Members that the United

States would be apologizing. The Crew Members were transferred to Panmunjom, North Korea,

in anticipation of repatriation to U.S. custody. Before the repatriation, however, the prisoners

were threatened one last time: they were told that they had to cross the bridge to safety in a

single line, and that if they did or said anything as they crossed the bridge, the hostages still

waiting to cross would be shot.

    32.    In sum, during the Crew Members' nearly year-long captivity, North Korea's

officials, employees, service members, and/or agents regularly subjected the Crew Members to

physical and mental torture, including but not limited to repeated savage beatings, threats of

death, mock executions, sleep deprivation, food deprivation, forced holding of repeated and

prolonged stress positions, and attempted brainwashing. These acts were aimed at, *inter alia*,

obtaining confessions for international propaganda purposes, and to coerce the United States into

making a public apology for spying on North Korea.

    33.    The Defendant's tortious acts described herein have been the proximate cause of

Crew Member Plaintiffs' suffering in numerous ways, including but not limited to one or more

of the following:

- Severe and permanent physical injuries;

- Past and continuing suffering from Post-Traumatic Stress Disorder and/or other
  ongoing mental health problems;

- Past and continued night-terrors and flashbacks;

- Past and continuing disability and disfigurement;

11

- Lost wages, income, and earning potential;

- Unreimbursed medical and other expenses on account of their injuries;

- Past and continued suffering of great pain and agony to their minds and bodies; and/or

- Deprivation of liberty and basic human rights for a period of 11 months.

34.    While the Crew Members were held hostage, their family members were left to wait helplessly for information of their loved ones' plight, often reduced to simply watching the crisis unfold on their television screens from thousands of miles away.  These families experienced continual uncertainty and unrelenting terror that their loved ones would be killed. The stress and trauma of those 11 months continued to torture the Crew Members and their families for many years after the Crew Members were released.  The Defendant's tortious acts described herein have been the proximate cause of Family Member Plaintiffs' suffering in numerous ways, including but not limited to one or more of the following:

- Fear and terror that their Crew Member was already dead or would be killed, tortured, disfigured, or otherwise harmed;

- Past and continued nightmares about their Crew Member or other loved ones' torture and/or death;

- Loss of services, companionship, affection, and loving words from their Crew Member;

- Loss of economic and emotional support from their Crew Member; and/or

- Permanent, negative changes to the relationship they had with the Crew Member prior to the attack.

35.     At all times relevant to the events of this case, North Korea provided material resources and support to those individuals carrying out the acts complained of herein, including funding, training/know-how, physical tools to carry-out the heinous acts, and instruction.

**B.     Torture**

36.     As to each Crew Member identified as a Plaintiff in Group A or Group C of Appendix I or Appendix II, or whose estate is identified as a Plaintiff in Group C, North Korea committed torture, as defined by Section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350, by intentionally inflicting severe pain and suffering that caused physical and psychological injuries to Plaintiffs and Plaintiffs' family members for the purpose of intimidating and coercing them, as well as the United States, into compliance with their demands.

**C.     Assault and Battery**

37.     "According to the Restatement (Second) of Torts, a defendant has committed an assault if 'he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact' and the person is 'thereby put in such imminent apprehension." *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 48 (D.D.C. 2001) (quoting Restatement (Second) of Torts § 21(1) ("Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.")); *id.* (quoting Restatement (Second) of Torts § 15).  On the other hand, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity."  Restatement (Second) of Torts § 19.

38.     Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by, those attacked and . . . 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  *Valore v.*

13

*Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) (alteration in original) (quoting Restatement (Second) of Torts § 13 (Battery: Harmful Contact)); *see also* Restatement (Second) of Torts § 18 (Battery: Offensive Contact).

39.    As to each Crew Member identified as a Plaintiff in Group A or Group C of Appendix I or Appendix II, or whose estate is identified as a Plaintiff in Group C, North Korea's officials, employees, service members, and/or agents intentionally engaged in harmful or offensive direct physical contact or intentionally caused imminent apprehension of such contact. As a result, North Korea assaulted these Plaintiffs within the meaning of Restatement (Second) of Torts § 21, and committed battery on these Plaintiffs within the meaning of Restatement (Second) of Torts §§ 13 and 18, and thus is liable for these acts of assault and battery.

      **D.**      <u>**Intentional Infliction of Emotional Distress and Outrageous, Reckless Conduct Causing Severe Emotional Distress and Pain and Suffering**</u>

40.    North Korea intentionally or recklessly caused severe emotional distress and pain and suffering as to each Crew Member identified as a Plaintiff in Group A or Group C of Appendix I or Appendix II, or whose estate is identified as a Plaintiff in Group C.  Accordingly, North Korea is liable for these acts of intentional or reckless infliction of emotional distress within the meaning of Restatement (Second) of Torts § 46.

41.    As to each member of a Crew Member's immediate family identified as a Plaintiff in Group B or Group C of Appendix I or Appendix II, or whose estate is identified as a Plaintiff in Group C, North Korea engaged in extreme and outrageous conduct to intentionally or recklessly cause severe emotional distress and pain and suffering.  Accordingly, North Korea is liable to those immediate family members and estates for intentional or reckless infliction of emotional distress within the meaning of Restatement (Second) of Torts § 46, the laws of the District of Columbia, or other applicable state law.

42.     The fact that these Family Member Plaintiffs were not on the U.S.S. Pueblo or present in North Korea between January 23 and December 23,1968, does not bar these claims against North Korea.  North Korea's acts of hostage taking, false imprisonment, and torture in this case were sufficiently extreme and outrageous to establish that North Korea intentionally or recklessly inflicted emotional distress on the Crew Members' immediate family wherever they were located.  Indeed, acts of terrorism such as hostage taking and torture are by their very definition extreme and outrageous and are intended to cause the highest degree of emotional distress in their victims, including immediate family members of victims.

### E.     False Imprisonment

43.     "Under general principles of tort law, a plaintiff may recover for false imprisonment when one person '(a) acts intending to confine the other . . . within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'"  *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342-43 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 35).

44.     As to each Crew Member identified as a Plaintiff in Group A or Group C of Appendix I or Appendix II, or whose estate is identified as a Plaintiff in Group C, North Korea intentionally confined him within fixed boundaries on the U.S.S. Pueblo, within North Korea at locations known by the Crew Members as the "Barn" and the "Farm," in or on assorted modes of transport, and at other holding locations.  These Plaintiffs were conscious of their confinement and were physically and psychologically harmed by it.  Accordingly, North Korea is liable for these acts of false imprisonment within the meaning of Restatement (Second) of Torts §  35.

F.   **Loss of Solatium**

45.   Family Member Plaintiffs may recover for loss of solatium for a defendant's intentional infliction of emotional distress where defendant, "'by extreme and outrageous conduct intentionally or recklessly cause[d] [them] severe emotional distress.'" *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39-40 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 46(1)).   "Where the claimants were not the direct recipient of the 'extreme and outrageous conduct,' the Restatement permits recovery if they are members of the Victim's immediate family and "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present." *Id*. at 39 (quoting *Estate of Heiser*, 659 F. Supp. 2d at 27) (internal citations omitted); *see also* Restatement (Second) of Torts § 46, cmt. l (Am. Law Inst. 1977) (leaving "open the possibility of situations in which presence at the time may not be required").

46.   In *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002), this Court recognized a cause of action for loss of solatium under the federal common law, stating: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."   All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress in the victims and their immediate family members.

47.   North Korea's extreme and outrageous abuse and mistreatment of the Crew Members was intended, or may be deemed to have been intended, to inflict severe emotional harm to the Crew Members' immediate family.   Accordingly, North Korea is liable pursuant to § 1605A(c) or, in the alternative, applicable state law, for solatium damages to each immediate

16

family member identified as a Plaintiff in Group B or Group C in Appendix I or Appendix II or whose estate is identified as a Plaintiff in Group C.

### G.   Wrongful Death

48.     A wrongful death cause of action requires a wrongful act (or negligence) that causes another person's death. *See Thuneibat*, 167 F. Supp. 3d at 39 ("Victims may recover for their wrongful deaths if they can establish the defendants caused their deaths.") (quoting Restatement (Second) of Torts § 925); *see also Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999) (a wrongful death action under CA Code Civ. Proc. § 377.60).

49.     Plaintiff C-17 is entitled to damages for wrongful death because North Korea's actions were the proximate cause of decedent's death. ███████████████████████

███████████████████████████████████████████

### H.   Claims by Estates of Crew Members or Their Immediate Family Members and Claims Made Through a Next Friend

50.     Plaintiffs listed in Group C of Appendix I or Appendix II include estates of deceased Crew Members and estates of deceased immediate family members of Crew Members, as well as Plaintiffs who are presently unable to make decisions on their own behalf and are assisted by someone acting as a Next Friend.

51.     Each estate is represented by someone, also listed in Group C of Appendix I or Appendix II, who has been duly appointed for that purpose by a competent court with jurisdiction over the estate of the decedent. Under FSIA § 1605A, federal common law and the state law of the respective domicile of each of the deceased Crew Members and deceased immediate family members immediately prior to their deaths, the claims by estates constitute valid survival actions against North Korea for the acts of assault, battery, false imprisonment, intentional infliction of emotional distress, loss of solatium, and/or wrongful death, as alleged

17

above.  Accordingly, North Korea is liable to the Plaintiffs identified in Group C of Appendix I or Appendix II as Crew Member estates for acts of assault, battery, false imprisonment, intentional infliction of emotional distress, and/or wrongful death, committed against those Crew Members.  Similarly, North Korea is liable to the estate Plaintiffs listed in Group C of Appendix I or Appendix II who are acting through a personal representative, executor, or administrator of the estate of immediate family members of Crew Members, for solatium damages and/or intentional or reckless infliction of emotional distress suffered by the decedent's immediate family members.

52.    As to any Plaintiffs identified in Group C as Crew Members being represented at this time by a Next Friend, North Korea is liable for the acts of assault, battery, false imprisonment, and intentional infliction of emotional distress, as alleged above.

53.    As to any Plaintiffs identified in Group C as Family Members being represented at this time by a Next Friend, North Korea is liable for solatium damages and intentional or reckless infliction of emotional distress.

54.    All of the acts complained of herein as causing the injuries and damages suffered by the Crew Members and their immediate family are acts by or attributable to North Korea and its officers, employees, and/or agents operating under the color of authority of the Government of North Korea.  There is thus a reasonable and sufficient connection between the acts of North Korea complained of herein and the injuries and damages suffered by Plaintiffs.  Indeed, North Korea's acts were the proximate cause of those injuries and damages.

I.    **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

18

55.    A speedy and final resolution of the claims of these victims of state-sponsored terrorism, many of whom are of an advanced age; and

56.    A Judgment against North Korea holding North Korea liable for the acts complained of herein; and

57.    A Judgment against North Korea for money damages, including but not limited to economic, solatium, and pain and suffering damages, in an amount to be determined based on evidence to be adduced in accordance with a schedule to be set by the Court, for money damages of not less than $1.1 billion ($1,100,000,000), plus punitive damages and pre-judgment and post-judgment interest in the amount the Court may determine to be just.


DATED:  March 6, 2018                    Respectfully submitted,



By: _____
       Mark N. Bravin (D.C. Bar No. 249433)
       Alexandra A.K. Meise (D.C. Bar No. 977173)
       MITCHELL SILBERBERG & KNUPP LLP
       1818 N Street NW, 8th Floor
       Washington DC, 20036
       (202) 355-7909 (Telephone)
       (202) 355-7886 (Facsimile)
       mnb@msk.com

       *Attorneys for Plaintiffs*

19