## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE A-1, *et al.*,

       Plaintiffs,

  v.

DEMOCRATIC PEOPLE'S REPUBLIC OF
KOREA Ministry of Foreign Affairs
Jungsong-Dong, Central District,
Pyongyang, Democratic People's Republic Of
Korea,

       Defendant.

CASE NO. 1:18-CV-00252-DLF

## PLAINTIFFS' MOTION FOR PARTIAL DEFAULT JUDGMENT ON LIABILITY UNDER 28 U.S.C. § 1608(e) AND MEMORANDUM IN SUPPORT THEREOF

Alexandra A.K. Meise (DC Bar No. 977173)
Mark N. Bravin (DC Bar No. 249433)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, 7th Floor
Washington, DC 20036
(202) 517-6636
akm@msk.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

I.    INTRODUCTION........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 5
      A.    North Korea Forcibly Seized the U.S.S. Pueblo's Crew and Captured the
            Survivors ......................................................................................................... 5
            1.    North Korea Engaged in an Armed Attack against the U.S.S.
                  Pueblo Without Provocation ............................................................... 5
            2.    One Crew Member Was Killed and Others Were Seriously
                  Injured ................................................................................................. 9
            3.    The North Korean Military Boarded the Pueblo and Took the
                  Surviving Crew Members Hostage .................................................... 10
      B.    North Korea Labeled the Crew Members "Spies" and Criminals, and
            Held Them Hostage for the Next Eleven Months while Demanding that
            the United States Apologize for Its Alleged "Crimes" .................................... 13
            1.    Abuse at the Barn ............................................................................... 13
            2.    Abuse at the Farm ............................................................................... 15
            3.    At the Barn and Farm, the North Koreans Subjected All Crew
                  Members to Inhumane Treatment and Unsanitary Conditions ......... 16
            4.    North Korea Deprived Crew Members of Basic Medical Attention .. 18
            5.    Hell Week ........................................................................................... 19
      C.    North Korea Used the Crew for International Political Ends ......................... 20
      D.    Negotiations Between North Korea and the United States Were Stymied
            by North Korea's Un-wavering Demand for an Apology .............................. 24
      E.    The Crew Members Were Finally Released Once North Korea Received
            the "Apology" It Had Demanded .................................................................. 25
      F.    Family Members Went Through Eleven Months of Mental Anguish ........... 27

III.  THIS COURT HAS PERSONAL JURISDICTION OVER NORTH KOREA ....... 28

IV.   VENUE IN THIS COURT IS PROPER ................................................................... 30

V.    APPLICABLE LEGAL STANDARDS ................................................................... 30
      A.    This Court Has the Authority to Enter a Default Judgment on Liability
            Against North Korea ....................................................................................... 30
      B.    This Court Should Credit Plaintiffs' Uncontroverted Evidence and Take
            Judicial Notice of the Court's Findings in *Massie* and Records in
            *Warmbier* ........................................................................................................ 31
            1.    Crediting Plaintiffs' Uncontroverted Evidence .................................. 31
            2.    The Court Should Take Judicial Notice of Judge Kennedy's
                  Findings of Fact in *Massie* and the Evidence in *Warmbier* ............. 33

VI.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER
      PLAINTIFFS' CLAIMS AGAINST NORTH KOREA ............................................ 35

     **A.**     **North Korea Was Designated a State Sponsor of Terrorism as a Result of the Hostage Taking, Torture, and Extrajudicial Killing of U.S.S. Pueblo Crew Members** ...................................................... 36

     **B.**     **Plaintiffs Have Standing to Assert a Private Right of Action Against North Korea for Compensatory Damages Under FSIA § 1605A(a) and § 1605A(c)** ............................................................................ 37

     **C.**     **Plaintiffs Seek Money Damages for Personal Injury Caused by North Korea's Acts of Hostage Taking, Torture, and /or Extrajudicial Killing** ...... 46

          **1.**     **North Korea Engaged in Torture** ........................................................ 46

          **2.**     **North Korea Engaged in Hostage Taking** .............................. 51

          **3.**     **North Korea Engaged in Extrajudicial Killing** .................................... 53

**VII.**     **NORTH KOREA IS LIABLE TO PLAINTIFFS UNDER FSIA § 1605A(c) AND RECOGNIZED TORT THEORIES FOR ASSAULT, BATTERY, FALSE IMPRISONMENT, EMOTIONAL DISTRESS AND/OR SOLATIUM** .................. 56

     **A.**     **Applicable Standard** .............................................................. 56

     **B.**     **Plaintiffs' Theories of Tort Recovery** .......................................... 57

          **1.**     **Crew Members Have Established Their Assault Claims** ................... 57

          **2.**     **Crew Members Have Established Their Battery Claims** .................... 58

          **3.**     **The Pueblo Crew Members Have Established Their False Imprisonment Claims** ................................................................ 60

          **4.**     **The Pueblo Crew Members Have Established Their Emotional Distress Claims** ..................................................................... 61

          **5.**     **Family Member Plaintiffs Have Established Their Emotional Distress and/or Solatium Claims** .............................................. 63

          **6.**     **Applicable Plaintiffs Have Established Their Wrongful Death Claim** .......................................................................... 66

**VIII.**     **CONCLUSION** ............................................................................ 68

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abur v. Republic of Sudan*,
  437 F. Supp. 2d 166 (D.D.C. 2006) ..................................................................29

*Adams Fruit Co. v. Barrett*,
  494 U.S. 638 (1990), *superseded by statute as recognized in Ruiz v. Cabrera*,
  98 Cal. App. 4th 1198 (2002) ..........................................................................45

*Anderson v. Islamic Republic of Iran*,
  90 F. Supp. 2d 107 (D.D.C. 2000) ....................................................................64

*Balt. & O. R. Co. v. Joy*,
  173 U.S. 226 (1899)..........................................................................................43

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
  734 F.3d 1175 (D.C. Cir. 2013) ..................................................................30, 31

*Bfp v. Resolution Tr. Corp.*,
  511 U.S. 531 (1994)..........................................................................................45

*Blais v. Islamic Republic of Iran*,
  459 F. Supp. 2d 40 (D.D.C. 2006) ....................................................................55

*Bodoff v. Islamic Republic of Iran*,
  424 F. Supp. 2d 74 (D.D.C. 2006) ....................................................................33

*Braun v. Islamic Republic of Iran*,
  228 F. Supp. 3d 77 (D.D.C. 2017) ...............................................................53, 66

*Brewer v. Islamic Republic of Iran*,
  664 F. Supp. 2d 43 (D.D.C. 2009) ...............................................................33, 34

*C.f. Kercado-Melendez v. Aponte-Roque*,
  829 F.2d 255 (1st Cir. 1987) ............................................................................53

*Colvin v. Syrian Arab Republic*,
  No. CV 16-1423 (ABJ), 2019 WL 416462 (D.D.C. Feb. 1, 2019).........................66

*Commercial Bank of Kuwait v. Rafidain Bank*,
  15 F.3d 238 (2d Cir. 1994)................................................................................32

*Eisenfeld v. Islamic Republic of Iran*,
  172 F. Supp. 2d 1 (D.D.C. 2000) ......................................................................66

*Elahi v. Islamic Republic of Iran,*
   124 F. Supp. 2d 97 (D.D.C. 2000) ......................................................................65

*Estate of Doe v. Islamic Republic of Iran,*
   808 F. Supp. 2d. 1 .............................................................................39, 40, 41

*Estate of Heiser v. Islamic Republic of Iran,*
   466 F. Supp. 2d 229 (D.D.C. 2006) ("*Heiser I*") ..................................................55

*Estate of Heiser v. Islamic Republic of Iran,*
   659 F. Supp. 2d 20 (D.D.C. 2009) ("*Heiser II*") .............................................61, 63

*Estate of Hirshfeld v. Islamic Republic of Iran,*
   330 F. Supp. 3d 107 (D.D.C. 2018) ....................................................................66

*Flanagan v. Islamic Rep. of Iran,*
   190 F. Supp. 3d 138 (D.D.C. 2016) ...............................................................40, 54

*Gates v. Syrian Arab Republic,*
   646 F.3d 1 (D.C. Cir. 2011) ...............................................................................29

*Gillard v. Culclager,*
   No. 5:14CV00216 JM/JTR,
   2014 WL 11516259 (E.D. Ark. Aug. 14, 2014) ..................................................53

*Han Kim v. Democratic People's Republic of Korea,*
   774 F.3d 1044 (D.C. Cir. 2014) .........................................................................52

*Hannabury v. Hilton Grand Vacations Co.,*
   174 F. Supp. 3d 768 (W.D.N.Y. 2016) ...............................................................44

*Higgins v. The Islamic Republic of Iran,*
   No. 1:99-cv-00377, 2000 WL 33674311 ..............................................................65

*In re Islamic Republic of Iran Terrorism Litigation,*
   659 F. Supp. 2d 31 (D.D.C. 2009) .....................................................................45

*Jankovic v. Intl Crisis Group,*
   494 F .3d 1080, 1088 (D.C. Cir. 2007) ...............................................................34

*Jerome v. United States,*
   318 U.S. 101 (1943).........................................................................................44

*Kilburn v. Islamic Republic of Iran,*
   699 F. Supp. 2d 136 (D.D.C. 2010) ...................................................................50

*Leibovitch v. Islamic Rep. of Iran,*
   697 F.3d 561 (7th Cir. 2012) .............................................................................40

*Mallick v. Int'l Bhd. of Elec. Workers,*
    814 F.2d 674 (1987)..................................................................................................43

*Massie v. Democratic People's Republic of Korea,*
    592 F. Supp. 2d 57 (D.D.C. 2008) ............................................................... *passim*

*Miss. Band of Choctaw Indians v. Holyfield,*
    490 U.S. 30 (1989).....................................................................................................44

*Murphy v. Household Fin. Corp.,*
    560 F.2d 206 (6th Cir. 1977) ....................................................................................44

*Murphy v. Islamic Republic of Iran,*
    740 F. Supp. 2d 51 (D.D.C. 2010) ...........................................................................66

*Owens v. Republic of Sudan,*
    174 F. Supp. 3d 242 (D.D.C. 2016),
    *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) ......................................................................33

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017)........................................2, 30, 31, 32, 33, 35, 52, 55

*Perez v. Campbell,*
    402 U.S. 637 (1971)...................................................................................................45

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    274 F. Supp. 2d 20 (D.D.C. 2003),
    *aff'd*, 389 F.3d 192 (D.C. Cir. 2004) ......................................................................50

*Regier v. Islamic Republic of Iran,*
    281 F. Supp. 2d 87 (D.D.C. 2003)............................................................................50

*Roth v. Islamic Republic of Iran,*
    78 F. Supp. 3d 379 (D.D.C. 2015)............................................................................32

*Salazar v. Islamic Republic of Iran,*
    370 F. Supp. 2d 105 (D.D.C. 2005)..........................................................................62

*Simon v. Republic of Hungary,*
    812 F.3d 127 (D.C. Cir. 2016)..................................................................................31

*Simpson ex. rel. Estate of Karim v. Socialist People's Libyan Arab Jamahiriya,*
    470 F.3d 356 (D.C. Cir. 2006)..................................................................................52

*Simpson v. Socialist People's Libyan Aram Jamahiriya,*
    326 F.3d 230 (D.C. Cir. 2003)..................................................................................29

*Sinito v. United States DOJ*,
    176 F.3d 512 (1999).............................................................................43, 44

*Smith v. No. 2 Galesburg Crown Fin. Corp.*,
    615 F.2d 407 (7th Cir. 1980) ...............................................................43

*Stansell v. Republic of Cuba*,
    217 F. Supp. 3d 320 (D.D.C. 2016) ...........................57, 58, 59, 60, 62, 63

*Stethem v. Iran*,
    201 F. Supp. 2d 78 (D.D.C. 2002) ......................................................57, 61

*Thuneibat v. Syrian Arab Republic*,
    167 F. Supp. 3d 22 ...........................................................................40, 53, 63

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) ..............................................................28

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ......................................34, 40, 49, 65

*Warmbier v. Democratic People's Republic of Korea*,
    No. CV 18-977 (BAH),
    2018 WL 6735801 (D.D.C. Dec. 24, 2018)................................. *passim*

*Wolff v. McDonnell*,
    418 U.S. 539 (1974).............................................................................53

*Worley v. Islamic Republic of Iran*,
    75 F. Supp. 3d 311 (D.D.C. 2014) (Lamberth, J.) ...............42, 55, 56, 57

## STATUTES

28 U.S.C.
    § 1330(b) ................................................................................................28, 30
    § 1350, Sec. 3.........................................................................46, 48, 50, 52
    § 1391(f)(4)............................................................................................28
    §§ 1602, *et seq*. Foreign Soverign Immunity Act ("FSIA") .....................2
    § 1605(a)(7) ..........................................................................................34, 45
    § 1605A .......................................................................................... *passim*
    § 1605A(h)...............................................................................2, 46, 51, 52
    § 1608(a) ...............................................................................................28, 29
    § 1608(d)................................................................................................30
    § 1608(e) ...............................................................................30,31, 32, 34

**OTHER AUTHORITIES**

Fed. R. Civ. P.
   4(j)(1) ................................................................................................................................28
   55(b)(2) .............................................................................................................................30

Fed. R. Evid.
   201(b) ...............................................................................................................................33

I.      **INTRODUCTION**

For eleven months in 1968, eighty-two men were held hostage in North Korea, living in daily fear of being tortured, shot, or executed as alleged spies of the United States.  Guilty of no more than lawfully serving their country aboard the U.S.S. Pueblo, they became political pawns in an intercontinental game of geopolitics set against the backdrop of the Cold War, the Tet Offensive, and stewing tensions between North and South Korea in the wake of North Korea's attempted assassination of South Korea's leader. This case is about getting justice for the five decades of pain and suffering Pueblo Crew Members and their families have endured due to North Korea's savage terrorist acts.

This motion presents clear and compelling evidence that North Korea should be found liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA") for harm caused by its unprovoked attack on and seizure of the U.S.S. Pueblo, holding the Pueblo's crew hostage, torturing them, and committing related heinous acts.

The Plaintiffs in this lawsuit are U.S. citizens who were (1) Crew Members on the U.S.S. Pueblo when North Korea attacked it on January 23, 1968 ("Crew Member Plaintiffs"); or (2) Family Members of Crew Members ("Family Member Plaintiffs").[1]  Plaintiffs seek to hold North Korea liable for acts of assault, battery, false imprisonment, intentional infliction of emotional distress, solatium, and/or wrongful death as a result of North Korea's terrorist acts upon the Pueblo and its crew.  Notably, this Court previously held North Korea liable to three Crew Members, the estate of Commander Lloyd M. "Pete" Bucher (who was the Commanding Officer of the U.S.S. Pueblo), and his wife, Rose Bucher, for personal injury resulting from the

---

[1] Both of these groups also include personal representatives of the estates of deceased Crew Members and deceased Family Members.  All of these "Estate Plaintiffs" are identified in Exhibit 3.

Pueblo incident and the harm North Korea's actions caused those plaintiffs, and awarded those plaintiffs substantial compensatory damages. *See Massie v. Democratic People's Republic of Korea*, 592 F. Supp. 2d 57 (D.D.C. 2008).[2]  Plaintiffs here  seek a partial default judgment on liability against North Korea, which has failed to appear and defend against Plaintiffs' claims, despite having properly served.

The terrorism exception to a foreign state's jurisdictional immunity,[3] 28 U.S.C. § 1605A(a)(1), provides this Court with personal jurisdiction over North Korea[4] and subject matter jurisdiction over Plaintiffs' claims.[5]  *See* FSIA § 1605A(a)(1).  That statute also provides a private cause of action against a foreign state that is a State Sponsor of Terrorism for U.S. citizens and certain others who are victims of acts of State Sponsored Terrorism – such as holding the Pueblo's crew hostage – to recover damages for acts of torture, hostage taking, and extrajudicial killing.  FSIA § 1605A(c).  Accordingly, this Court has the authority to hold North Korea liable for the personal injuries Plaintiffs have suffered as a direct result of North Korea's acts.

---

[2] For the Court's convenience, Judge Kennedy's default judgment and findings of fact and conclusions of law in *Massie* is attached here at Exhibit 4.  Judge Kennedy ultimately issued the judgment in favor of the *Massie* plaintiffs for all claims asserted.  *Massie*, 592 F. Supp. 2d at 74.  As discussed *infra* in Section V.B., this Court may take judicial notice of the factual findings made in, *inter alia*, *Massie*.

[3] FSIA § 1605A(a)(1) provides as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

[4] This Court's personal jurisdiction over North Korea is discussed *infra* in Section III.

[5] This Court's subject matter jurisdiction over North Korea is discussed *infra* in Section IV.

In Section II (Statements of Facts) immediately below, we discuss the essential supporting facts that establish the Court's jurisdiction over Plaintiffs' claims against North Korea and its authority to enter partial default judgment against North Korea on its liability to Plaintiffs.[6]  As discussed in Section V.A., it is well accepted that district courts may render default judgments against State Sponsors of Terrorism based solely on plaintiffs' affidavits and other written evidence.  Plaintiffs here provide more than enough evidence to prevail on their claims under the standards of this Circuit, *see Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), applicable to assessing evidence in FSIA terrorism cases against foreign sovereigns who have failed to appear.

The Court's task of evaluating Plaintiffs claims to decide this Motion is made easier by its authority to take judicial notice of the Court's prior findings in *Massie v. Government of the Democratic People's Republic of Korea*, 592 F.Supp.2d 57 (D.D.C. 2008) and evidence from *Warmbier v. Democratic People's Republic of Korea*, No. CV 18-977 (BAH), 2018 WL 6735801 (D.D.C. Dec. 24, 2018).[7]  But Plaintiffs do not rely upon the court's findings in *Massie* alone.  In support of this Motion, Plaintiff's also submit extensive evidence, including the U.S. Navy's Report on the Pueblo produced from the Naval Court of Inquiry proceeding conducted in 1969 (Exhibit 12); the National Security Agency's Report titled, "The Capture of the USS Pueblo

---

[6] Plaintiffs present a detailed Statement of Facts to assist the Court in making use efficiently of the relevant facts contained in over 160 declarations and other written evidence submitted herewith.  If the Court would find it helpful, Plaintiffs can also prepare "Proposed Findings of Facts and Law" for the Court's consideration.

[7] The *Warmbier* case arises out of the torture, hostage taking, and extrajudicial killing of college student Otto Warmbier.  Although the events leading to Warmbier's imprisonment and death differ from those of Plaintiffs, the evidence presented there by North Korea experts on North Korea's documented history of torturing those kept in captivity, poor medical care, and using U.S. citizens as hostages for North Korea's political gains, is directly relevant to Plaintiffs' torture and hostage-taking claims.  Indeed, the Pueblo incident was noted expressly in both expert testimony and in the court's ruling as exemplative of North Korea's pattern of conduct.

(Exhibit 7); selected other relevant documentation produced by the U.S. Government (Exhibits 5, 6, 11, 19); selected media reports and academic writings related to the Pueblo incident (Exhibits 8, 16, 21, 32); over 160 affirmed sworn declarations in support of each of Plaintiffs' claims and supporting exhibits thereto (Exhibits 1 and 2)[8]; transcripts of recent expert testimony before this Court on North Korea's history of torture and hostage-taking presented in *Warmbier* ("*Warmbier* Transcript"); and Chief Judge Howell's Default Judgment Order and Opinion rendered in the same proceeding (Exhibits 29 and 30).[9]

---

[8] Volumes 1-10 of John Doe Exhibit 1 include declarations supporting Plaintiffs standing and grounds for liability.  Volumes 1-2 of John Doe Exhibit 2 include second declarations from four Crew Members with much more detail about their experiences and impact of North Korea's acts on their lives.  Notably, when faced with a similarly large volume of plaintiff declarations evidencing tort theories of recovery for assault, battery, and the intentional infliction of emotional distress, the court in *Worley*, 75 F. Supp. 3d 311, held that it was not necessary for all plaintiffs to show at the liability stage that they each had established all of the elements of each claimed tort theory.  *Worley*, 75 F. Supp. 3d at 336-337.  Instead, the court found that as long as at least one plaintiff had established the relevant elements for recovery for each claim, the plaintiffs' motion for default judgment on liability should be granted with instructions to that case's special master to satisfy himself that all plaintiffs had established valid theories of recovery.  *Id.* at 336 ("Uncontroverted affidavit evidence does . . . establish that at least one plaintiff was put in imminent apprehension of harmful contact and did suffer such harmful contact as a result of the bombing . . .  The Court concludes that, on the basis of this affidavit, plaintiffs have established a valid theory of recovery on their assault and battery claims.  To the extent any plaintiffs alleging assault or battery are unable to present proof of their injuries to the special master, their claims shall be dismissed."); *id.* at 337 ("At least one plaintiff has established by uncontroverted affidavit evidence that he suffered emotional distress . . . .  This is sufficient to show that plaintiffs have a valid theory of recovery against defendants as to IIED.").  Similarly, Judge Jackson in *Stethem* held that because he had found that "plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendants[,]" the Court need not "belabor the issue of liability by addressing the independent elements of each separate tort claim advanced by [each of] the plaintiffs."  *Stethem*, 201 F. Supp. 2d at 91 n.20.  Plaintiffs submit that this court should follow this approach in adjudicating the claims of the 172 Plaintiffs in this case.

[9] All of Plaintiffs' Exhibits cited herein are attached to the Declaration of Alexandra A.K. Meise in support of this Motion.  Thus, the "John Doe Exhibits" to the Meise Decl. are cited herein simply as "Exhibits."

## II.     STATEMENT OF FACTS

### A.     North Korea Forcibly Seized the U.S.S. Pueblo's Crew and Captured the Survivors

#### 1.     North Korea Engaged in an Armed Attack against the U.S.S. Pueblo Without Provocation

On January 23, 1968, the U.S.S. Pueblo (commissioned as AGER-2[10]), a U.S. naval surveillance ship,[11] was conducting an intelligence surveillance patrol mission in international waters in the Sea of Japan, approximately 15 miles off the nearest North Korean island of Ung-do, and 25 miles from Wonson, North Korea, on the mainland.  Ex. 5 at 1658 (Report of Special Committee on the USS Pueblo, H.R. REP. No. 91-12 (1969)); *Massie v. Democratic People's Rep. of Korea,* 592 F. Supp. 2d 57, 61 (D.D.C. 2008) (Default Judgment Order and Opinion attached as Exhibit 4); Ex. 12 at 121 (Report of the Court of Inquiry); Ex. 8 at 1 (Spaulding R., *The Pueblo Incident:  Follow-Up Survey*).  The ship carried 83 Crew Members aboard, including U.S. Navy sailors, U.S. Marines, and two civilian oceanographers.[12]  Ex. 10 (USS NSA U.S.S. Pueblo Release Summary, November 20, 2012) (listing Pueblo crew); *see also* Ex. 1 Vol. 1 at 221; Ex. 1, Vol. 3 at 237; Ex. 5 at 1647; *see also Massie,* 592 F. Supp. 2d at 61.  Sixty-one of these Crew Members are Plaintiffs in this case.[13]

The Pueblo's mission was a non-combat one: in addition to conducting geological and hydrological tests, some Crew Members were collecting information about Soviet allied naval

---

[10] An AGER is an intelligence collector that is configured to collect intelligence (SIGINT) comprised of information derived from foreign non-communications electromagnetic radiations (ELINT) and information derived from foreign communications by other than the intended recipients (COMINT).  *See* Ex. 5

[11] *See* Ex. 11 at 2, showing a schematic of the USS Pueblo (source:  NSA Report on Cryptologic - Cryptographic Damage Assessment of USS Pueblo, (1968)).

[12] *See* Ex. 9 (*The Lawton Constitution*, "Pentagon Releases Names of Crewmen," Jan. 25, 1968).

[13] Forty-eight of those Crew Members are living, and thirteen others are deceased, in which instance their estates have joined this lawsuit.

and military operations off the Korean coast, including North Korean and Soviet ship movements.  *See* Ex. 1, Vol. 2 at 85; Ex. 1, Vol. 1 at 2, 66; *see also*, Ex. 12 at 94-96.  Others were "'to search for and record any signals emanating from' [North Korea]."  Ex. 27 at 459, Wolff Heintschel von Heinegg, "*The Difficulties of Conflict Classification at Sea: Distinguishing Incidents at Sea from Hostilities*," Int'l Review of the Red Cross, Vol. 98 No. 902 (Aug. 2016).  The ship's orders were clear: "stay at least 13 nautical miles from North Korea and its offshore islands, which meant at least a mile outside North Korea's territorial waters." Ex. 1, Vol. 2 at 85; Ex. 12 at 36.

   As a surveillance vessel tasked with peacefully operating in international waters, the Pueblo was not designed for combat.[14]  It was equipped with only minimal arms:  .50 caliber machine guns, ten browning semi-automatic rifles, and a handful of .45 caliber handguns, *Massie*, 592 F. Supp. 2d at 61; *see also* Ex. 7 at 30 (The Capture of the USS Pueblo and Its Effect on SIGINT Operations), *see also* Ex. 12 at 113-115 (describing armament on the ship), which reflected its orders to stay in international waters, not "interfere" with the enemy, and only fire if the "threat to survival was obvious[,]" Ex. 5 at 1644.  Furthermore, the Pueblo was ordered to "keep [] weapons covered" to avoid any possible provocation.  Ex. 1, Vol. 2 at 85; *see* Ex. 5 at 1644; Ex. 12 at 114-115 ("weapons carried aboard for defensive purposes, not to be exhibited or displayed in such manner that intentions of use could be misinterpreted").

   About noon local time on January 23, 1968, when the Pueblo was sitting dead on the high sea, a vessel identified as a North Korean SO-l class submarine chaser ("subchaser") quickly

---

[14] In March 1969, Navy Admiral Thomas Moorer, Chief of Naval Operations, testified before Congress that the "Pueblo was not nor could she be considered a combatant ship."  Ex. 6 at 637-638 (Hearings on H.R. 91-12 Before the Spec. Subcomm. On U.S.S. Pueblo of the H. Comm. On Armed Forces (1969)) (Statement of Adm. Thomas Moorer, Chief of Naval Operations).

approached the Pueblo, circled it two times, and then hoisted a flag signal querying the Pueblo's

nationality.  Ex. 7 at 54-55; Ex. 12 at 122; *Massie*, 592 F. Supp. 2d at 61; *see also* Ex. 2, Vol. 1

at 9.  The Pueblo immediately responded by hoisting the American colors and displaying flag

signals indicating it was on an oceanographic research mission.  Ex. 7 at 54-55; Ex. 12 at 122;

*Massie*, 592 F. Supp. 2d at 61.  The subchaser circled the Pueblo for a third time.  Ex. 7 at 54-55;

Ex. 12 at 123.  In the meantime, three North Korean torpedo boats raced towards the Pueblo, and

two North Korean MiGs flew past the ship.  Ex. 7 at 54-55; Ex. 12 at 123; *Massie*, 592 F. Supp.

2d at 61; *see also* Ex. 2, Vol. 1 at 10.  On its third swing, the subchaser unexpectedly hoisted a

new signal: "Heave to or I will open fire on you."  Ex. 12 at 123; *Massie*, 592 F. Supp. 2d at 61;

Ex. 1, Vol. 5 at 90.  The Pueblo crew verified its location and signaled in return that "the North

Koreans were interfering with the Pueblo's free passage of international waters."[15]  Ex. 12 at

123; *Massie*, 592 F. Supp. 2d at 61; Ex. 7 at 59; *see also* Ex. 5 at 1666.  However, the North

Korean vessels continued circling ever closer to the Pueblo.  Ex. 7 at 60.  Shortly thereafter, the

subchaser hoisted new flags:  "Follow in my wake. I have a pilot aboard."  Simultaneously, one

of the North Korean boats came alongside the Pueblo's starboard quarter with armed men

positioned and ready to board the Pueblo.  Ex. 7 at 59; Ex. 12 at 123-24; *Massie*, 592 F. Supp. 2d

at 61.

---

[15] The Report of the Special Commission on the USS Pueblo indicates that, after multiple
inquiries, the data, obtained from classified sources, eliminated any possible doubt that the
Pueblo was outside North Korea's claimed twelve-nautical mile territorial waters.  Ex. 5 at 1661.
*See also* Ex. 27 at 449, n.52.  The monograph "The Capture of the USS Pueblo and Its Effect on
SIGINT Operations," produced by the  National Security Agency, also reveals that North
Korea's forces knew that the American vessel was operating in international waters and were
initially reluctant to board the ship because "the distance was great," and therefore forced the
Pueblo "to get closer to North Korean territorial waters as much as possible before going aboard
the Pueblo."  Ex. 7 at 60; Ex. 5 at 1661; *see also* Ex. 28 (Jan. 26, 1968 NSA Press Release to
DIRNSA).

Realizing that the North Koreans intended to board the American vessel, the Pueblo tried to avoid confrontation and leave the area by maneuvering the ship towards the open sea.  Ex. 7 at 61; Ex. 12 at 124; *Massie*, 592 F. Supp. 2d at 61.  However, as soon as the Pueblo began picking up speed, the torpedo boats crisscrossed in front of the ship, cutting as close as a few hundred yards and aiming their machine guns and torpedo tubes in the Pueblo's direction.  Ex. 7 at 60-61; Ex. 12 at 124-125; *Massie*, 592 F. Supp. 2d at 61.

Trying to buy time to deescalate the situation and destroy classified documents, the Pueblo proceeded at full speed towards the open sea rather than accede to the subchaser's demand to follow it.  Ex. 7 at 60-61.  But instead the North Korean torpedo boats forced the Pueblo further and further away from open sea, pinning it in.  Their tight formation left only a 300-yard space around the ship.[16]  *Id*. at 60-61.  This left the Pueblo without a clear path to the open sea.  *Massie*, 592 F. Supp. 2d at 61-62.

Although the Pueblo tried to forestall North Koreans from boarding, the subchaser that had first called the Pueblo to "heave to" unleashed its 57mm weapons upon the Pueblo.  Ex. 12 at 125; *Massie*, 592 F. Supp. 2d at 61-62; Ex. 2, Vol. 1 at 5.  Almost simultaneously, North Korean torpedo boats raked the Pueblo with machine gunfire, striking the Pueblo's forward mast, knocking out its antennas, and sending shrapnel across the deck.  Ex. 7 at 63; Ex. 12 at 125; *see also Massie*, 592 F. Supp. 2d at 62.  The Pueblo made no attempt to return fire.  Ex. 7 at 63.  At that moment, its two largest guns were on the open deck and under frozen tarps.  Anyone who tried to get to them would have had to cross an open deck without any cover, and there is no reason to believe that anyone could have successfully uncovered the gun, loaded it, and returned

---

[16] For a drawing showing the positions of the North Korean naval vessels and the Pueblo during the attack and seizure on January 23, 1968, *see* Exhibit 7 at 62.

accurate fire.[17]  The subchaser opened fire again and pumped additional shells into the Pueblo, producing another dangerous shower of shrapnel.  Ex. 7 at 63.  Recognizing that there was no escape, the Pueblo came to a full stop.  *Id.*

The subchaser signaled again:  "Follow in my wake.  I have pilot aboard."  In response, the Pueblo moved briefly, then stopped again.  The North Koreans' next reaction was swift and deadly.  *See Massie*, 592 F. Supp. 2d at 62.  Almost immediately, the subchaser fired two more salvos of 57mm shells.  *See Massie*, 592 F. Supp. 2d at 62; Ex. 7 at 67.

## 2.     One Crew Member Was Killed and Others Were Seriously Injured

One of the subchaser's shells exploded in the passageway outside the ship's wardroom, virtually severing the right leg of Fireman Duane Hodges at the thigh and seriously wounding another Fireman.  Ex. 1, Vol. 1 at 26, 43, 170, 122; Ex. 1, Vol. 3 at 216 (identifying Hodges's injuries from the shelling), and Ex. 2, Vol. 2 at 3 (describing his severe injuries resulting from the shelling); *see also* Ex. 7 at 67; Ex. 12 at 127; *Massie*, 592 F. Supp. 2d at 62.  A second shell struck nearby and injured other Crew Members, two of them sustaining very serious injuries. *See* Ex. 1, Vol. 1 at 148, 122; *see also* Ex. 2 Vol. 2 at 6; Ex. 1, Vol. 2 at 85;  Ex. 7 at 67; Ex. 12 at 127.  One of these Crew Members lost a testicle, and another's back was filled with deep-bedded shrapnel.  Ex. 1, Vol. 1 at 122; Vol. 3 at 216; Ex. 2, Vol. 2 at 53-54.

---

[17] Moreover, as Admiral Moorer testified before Congress, even if the Pueblo had opened fire, the guns on the North Koreans ships "would undoubtedly have permitted these [North Korean] ships to prevail…."  Ex. 6 at 682.

Crew Members who witnessed Duane Hodges being hit by the shell rushed to help.  Ex. 1, Vol. 2 at 85.  Hodges' injuries were "terrifying":  "[H]is leg had been nearly blown off, his abdomen was torn open, and his intestines were spilling out."  Ex. 1, Vol. 1 at 45, 170.  Some Crew Members quickly brought him into the officers' wardroom where the ship's corpsman was treating other injured Crew Members.  Ex. 1, Vol. 2 at 85.  "He was bleeding profusely."  Ex. 1, Vol. 1 at 45.  The corpsman tried to stop Hodges' bleeding, but "lack of adequate equipment and surgical skills made it impossible."  *Id.*  Knowing that Hodges was in excruciating pain and bleeding badly, other Crew Members supplied morphine and plasma to him.  Ex. 1, Vol. 1 at 26, 45.  "The best [the corpsman] could do was give him morphine to try to control his pain."  Ex. 1, Vol. 1 at 45.  The corpsman also heard him talkin*g. Id.* at 45.  According to a Crew Member who administered oxygen to him, he was "singing and humming hymns" as they struggled to treat him.  Ex. 1, Vol. 1 at 26.  Hodges clung to life for approximately 45-60 minutes after he was hit, *see*, *e.g.*, *id*., but died from his injuries shortly after the North Koreans boarded the ship.  Ex. 1, Vol. 1 at 45; Ex. 1, Vol. 2 at 85.  ████████████████████████████████ ████████  Ex. 1, Vol. 1 at 26.[18]

### 3.    The North Korean Military Boarded the Pueblo and Took the Surviving Crew Members Hostage

As noted above, the Pueblo was under orders to avoid confrontation unless absolutely necessary.  Ex. 1, Vol. 1 at 2; Vol. 2 at 8, 66; *see also* Ex. 12 at 94-96.  To avoid further confrontation after the shelling, the Pueblo followed the subchaser for approximately 25 minutes,

---

[18] Duane Hodges' fellow Crew Members have never forgotten his struggle to survive that day, *see* Plaintiff Crew Members declarations attached as Exhibit 1, Volumes 1-4 and Exhibit 2, Volumes 1-2, *passim*, and continue to be affected by it and honor him.  For example, the crew created a challenge coin in Hodges' memory that included his picture.  Ex. 31 (a picture of the coin).

until a North Korean ship signaled to cease any further movement. Ex. 7 at 69. Then, two North Korean officers,[19] accompanied by eight to ten enlisted men armed with AK-47 automatic weapons, stepped aboard the Pueblo. Ex. 7 at 69; Ex. 12 at 129-130; *Massie*, 592 F. Supp. 2d at 62. The Pueblo Crew Members did not know then that this was the beginning of eleven grueling months of starvation, humiliation, and physical and mental abuse as hostages of "the Hermit Kingdom."

North Korea's officers and agents easily took control of the ship. They quickly and forcibly gathered the entire crew on the well deck, tied Crew Members' hands and blindfolded them. Ex. 1, Vol. 1 at 26; Vol. 2 at 135; Ex. 2, Vol. 1 at 7, 61; *see also Massie*, 592 F. Supp. 2d at 62. Gathered as one big crowd, many Crew Members feared that they were about to be shot. Ex. 1, Vol. 4 at 63; Ex. 2, Vol. 1 at 61. North Koreans then dragged Crew Members onto the lower deck of the ship and forced them to sit for approximately an hour on the freezing platform where the temperature was below zero. *Id.*; Ex. 1, Vol. 2 at 101; Ex. 14 at 16 (Memo on Mistreatment of Pueblo Returnees); Ex. 7 at 70; *Massie*, 592 F. Supp. 2d at 62.

North Korea's officers and agents swaggered around the ship "like they owned the place." Ex. 2, Vol. 1 at 62. If Crew Members failed to comply immediately with their orders, North Koreans fiercely hit them with their weapons or kicked them with their heavy boots. *Id*. at 62, 7; Ex. 1, Vol. 1 at 156; *see also Massie*, 592 F. Supp. 2d at 62.

Shortly after boarding, North Koreans began interrogating Commander Bucher. Ex. 2, Vol. 1 at 7, *see also Massie*, 592 F. Supp. 2d at 62. They forced the Pueblo helmsman and

---

[19] For purposes of this brief, Plaintiffs use the terms North Koreans and North Korean "captors," "guards," "officials," and/or "officers" interchangeably to refer to the individuals who were in North Korean military uniforms or working along such individuals who guarded the Crew Members, abused them, interrogated them, or otherwise engaged in tortious acts against them while they were being taken and held hostage in North Korea.

Commander Bucher to get the ship underway and follow the North Korean submarine chaser. Ex. 2, Vol. 1 at 7; *see also* Ex. 7 at 69; Ex. 12 at 130.

About an hour after the initial boarding, another group of North Korean officers, including a senior colonel, civilian pilot, and interpreter, boarded the Pueblo.  Ex. 7 at 70, Ex. 12 at 131; *Massie*, 592 F. Supp. 2d at 62.  They took over the ship's steering wheel and the Pueblo crawled towards Wonson, North Korea's main naval port.  Ex. 2, Vol. 1 at 7; Ex. 7 at 70; *Massie*, 592 F. Supp. 2d at 62.

Around sunset, the Pueblo reached the Wonson pier.  Ex. 12 at 132; *Massie*, 592 F. Supp. 2d at 62.  Once docked, armed North Koreans shoved the Crew Members off the ship and across a wobbly plank to the mainland, and led them in front of an enraged crowd that spit on them, hit them with rocks, and punched and kicked them, while yelling anti-American slurs.  *See*, *e.g*., Ex .2, Vol. 1 at 63; Ex. 1, Vol. 1 at 4; Ex. 2, Vol. 1 at 8; *see also* Ex. 12 at 146; *Massie*, 592 F. Supp. 2d at 62; Ex. 14 at 17.  North Koreans then pushed the crew into small buses and took them to a train station.  *See Massie*, 592 F. Supp. 2d at 62.  In transit, North Koreans beat the crew with rifle butts and fists and kicked them.  *Massie*, 592 F. Supp. 2d at 62-63; Ex. 2, Vol. 2 at 3.  When the buses arrived at the train station, North Koreans pulled the crew from the buses, kicked, and punched them, and then pushed them onto a train destined for a detention center outside of North Korea's capital, Pyongyang. Ex. 2, Vol. 1 at 8-9, 63; *see also* Ex. 7 at 126; Ex. 14 at 16; *Massie,* 592 F. Supp. 2d at 63.  Throughout the bus and train trip, North Korean captors kept Crew Members blindfolded and bound.  Ex. 2, Vol. 1 at 64, 9.

During the train journey, which lasted approximately 10 hours, the North Korean soldiers and officers continued to repeatedly beat, kick, spit on, slap, drag, and punch Crew Members. Ex. 1, Vol. 3 at 192; Vol.1 at 4; Ex. 14 at 27.  *Massie*, 592 F. Supp. 2d at 63. The North Korean

captors forced Crew Members to sit-up straight, with their heads bowed down.  Ex. 2, Vol. 1 at 64; Ex. 14 at 16, 31; *see also Massie,* 592 F. Supp. 2d at 63.  Anyone who attempted to speak or moved slightly was hit by the guards. Ex. 2, Vol. 1 at 8, 64; Ex. 14 at 17.  Their hands were tied so tight that some Crew Members lost feeling in their hands.  Ex. 2, Vol. 1 at 9, 64; *see also* Ex. 7 at 18.  While in transit, North Korean officials intermittently interrogated Crew Members, accusing them of espionage and making a show of it to the rest of the crew. Ex.2, Vol. 2 at 9; *see also* Ex. 14 at 6; *Massie*, 592 F. Supp. 2d at 63.  Injured Crew Members were not given medical attention.  Ex. 2, Vol 2 at 55; Ex. 14 at 5.

**B.    North Korea Labeled the Crew Members "Spies" and Criminals, and Held Them Hostage for the Next Eleven Months while Demanding that the United States Apologize for Its Alleged "Crimes"**

At the train station in Pyongyang, the Crew Members' arrival was heavily covered by the North Korean press for the propaganda campaign that followed.  *See* Ex. 2, Vol. 1 at 64 (describing how the captors removed Crew Member blindfolds to photograph and film them upon arrival to Pyongyang); Ex. 1, Vol. 3 at 170; *see also* Ex. 14 at 8.  Upon arriving in Pyongyang, Crew Members finally had their hands untied and the blindfolds removed.  Ex. 2, Vol. 1 at 9, 64; *see also* Ex. 14 at 8.  The crew was then herded into buses, with windows covered with newspapers, and taken to a detention center.  The Crew Members later nicknamed this detention center the "Barn" due to its strong and unpleasant odor.  Ex. 14 at 16; Ex. 2, Vol. 1 at 9; *see generally* Ex. 1, Vol. 2 at 145; Vol. 1 at 123; *Massie*, 592 F. Supp. 2d at 63.  North Korea held the crew hostage at the Barn for the next six weeks.

**1.    Abuse at the Barn**

After arriving at the Barn, North Korean officers and agents commenced intensive interrogations of Crew Members, mercilessly beating, torturing, and terrorizing them in an

attempt to coerce confessions of, and an apology for, "crimes" against North Korea.[20]  *Massie*,

592 F. Supp. 2d at 65-66; Ex. 14 at 31; Ex. 8 at 2.  The North Korean officers accused Crew

Members of being U.S. spies and threatened to execute them for their espionage activities unless

they falsely confessed that they were "engaged in espionage in North Korean territorial waters."

Ex. 1, Vol. 1 at 157; Ex. 2 Vol. 1 at 11; Ex. 14 at 23; *Massie*, 592 F. Supp. 2d at 65-66; Ex. 12 at

150.  The captors also insisted the Crew Members were civilians and non-combatants, telling one

of the *Massie* Plaintiffs that "the Geneva convention did not apply because the crew was held as

civilian prisoners in violation of North Korean criminal espionage laws."  *Massie*, 592 F. Supp.

2d at 63; *see also* Ex. 1, Vol. 1 at 180; Vol. 9 at 11.

During this time, Crew Members were savagely beaten for hours, often by several guards

at the same time.  *See e.g.*, Ex. 1, Vol. 1 at 204-05 (beaten for 19 hours); Ex. 7 at 27.  If Crew

Members attempted to speak with each other, North Koreans subjected them to additional cruel

beatings.  Ex. 1 Vol. 2 at 76-77; Vol. 4 at 63-64; *Massie*, 592 F. Supp. 2d at 64; *see also* Ex. 14

at 30 (Crew Member punished after attempting to make a contact with another Crew Member).

These beatings continued until Crew Members signed confessions prepared for them by

their captors.  The North Koreans first "worked on" Commander Bucher to extract a written

confession from him.  Ex. 12 at 148; *Massie*, 92 F. Supp. 2d at 65; Ex. 2, Vol. 1 at 10, 74-75; Ex.

1, Vol. 9 at 12 (describing hearing the Commander's groans and anguish after being savagely

beaten).  Then, the captors coerced other Crew Members to acknowledge the Commander's

"false" confession and to sign similar "prepared" confessions.  *See*, *e.g.*, Ex. 1, Vol. 1 at 3; *see*

---

[20] According to the Navy's official "General Findings" regarding the Pueblo, the "evidence is
overwhelming that North Korean officers controlled the maltreatment of the Pueblo crew, and on
numerous occasions personally administered violence to their captives."  *See* Ex. 13 at 3.  The
findings state that there is "no reasonable hypothesis, under which the evidence of maltreatment
and brutality can be attributed solely to unsupervised misbehavior by guard personnel."  *Id.*

*also id.* at 106, 204; Vol. 9 at 12.  These coerced confessions then were sent to North Korean and international media for propaganda purposes.  Ex. 7 at 113-14; *see also*, Ex. 15 at 5 (Wilson Center, *Essays on the Pueblo Incident*); herein Sections II.C., VI.C.2.  The propaganda sought to portray North Korea's treatment of the hostages as good and the United States as having illegally intruded into North Korean waters.  Ex. 1, Vol. 1 at 5, 44, 52, 68.

Once North Korea succeeded in obtaining false "confessions" from Crew Members, a new phase of harsh treatment followed.  On March 4, 1968, North Koreans moved the entire crew to another building located on the outskirts of Pyongyang, which Crew Members nicknamed the "Farm."  Ex. 2, Vol. 1 at 65; Vol. 2 at 5-6; *see also Massie*, 592 F. Supp. 2d at 66; Ex. 7 at 126; Ex. 8 at 2 (Spaulding R., *The Pueblo Incident:  Follow-Up Survey*).  Upon arrival there, North Korean officials informed Crew Members that they would remain there until the United States apologized for spying and intruding into North Korea's territorial waters.  Ex. 1, Vol. 1 at 180.  The period of imprisonment at the Farm lasted 42 weeks.  *Massie*, 592 F. Supp. 2d at 66; *accord* Ex. 1, Vol. 2 at 159.

### 2.        Abuse at the Farm

At the Farm, North Korean captors subjected Crew Members to very harsh and strict rules, which they called the "Rules of Life."  *See* Ex. 1, Vol. 4 at 70; Ex. 2, Vol. 1 at 21-22; *see also* Ex. 12 at 151, 155.  These written Rules made clear what the crew already knew: their captors would not tolerate any interference with their interrogations, and Crew Members would be "punished severely and unconditionally" if they gave what their captors considered "false statements," "refus[ed] questioning," or "show[ed] disrespect or disorder to [sic] any of the duty personnel."  Ex. 1, Vol. 4 at 70.  North Korea's officers and other agents used extreme mental and physical measures to enforce the Rules and brutally punished anyone who broke any Rule in the slightest manner.  *Massie*, 592 F. Supp. 2d at 67; Ex. 14 at 17.  *See also*, *e.g.*, Ex. 1, Vol. 1 at

7, 223; Vol. 2 at 10; Vol. 4 at 63.  The Crew Members could not leave:  they were closely guarded at all times and were threatened with death if they tried to escape.  Ex. 1, Vol. 1 at 108, 36, 44 and 157.

The deplorable physical conditions and mental abuse administered at the Barn continued at the Farm.  Crew Members were required to sit in wooden, straight-backed chairs with their heads bowed unless they had specific permission to do otherwise.  *Id*. at 214; Ex. 14 at 33.  The North Korean captors forced the crew to remain like that for up to 17 hours at a time.  Ex. 1, Vol. 2 at 10; *see also* Ex. 14 at 20.  Brutal interrogations and beatings continued.  For instance, Crew Members were beaten when the guards decided that they were not being "sincere" in their answers or in their apologies for their "crimes," or that they were not showing sufficient enthusiasm when praising the North Korean regime.  Ex. 2, Vol. 1 at 6; *Massie*, 592 F. Supp. 2d at 67.  During this time, all of the hostages endured high levels of stress and anxiety, even when they were not themselves being beaten, because they constantly witnessed severe physical and mental abuse of fellow Crew Members. Ex. 1, Vol. 1 at 148; Vol. 4 at 3, 13, 37 and 53; *see also* Ex. 14 at 18 (describing witnessing Crew Members being beaten beyond recognition).

### 3.   At the Barn and Farm, the North Koreans Subjected All Crew Members to Inhumane Treatment and Unsanitary Conditions

In addition to being subjected to severe beatings and interrogation, Crew Members were forced to live in unsanitary, unhealthy, and demoralizing physical conditions at the Barn and the Farm.  Ex. 2, Vol. 1 at 19, 78; Vol. 2 at 9; *see also id*. at 103, 161; Ex. 1, Vol. 3 at 186; Ex. 14 at 25; *Massie*, 592 F. Supp. 2d at 63.  For example, there were no working heating systems.  *See* Ex. 1, Vol. 1 at 28, 121, 180.  Crew Members were kept in small crowded rooms with up to four or eight other Crew Members and were forced to wear the same increasingly dirty clothing for months. Ex. 2, Vol. 1 at 19, 20, and 65; Ex. 1, Vol. 1 at 123; *see also Massie*, 592 F. Supp. 2d at

66.  The Crew Members were allowed to bathe rarely (about once every six weeks), and when they were, it was with no privacy and in a communal bath with one basin of heated water for all the men in a room.  Ex. 1, Vol. 1 at 124; Vol. 2 at 55, 137-38; Ex. 2, Vol. 1 at 20; *Massie*, 592 F. Supp. 2d at 65.  Rats and various vermin overran the facility. Ex. 1, Vol. 2 at 87 (rats by the toilets); Ex. 1, Vol. 1 at 28 (describing dirty facilities infested with vermin); Ex. 2, Vol. 1 at 78; *Massie*, 592 F. Supp. 2d at 63-64.  Beds were full of bed bugs, which led some Crew Members to develop serious infections.  Ex. 1, Vol. 1 at 59; *see also* Ex. 1, Vol. 1 at 99; Vol. 2 at 137; Vol. 4 at 65.

The North Korean captors deprived Crew Members of privacy in their daily activities, as well as sleep, subjecting them to constant surveillance and using such tactics as keeping the lights on at all times.  Ex. 2, Vol. 1 at 68, 79 (describing constant surveillance); *id.* at 19 (describing lights being kept on 24/7); *id.* at 149; *see also* Ex. 14 at 18, 33.  Crew Members could not use the bathroom without permission, which was not freely given, and even when they were permitted to use the bathroom, their captors physically abused and harassed them on their way to and from the toilet facilities, especially when Crew Members tried to use those facilities alone.  *Massie*, 592 F. Supp. 2d at 64; Ex. 2 Vol. 1 at 59; Ex. 1, Vol. 2 at 3, 145.

The food the hostages were given was sparse and inadequate; it barely sustained them.[21]

Ex. 1, Vol. 1 at 29, 36; Ex. 2, Vol. 1 at 20; *see also* Ex. 12 at 150, 159; *Massie*, 592 F. Supp. 2d

---

[21] In the Declassified Summary, the U.S. Government infers that some of the food problems might be attributable to cultural differences.  *See* Ex. 13 at 3 (Memo on Summary of Navy Compendium on Treatment of Pueblo Crew).  Whatever cultural difference there might have been, a diet of 500 calories is barely sustainable, and all of the Crew Member Plaintiffs here describe the food as inadequate.  *See*, *e.g.*, Ex. 12 at 40, 150 (describing a 500-calorie diet).  *Massie*, 592 F. Supp. 2d at 65. The result was that all Crew Members lost significant weight during captivity, some well over 50 pounds.  Ex. 2, Vol. 2 at 58 (lost 55 pounds), Ex. 1 Vol. 1 at 124 (lost 50 pounds); *id* at 36 (lost 80 pounds); *id* at 149 (lost about 50-60 pounds).

at 65.  Meals were deficient both in quality and quantity and usually consisted of turnip soup or turnips with rice.  Sometimes, although rarely (for example, on North Korean holidays), the concoction was complemented with rice or boiled fish heads.  Ex. 1, Vol. 1 at 28, 124, Ex. 15 at 6; *see also Massie,* 592 F. Supp. 2d 57 at 66; Ex. 12 at 159 (describing unsanitary food conditions).

### 4.    North Korea Deprived Crew Members of Basic Medical Attention

Basic medical needs were largely ignored.  The North Korean captors did not give Crew Members who were injured during the attack proper medical care, and they suffered in agony from their shrapnel wounds.  Ex. 12 at 150; Ex. 1, Vol. 1 at 149; Vol. 2 at 87.  Indeed, the injuries of those wounded during North Korea's attack on the Pueblo were left to fester, and some Crew Members developed serious infections.  *See* Ex. 1, Vol. 2 at 123; Vol. 3 at 217.  In at least one case, the infections and rotting flesh lead to a smell of rot so odiferous that captors avoided the victim as much as possible.  Ex, 2, Vol. 2 at 55.  When medical attention was provided, it was without sufficient anesthesia,[22] which inflicted severe pain and slowed the healing process.  Ex. 1, Vol. 1 at 123; Ex, 2, Vol. 2 at 56, 59; *Massie*, 592 F. Supp. 2d at 64.  In lieu of anesthesia, the North Korean captors simply bound a Crew Member's hands and feet to the table before performing invasive surgery.  Ex, 2, Vol. 2 at 56.  The Crew Members report that medical treatment was largely superficial and lacked the level of care needed to properly treat injuries from the initial attack on the ship and subsequent beatings, or to identify and treat diseases they developed while be held in deplorable conditions.  Ex. 2, Vol. 1 at 21 (describing a

---

[22] A declassified report of the National Security Agency, released in 1992, suggested that North Korean doctors performed medical examinations and surgeries using anesthesia. Ex. 7 at 127. However, many Plaintiff Crew Members who had to endure surgeries during their captivity testified that no anesthesia was administered to them.

Crew Member's blindness from a North Korean eye injection);  Ex. 1, Vol. 1 at 6; Vol 2 at 69,

137; Vol. 3 at 216; Vol. 4 at 5.

### 5.      Hell Week

In early December 1968, North Korea's officers and agents began a new campaign of

beatings, harassment, and interrogations so intense and concentrated that Crew Members named

that time-period "Hell Week."[23]  This period, which lasted about two weeks, included beatings

day and night.  Ex. 1, Vol. at 35, Ex. 2, Vol. 1 at 15, 16; Ex. 2 Vol. 2 at 59; *Massie*, 592 F. Supp.

2d at 67; Ex. 12 at 156.  The interrogations and accompanying physical and mental coercion

methods caused insufferable fear, pain, and despair to Crew Members, making them believe that

their deaths were imminent.  Ex. 1, Vol. 1 at 3, 97; *see also Massie*, 592 F. Supp. 2d at 64-65

During Hell Week, Crew Members were beaten for several hours at a stretch and were

subjected to other kinds of severe torturous treatment.  *See e.g.*, Ex. 2, Vol. at 15 – 17 (describing

beatings lasting for up to 16-17 hours straight); *Massie*, 592 F. Supp. 2d at 68; Ex. 14 at 27.

Sometimes, the beatings led to unconsciousness.  Ex. 1, Vol. 1 at 4; Ex. 2, Vol. 1 at 17; Ex. 1,

Vol. 1 at 179.  North Korea's officers and agents often hit Crew Members on their faces, heads,

and necks, administered karate chops, and beat them with fists, sticks, boards, broomsticks,

rifles, chairs, and whatever else might be handy.  Ex. 14 at 29; Ex. 1. Vol. 1 at 35; *id* at 67; Ex. 2,

Vol. 1 16; Ex. 1, Vol. 2 at 67, 70; Ex. 1. Vol. 3 at 192, *id.* at 217; Ex. 1, Vol. 2 at 151; *see also*

*Massie*, 592 F. Supp. 2d at 64, 68.

The North Korean captors utilized many other torture tactics, including forcing Crew

Members to assume rigid, uncomfortable positions for hours.  Ex. 2, Vol. 1 at 79; Ex. 13 at 2

(Declassified Summary 1969), Ex. 14 at 23, 28, 34 (Summary of Navy Compendium on

---

[23] For discussion of events precipitating the "Hell Week," *see infra* pp.23-24.

Treatment of Pueblo Crew. Jan 6, 1969); *see also Massie*, 592 F. Supp. 2d at 63.  For example, some Crew Members were forced to kneel on the floor and hold a chair above their head for prolonged periods and were kicked and beaten until they could no longer hold it.  Ex. 1, Vol. 1 at 178 (describing painful kneeing with broomstick behind the knees); Ex. 1, Vol. 1 at 122; Vol. 4 at 36; Vol. 9 at 12; *see also* Ex. 14 at 28; Ex. 12 at 150.  On other occasions, the North Koreans forced Crew Members to squat and hold their arms over their head for prolonged periods and beat them savagely as soon as their arms started to drop.  Ex. 1, Vol. 1 at 214, 170, 223; Vol. 2 at 53; Vol. 3 at 14; Ex. 14 at 27*; see also Massie*, 592 F. Supp. 2d at 64.  As another form of torture, the North Korean captors forced some Crew Members to sit with their head between their legs for hours, which inflicted severe pain.  Ex. 1, Vol. 1 at 149, 170, 216.  And, during Hell Week, the North Korean officers and agenda kept the doors to the cells open at all times to have the opportunity to continuously watch Crew Members, thereby intensifying their fear and depriving them of privacy, which severely harmed the Crew Members' mental well-being.  Ex. 2, Vol. 1 at 22; Ex. 2, Vol. 2 at 59.

To further humiliate and cause a feeling of despair, the captors forced some Crew Members to clean the blood (either their own blood or the blood of other Crew Members) off the walls and floors of the rooms in which they were beaten.  Ex. 1 Vol. 1 at 224; Vol. 2 at 136; Ex. 2, Vol. 2 at 5-6.  According to many Crew Members, the terror they were subjected to during "[Hell] week was almost unbearable."  Ex. 7 at 4 and 14; Ex. 2, Vol. 1 at 18 and 79.

### C.     North Korea Used the Crew for International Political Ends

During the eleven months it held the Pueblo crew captive, North Korea engaged in a prolonged effort to extract a public apology from the United States for the Pueblo's alleged intrusions into North Korean territorial waters, and exploited the Crew Member hostages for its propaganda purposes.  Ex. 7 at 123; *Massie*, 592 F. Supp. 2d at 67.

For example, the North Korean captors forced Crew Members to participate in several orchestrated press conferences.  Ex. 12 at 150 (describing the January 25 and February 13, 1968, conferences); Ex. 7 at 123, 125; *Massie*, 592 F. Supp. 2d at 67; *see also* Ex. 1, Vol. 1 at 107, 124; 171.  North Korean officers forced the Crew Members to falsely confirm that the ship had been engaged in espionage and that it had intruded into North Korea's territorial waters.  Ex. 1, Vol. 1 at 163; Vol. 2 at 86; Ex. 7 at 123; *Massie*, 592 F. Supp. 2d at 67.  They also forced Crew Members to make other false statements, such as that North Korea was treating them well in captivity.  Ex. 1, Vol. at 55, 94, 103.

In addition, the captors forced Crew Members to make a public statement directed to President Lyndon Johnson.  Ex. 17 (N.Y. Times, *Text of Letter on the Pueblo Incident*, March 5, 1968).  In this statement, Crew Members were forced to "confess" to espionage activities and urge President Johnson to apologize to the North Korea.  *Id.*  North Korea's officers also forced some Crew Members to make a recording falsely confessing that the Pueblo had intruded into North Korean territorial waters and calling upon the United States to apologize.  Ex. 1, Vol. 9 at 12; Ex. 1, Vol. 1 at 107, 178.  Many of these recordings were played on local radio stations in North Korea and elsewhere in Asia, reports of which incited shock in the international public as well as fear and anxiety in the crew's families.  Ex. 1, Vol. 9 at 12; Ex. 18 (N.Y. Times, *Text of Purported Confession and Pentagon's Reply*, Jan. 25, 1968).  Other items, such as press releases, films, and photographs propagandizing the incident, flooded the international press.  *See*, *e.g.*, Ex. 19 (USAFSS, USS Pueblo Incident, April 18, 1968); Ex. 20 (NSA Press Release, *PUEBLO Propaganda Material*, April 29, 1968) (reporting on propaganda materials from North Korea, China, Africa, Cuba, and Canada).

The captors also forced Crew Members to read, listen to, and study North Korean propaganda. Ex. 1, Vol. 3 at 186; *See also Massie*, 592 F. Supp. 2d at 67; Ex. 12 at 160; Ex. 8 at 52. On at least one occasion, Crew Members were made to watch movies and listen to hours of lectures on the teachings of North Korean Premier Kim Il Sung and the "evils" of American society. Ex. 1, Vol. 1 at 59; 36; Vol. 2 at 103; Ex. 2, Vol. 1 at 9 (describing long propaganda lectures). On another occasion, the North Korean captors forced Crew Members to tour the North Korean War Museum, which was filled with anti-America displays purporting to illustrate Korean War atrocities. Ex. 1, Vol. 1 at 59; Ex. 1, Vol. 5 at 99.

North Korea used the Crew Members to try to influence the opinions of their own family members, the American public, and American politicians so that the U.S. Government would take action in conformity with North Korean demands. For example, the North Korean captors forced Crew Members to write letters stating that they were being treated well but that they would be tried and/or executed if the United States did not acknowledge and apologize to North Korea for alleged "crimes," including intrusion into North Korea's territorial waters.[24] *See, e.g.,* Ex. 2, Vol. 1 at 12-13; Ex. 1, Vol. 1 at 5, 36; Vol. 2 at 102-04; Ex. 14 at 20; *Massie*, 592 F. Supp. 2d at 67. The captors were very specific in what they wanted in the letters: they forced the crew to write and rewrite the letters, by hand, until the captors were satisfied that they contained, *inter alia*, sufficient pleas for the United States to apologize. *See, e.g.*, Ex. 1, Vol. 1 at 180-81 (describing seven rewrites before the North Koreans found the letter acceptable); *see also id.* at 68; Ex. 1, Vol. 2 at 94, 160, 161; *see also* Ex. 1 Vol. 1 at 5; Ex. 2, Vol. 1 at 13; Ex. 1, Vol. 2 at 103, 145. Anyone who did not comply was severely beaten. *See, e.g.*, Ex. 2, Vol. 1 at 13; Ex. 1,

_____

[24] Several Crew Members have included copies of the "propaganda" letters they wrote to their families while in captivity as exhibits to their declarations. *See, e.g.*, Ex. 1 Vol. 1 at 68, Ex. C; *id.* at 5, Ex. B; *id.* at 180-81, Ex. B; Ex. 1, Vol. 2 at 105, Ex. B, C.

Vol. 1 at 5; 179.  *Massie*, 592 F. Supp. 2d at 67.  To discredit the North Korean propaganda, many Crew Members snuck in fake names or other false statements to indicate to their families that they were being coerced.  Ex. 1, Vol. 1 at 5, 68, 149; Ex. 2, Vol. 1 at 13.

North Korea also forced Crew Members to take staged photographs.  Ex. 1, Vol. 2 at 77, 136, 160.  Crew Members took advantage of such opportunities to undermine their captors' efforts as best they could.  *Massie*, 592 F. Supp. 2d at 67.  For example, on one occasion, as they posed, a group of Crew Members casually held up their middle fingers – an obscene gesture that the North Koreans apparently did not understand.  They explained the gesture as a "Hawaiian Good Luck Sign" that meant "wonderful."  Ex. 2, Vol. 1 at 14, 79; *Massie*, 592 F. Supp. 2d at 67.

North Korea released the photographs[25] and they were published in the international media, including in *Time* magazine in October 1968.  In the accompanying article, *Time* exposed the real meaning of the gesture and praised the crew for their courage.  Ex. 21 at 38 (Times magazine article, Oct 18, 1968); *see also* Ex. 2, Vol. 1 at 14, 65; *Massie*, 592 F. Supp. 2d at 67.  After the North Koreans discovered the article and realized that they had been duped, they became enraged.  Ex. 2, Vol. 1 at 13, Ex. 1, Vol. 1 at 58; Ex. 2, Vol. 1 at 79; Ex. 2, Vol. 2 at 10-11 (describing violent behavior of the captors); *Massie*, 592 F. Supp. 2d at 67-68.  This was what triggered the period of intense interrogations and beatings called "Hell Week," discussed above.  *Massie*, 592 F. Supp. 2d at 68; *see supra* Section II.B.5.

---

[25] *See* Ex. 1, Vol. at 23, 77, 200, 201; Vol. 6 at 35, (includes some of the photographs released by North Korea to press in 1968).

**D.      Negotiations Between North Korea and the United States Were Stymied by North Korea's Un-wavering Demand for an Apology**

Throughout the crew's captivity, North Korea demanded that the United States issue an official apology and admit its "crimes" as a condition for the release of the Pueblo hostages.  Ex. 7 at 133.  *See also* Ex. 23 ¶ 2 (Telegram No. 127759 March 9, 1968); Ex. 7 at 132-33.  The U.S.-North Korea negotiations stretched on for weeks and then months, while the Crew Members continued to be tortured.  *See*, *e.g.*, Ex. 22 (U.S. Dep't Telegram No. 242959, September 21, 1968) (noting 21st meeting went by without any progress).  North Korea was rejecting every U.S. Government proposal to resolve the conflict, which included setting up an independent investigation committee to examine all aspects of seizure of the ship and its documents, and taking the crew hostage.  Ex. 23; *see also* Ex. 24 (U.S. Dep't of State Telegram No. 119560, February 22, 1968).  The U.S. Government's attempts to use international pressure to end the crisis produced no results. Ex. 24.  *See*, *e.g.*, Ex. 23 ("Efforts to obtain release of ship and crew through third parties have been unsuccessful.").

During the negotiations, North Korea insisted that it would release the crew <u>only</u> if the United States signed an apology that North Korea had drafted, without revision. *See* Ex. 25 at 4 (Telegram No. 7078, May 8, 1968)); *see also* Ex. 5 at 1628; Ex. 29, at 20:8-15 ("*Warmbier* Transcript"); Ex. 16 (*Statement Signed at Panmunjom*, NY Times Dec. 23, 1968).  Ultimately, after ten months of intense negotiation with North Korea, the U.S. Government agreed to sign an apology stating that it "had illegally intruded into the territorial waters of Democratic People's Republic of Korea," but only on the condition that it be allowed to publicly renounce the apology at the same time.  *See* Ex. 5 at 1628; Ex. 7 at 134.

This development occurred around the time of Hell Week, and after about two weeks, Hell Week ended almost as abruptly as it had started.  The captors suddenly began treating the

Crew Members better, even showing concern about their appearance and whether bruises from beatings were visible.  Ex. 1, Vol. 1 at 36; Ex. 2, Vol. 1 at 80.  The captors provided hard-boiled eggs to rub on blackened eyes to break up clots caused by the beatings.  *See*, *e.g.,* Ex. 1 Vol. 1 at 36; Vol. 3 at 146; Ex. 2, Vol 1 at 23.  Then the crew received new clothes.  Ex. 1, Vol. 1 at 36; Ex. 2, Vol.1 at 24.

On December 23, 1968, right before he signed the false "apology," General Woodward made a public statement explaining that the Pueblo never engaged in illegal activities or intruded into the North Korean waters, and that he was signing the North Korean version of the statement "only to free the crew."  Ex. 16; Ex. 15 at 11.

### E.  The Crew Members Were Finally Released Once North Korea Received the "Apology" It Had Demanded

North Korea released the Crew Members on December 23, 1968, after eleven months of captivity.  The crew were taken to Panmunjom, located at the border between North and South Korea.  There, the North Korean captors ordered the Crew Members to cross the Bridge of No Return (also known as the "Peace Bridge") one-by-one into South Korea.  Ex. 1, Vol. 1 at 125; Vol. 2 at 87; Ex. 2, Vol. 2 at 16; *see also Massie*, 592 F. Supp. 2d at 68-69; Ex. 2, Vol. 1 at 24. Commander Bucher crossed first, followed by the remaining Crew Members from the most junior-ranking to most senior-ranking.  Ex. 1, Vol. 2 at 87 (the second-in-command crossed the bridge last); Ex. 1, Vol. 1 at 125; *see also Massie*, 592 F. Supp. 2d.at 69.  The crew's captors threatened them one last time at the crossing, telling them if any Crew Members attempted to communicate with each other or say anything as they crossed the bridge, they would be shot.  Ex. 2, Vol. 1 at 81; *Massie*, 592 F. Supp. 2d at 68-69.  After months of being brutalized, the Crew Members believed those threats and feared that they could be shot as they crossed the bridge. Ex. 2, Vol. 2 at 11; Ex. 1, Vol. 1 at 226; Ex. 2, Vol. 1 at 81.

U.S. military personnel greeted the Crew Members on the South Korean side of the Bridge.  *Massie*, 592 F. Supp. 2d at 69.  From there, they were taken to the 121st Evacuation Hospital in South Korea where they underwent a preliminary medical examination and treatment.  On December 24, 1968, the crew flew back to the United States and reunited with their families in San Diego, with whom they were able to spend Christmas.  *See*, *e.g.,* Ex. 1, Vol. 2 at 14, 166; Ex. 32 at 52.

In San Diego, Crew Members went through debriefings at the San Diego Air Force facility and further medical examinations at the San Diego U.S. Navy Hospital.  Ex. 2, Vol. 1 at 25; Ex. 32 at 52.  During these examinations, Crew Members were found to have experienced varying degrees of anxiety accompanied by feelings of despair, hopelessness, and suicidal thoughts.  *Id.* at 53.  Crew Members also testified before a Naval Court of Inquiry about the capture and their captivity.  *See*, *e.g.,* Ex. 2, Vol. 1 at 81; Ex. 5 at 1629; Ex. 12 at 82 (starting January 20, 1969, testimony was taken over 36 days in open and closed sessions).

After returning to the United States, Crew Members struggled to put these horrific events behind them and adjust to civilian life after their ordeal.  Almost all of them suffered from chronic pain and permanent disabilities, and those who are living continue to suffer to this day.  Ex. 1, Vol. 1 at 151, 172, 206.  In addition to the physical trauma, Crew Members suffered (and continue to suffer) from emotional trauma.  Many Crew Members ended up reliving the horrible experiences and emotions during their captivity over and over again.  Ex. 1, Vol. 4 at 38, 55, 66.  Crew Members have suffered from extreme anxiety and claustrophobia, *see*, *e.g.*, Ex. 1, Vol. 1 at 226; Vol. 2 at 13, 87.  Many suffer from post-traumatic stress disorder.  *See*, *e.g.*, Ex. 2, Vol. 1 at 100 (Crew Member describing one hundred percent disability due to post-traumatic stress disorder).  Some have suffered from fear of any medical treatment.  *See*, *e.g.*, Ex. 2, Vol. 2 at 56

(Crew Member describing angst developed as a result of several painful surgeries performed by a North Korean doctor).  Some Crew Members developed anger problems, which deeply affected their relationships with family members.  Ex. 2, Vol. 1 at 27-28 (Crew Member describing, *inter alia*, being unable to tolerate loud noise or control anger); Ex. 2, Vol. 2 at 60, 17; *see also* Ex. 1, Vol. 3 at 194 (Crew Member describing a struggle to adjust to normal life and developed problems with alcohol as result); Ex. 1, Vol. 1 at 37 (Crew Member describing taking out anger on his family).  As a result, the captivity in North Korea not only damaged the Crew Members' lives, but also those of their families.

### F.    Family Members Went Through Eleven Months of Mental Anguish

The eleven months of captivity took a hard toll on the Crew Members' family members.  During that time, they hoped and prayed for the release of their loved ones.  *See, e.g.* Ex. 1, Vol. 8 at 131, 201.  The lack of information about their condition and when, if ever, they would be released, caused enormous anxiety and despair.  *See, e.g.*, Ex. 1, Vol. 8 at 130; Ex. 1, Vol. 5 at 61, 68, 149.  Many family members suffered from nightmares, anxiety, and depression, and had difficulties coping with the feelings of sadness and fear.  *See, e.g.,* Ex. 1, Vol. 6 at 49; Vol. 5 at 135.  Some lost the ability to function in daily life.  *See*, *e.g.*, Ex. 1, Vol. 7 at 9; Vol. 6 at 49.  But many family members never lost hope – petitioning elected officials, the U.S. military, and even President Johnson to push for action to force the North Koreans to release their loved ones.  *See*, *e.g.,* Ex. 1, Vol. 6 at 102; Vol. 8 at 131, 201.

Many family members continued to be devastated for decades by this horrific incident, experiencing long-term sadness, depression, and emotional and psychological effects, which had a profound impact on them for the rest of their lives.  *See*, *e.g.*, Ex. 1, Vol. 7 at 114-15 (describing feeling deprived of a healthy and supportive relationship with her father); Ex. 1, Vol. 5 at 206 (describing negative feelings and flashbacks when he sees or hears news about North

Korea); *see also* Ex. 1, Vol. 5 at 37-38, 54, 68, 188; Vol. 6 at 150; Vol. 7 at 9, 46, 76, 108-09,

146-47; Vol. 8 at 207.

## III.     THIS COURT HAS PERSONAL JURISDICTION OVER NORTH KOREA

Under FSIA § 1330(b), Congress provided that U.S. courts have personal jurisdiction

over a foreign state "as to every claim for relief over which the district courts have [subject

matter] jurisdiction . . . " where the foreign state has been properly served in accordance with 28

U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b); *see also* Fed. R. Civ. P. 4(j)(1) ("a foreign state or its

political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C.

§ 1608").[26]  In this Section, we show that North Korea has been properly served, and in Section

IV, *infra,* we show that this Court has subject matter jurisdiction over Plaintiffs' claims.

FSIA § 1608 establishes a hierarchy of four methods of service, and a plaintiff must

attempt service by the first listed applicable method before proceeding to the next applicable

method.  The first two methods of service, §§ 1608(a)(1) and (a)(2), are inapplicable to North

Korea in this case because, respectively, there are no "special arrangements for service" between

the United States and North Korea, and North Korea is not a party to any "international

convention on service of judicial documents."  *Warmbier*, 2018 WL 6735801, at *16.

On March 13, 2018, pursuant to the FSIA § 1608(a)(3), the Office of the Clerk of this

Court mailed a copy of the summons and amended complaint and a notice of suit, together with a

translation of each into the official language of the foreign state (in this case, Korean) by DHL

International courier service,[27] "to the head of the ministry of foreign affairs" of North Korea.

---

[26] The statutory requirements under § 1330(b) are all that must be satisfied to establish general
jurisdiction over a foreign state.  *See TMR Energy Ltd. v. State Property Fund of Ukraine,* 411
F.3d 296, 302-03 (D.C. Cir. 2005).

[27] FSIA § 1608(a)(3) requires service "by any form of mail requiring a signed receipt."  This
includes DHL International courier service. *See Gates v. Syrian Arab Republic,* 646 F.3d 1, 4

*See* Return of Service, ECF. No. 19, 19-1.  In conformity with FSIA requirements, also included

in the service package was a copy of the FSIA and an Offer to Arbitrate,[28] plus a Korean

translation of both.[29]  *See* FSIA § 1605A(a)(2)(A)(iii) (the statute requires that where "the act

occurred in the foreign state against which the claim has been brought, the claimant [has]

afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the

accepted international rules of arbitration").

On April 4, 2018 at 15:51 PM, North Korea was properly served under FSIA

§ 1608(a)(3) when the service package was delivered to the head of the Ministry of Foreign

Affairs of North Korea and was signed for, and accepted by, "Kim."  *See* Return of Service,

ECF. No. 19, 19-1.  North Korea did not serve an answer or other responsive pleading to the

Complaint, nor did it respond to the Offer to Arbitrate within sixty days of service, as required

by the FSIA § 1608(d).  Thus, on June 5, 2018, Plaintiffs requested the Clerk of Court to enter a

default as to North Korea, *see* ECF No. 20, and on June 11, 2018, the Clerk of this Court entered

the default, *see* Entry of Default, ECF No. 21.

---

(D.C. Cir. 2011) (finding the plaintiffs effected service where the necessary papers were mailed
via DHL in accordance with 28 U.S.C. § 1608(a)(3)); *Abur v. Republic of Sudan*, 437 F. Supp.
2d 166, 173 (D.D.C. 2006) ("In accordance with this statutory requirement, plaintiffs utilized the
commercial courier service DHL International.")

[28] Specifically, Plaintiffs offered "to submit the matter to arbitration conducted 'by a third party
organization [(1)] with extensive experience arbitrating international disputes,' and (2) in
accordance with international rules of arbitration.  Should Defendant Democratic People's
Republic of Korea agree to arbitration, that arbitration shall 'not require [Plaintiffs'] absence
from the United States.'"  Ex. 4, Gasanbekova Decl. (quoting *Simpson v. Socialist People's
Libyan Aram Jamahiriya*, 326 F.3d 230, 232, 234 (D.C. Cir. 2003)); *see also id.* ("a reasonable
opportunity to arbitrate" need not precede the filing of the complaint).

[29] Plaintiffs submitted a copy of the Service Package to this Court with their Memorandum on
the Statute of Limitations as an exhibit to the Declaration of Albina Gasanbekova concerning
Service of Process on Defendant ("Gasanbekova Decl."), concurrently filed as Exhibit A to
Plaintiffs' Statute of Limitations Memorandum.

Because, as explained *infra* in Section VI., this Court also has subject matter jurisdiction over Plaintiffs' claims against North Korea, Plaintiffs have established that this Court has personal jurisdiction over Defendant North Korea in accordance with FSIA § 1330(b).

## IV.    VENUE IN THIS COURT IS PROPER

Venue is proper in this Court under 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

## V.    APPLICABLE LEGAL STANDARDS

### A.    This Court Has the Authority to Enter a Default Judgment on Liability Against North Korea

This Court has the authority under Federal Rule of Civil Procedure 55(b)(2) to enter a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2); *Warmbier*, 2018 WL 6735801, at *6-7, 17 (discussing authority to issue default judgment, and ultimately doing so against North Korea).  Before the Court can enter a default judgment, Plaintiffs must, *inter alia*, meet their evidentiary burden of providing a *prima facie* showing of personal jurisdiction,  *Warmbier*, 2018 WL 6735801, at *6 (citing *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))), and must "establish[] [their] claim[s] or rights to relief by evidence satisfactory to the Court," 28 U.S.C. 1608(e); *Warmbier*, 2018 WL 6735801, at *6.

The FSIA "begins with a presumption of immunity" for a foreign sovereign, *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013), and "[t]he plaintiff bears an initial burden of production to show an exception to immunity, such as § 1605A, applies[,]" *Owens v. Republic of Sudan*, 864 F.3d 751, 784 (D.C. Cir. 2017).  Once the plaintiff meets his or her burden, "the <u>sovereign bears the ultimate burden of persuasion</u> to

show the exception does not apply," *Bell Helicopter Textron,* 734 F.3d at 1183 (emphasis

added), by a preponderance of the evidence.  *See Simon v. Republic of Hungary*, 812 F.3d 127,

147 (D.C. Cir. 2016). "Therefore, if a plaintiff satisfies his burden of production and the

defendant fails to present any evidence in rebuttal, then jurisdiction attaches" to enter a default

judgment.  *Owens*, 864 F.3d at 784.

> **B.     This Court Should Credit Plaintiffs' Uncontroverted Evidence and Take
> Judicial Notice of the Court's Findings in *Massie* and Records in *Warmbier***

> **1.     Crediting Plaintiffs' Uncontroverted Evidence**

In *Owens v. Republic of Sudan,* this Circuit summarized the evidentiary standards

applicable to FSIA default cases:

> With respect to a defaulting sovereign, the FSIA requires only that a plaintiff
> "establish[] his claim or right to relief by evidence satisfactory to the court." 28
> U.S.C. § 1608(e).  This standard mirrors a provision in Federal Rule of Civil
> Procedure 55(d) governing default judgments against the U.S. Government.
> *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994).
> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some
> protection against an unfounded default judgment, *see Jerez v. Republic of Cuba*,
> 775 F.3d 419, 423 (D.C. Cir. 2014), neither provision "relieves the sovereign
> from the duty to defend cases," *Rafidain Bank*, 15 F.3d at 242.  Moreover,
> § 1608(e) does not "require the court to demand more or different evidence than it
> would ordinarily receive," *cf. Marziliano v. Heckler*, 728 F.2d 151, 158 (2d Cir.
> 1984) (applying Rule 55(d)); <u>indeed, "the quantum and quality of evidence that
> might satisfy a court can be less than that normally required."</u>  *Alameda v. Sec'y
> of Health, Ed. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980) (applying Rule
> 55(d)).

864 F.3d at 785 (emphasis added)*.*

The D.C. Circuit in *Owens* further confirmed that this "lenient" evidentiary standard is all

the more appropriate in a Section 1605A case, "for which firsthand evidence and eyewitness

testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Id.*

Thus, particularly in a terrorism case such as this one, "Section 1608(e) does not require a court

to step into the shoes of the defaulting party and pursue every possible evidentiary

challenge . . . "  *Id.* at 785-86.  Moreover, "plaintiffs [may] prove their claims using evidence that might not be admissible in a trial."  *Owens*, 864 F.3d at 785 (relying on affidavits in a FSIA default proceeding).

 As emphasized by Chief Judge Howell very recently in *Warmbier*, courts must apply this standard to State Sponsors of Terrorism mindful of Congress' intent to hold SSTs accountable:

> While the 'FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be '"satisfactory to the court,"' courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[] to prevent state sponsors of terrorism – entities particularly unlikely to submit to this country's laws – from escaping liability for their sins.'"
>
> With this objective in mind, the D.C. Circuit has instructed that 'courts have the authority – indeed, we think, the obligation – to adjust evidentiary requirements to … differing situations.'  Courts must draw their 'findings of fact and conclusion of law from admissible testimony in accordance with the Federal Rules of Evidence.'  Uncontroverted factual allegations that are supported by admissible evidence are taken as true.

*Warmbier*, 2018 WL 6735801, at *6 (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014) (quoting 28 U.S.C. 1608(e)) (other citations omitted); *see also Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.").

 Consistent with these ends, this Circuit has held that a court may rely on plaintiff declarations and expert opinions, without holding a hearing, in order to determine liability and damages in a state sponsor of terrorism case.  *Owens*, 864 F.3d at 788-789 ("As long as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it satisfactory, its form or type is irrelevant . . . [t]herefore the plaintiffs' 'failure' to present eyewitness testimony or other direct evidence is of no moment as to whether they have satisfied

their burden of production."), *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 280 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) ("Although courts seeking to comply with [the § 1608(e)] requirement often hold hearings featuring live witness testimony, the provision does not actually demand a hearing or live testimony; it demands evidence . . . .  Courts have accordingly recognized that FSIA plaintiffs seeking a default judgment can proceed by affidavit." (internal citations omitted)); *see also Rafidain Bank*, 15 F.3d at 242 (FSIA § 1608(e) "does not actually demand a hearing or live testimony; it demands evidence"); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006) (relying on plaintiff declarations and expert reports because "[i]n evaluating plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence . . .  Plaintiffs' evidence may take the form of sworn affidavits." (internal citations and quotation marks omitted)).

Plaintiffs have presented this Court with extensive sworn declarations and public record evidence to prove both the existence of subject matter jurisdiction and North Korea's liability for the harms for which Plaintiffs seek a judgment for compensatory damages under the FSIA's terrorism exception.  In addition, Plaintiffs refer this Court to specific findings of fact in *Massie* and evidentiary record in *Warmbier* that provide further support for the conclusion that the Court has sufficient basis to enter a default judgment holding North Korea liable for Plaintiffs' claims.

### 2.   The Court Should Take Judicial Notice of Judge Kennedy's Findings of Fact in *Massie* and the Evidence in *Warmbier*

Pursuant to Fed. R. Evid. 201(b), a court may take judicial notice of any fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Thus, "this Court 'may take judicial notice of related proceedings and records in cases before the same court.'"  *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (quoting *Estate of Heiser v. Islamic Republic of Iran*, 466

F. Supp. 2d. 229, 263 (D.D.C. 2006) ("*Heiser I*")).  Indeed, "the FSIA does not require this Court

to re-litigate issues that have already been settled" in previous decisions.  *Id.* at 54.  "Instead, the

Court may review evidence considered in an opinion that is judicially noticed, without

necessitating the re-presentment of such evidence." *Valore v. Islamic Rep. of Iran*, 700 F. Supp.

2d 52, 60 (D.D.C. 2010); *see also Jankovic v. Intl Crisis Group*, 494 F .3d 1080, 1088 (D.C. Cir.

2007).

      The Plaintiffs' claims in this case are very closely related to the claims presented in

*Massie* and arise out of the same terrorist act:  The claims in the two cases arise from largely

identical facts and circumstances – particularly with regard to the Pueblo's seizure, its crew's

capture, and the crew's torture and other treatment while in captivity. *See generally* Ex. 1, Vol. 1

at 24, 41, 176.  Like all of the plaintiffs in *Massie,* all of the Plaintiffs in this case are either

former Crew Members of the U.S.S. Pueblo or their immediate family members (or legal

representatives thereof).  Consistent with decisions in this Circuit, Plaintiffs ask the Court to take

judicial notice of the *Massie* record, and Judge Kennedy's findings of fact.

      Plaintiffs also submit a transcript of expert testimony presented in the recent case of

*Warmbier*, as well as a copy of Chief Judge Howell's opinion and ruling in that case.  She

recognized David Hawk (consultant on international human rights "who has authored multiple

reports on North Korean prison facilities for international organizations") and Professor Sung-

Yoon Lee (Kim Koo-Korea Foundation Professor in Korean Studies and Assistant Professor at

The Fletcher School at Tufts University[30]) as experts before the Court.  *Warmbier*, 2018 WL

6735801, at *13; Ex. 29 ("*Warmbier* Transcript"), at 5:16-17; *id.* at 28:1-17.  Each submitted a

---

[30] Professor Lee's university biography can be found on The Fletcher School website.  *See* Sung-
Yoon Lee, *Biography*, The Fletcher School, available at: https://fletcher.tufts.edu/people/sung-
yoon-lee (last accessed February 27, 2019).

sealed expert report prior to their oral testimony in December 19, 2018.  *Warmbier*, No. CV 18-977 (BAH), ECF. Nos. 16-4 -16-8.  These experts testified, *inter alia*, to North Korea's patterns of conduct regarding treatment of prisoners, its use of torture, and its use of Americans as a tool of its diplomatic and geopolitical policy, and they compared what happened to the Pueblo crew to what happened to Otto Warmbier as part of their testimony.  *See generally* Ex. 29 ("*Warmbier* Transcript).  Plaintiffs ask the Court to take judicial notice of the experts' testimony, and any relevant facts in Judge Howell's ruling.

In addition to submitting the *Massie* findings and *Warmbier* testimony, as noted in Section I, Plaintiffs submit, *inter alia*: (1) relevant documentation unearthed since the *Massie* opinion; and (2) over 160 declarations in support of Plaintiffs' claims.  Collectively, Plaintiff's evidence shows that North Korea carried out acts of torture, hostage-taking and extrajudicial killing that caused personal injuries to the crew of the U.S.S. Pueblo, and it continues to use torture and hostage-taking as a means of political manipulation and negotiation.

## VI.  THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS AGAINST NORTH KOREA

FSIA § 1605A imposes three requirements that must be met in order for this Court to exercise subject matter jurisdiction over Plaintiffs' claims against North Korea in this case.  *First*, pursuant to FSIA § 1605A(a)(2)(A)(i), the claims must be against a foreign state that was designated as a State Sponsor of Terrorism at the time the acts complained of occurred or be so designated because of those acts.  *Second*, pursuant to FSIA § 1605A(a)(2)(A)(ii), the plaintiffs ("claimants" and/or "victims") must have been U.S. nationals or members of the armed forces at the time that the alleged terrorist events occurred, or employees or contractors of the United States Government, acting within the scope of their employment.  *Third*, pursuant to FSIA § 1605A(a)(1), the plaintiffs must be seeking money damages against a foreign state under

theories of tort liability for personal injury or death that was caused by the foreign state's acts of,

*inter alia*, torture, extrajudicial killing, and/or hostage taking.  *See also Owens*, 864 F.3d at 778.

In any such action, such damages may include economic damages, solatium, pain and suffering,

and punitive damages and a foreign state shall be vicariously liable for the acts of its officials,

employees, or agents.  FSIA § 1605A(c)(4).

As discussed below, Plaintiffs satisfy each of these requirements of § 1605A(a) for

subject matter jurisdiction over their claims.

> **A.**     **North Korea Was Designated a State Sponsor of Terrorism as a Result of the Hostage Taking, Torture, and Extrajudicial Killing of U.S.S. Pueblo Crew Members**

North Korea was first designated a State Sponsor of Terrorism on February 5, 1988, due

in part to North Korea's hostage taking and torture of the crew of the U.S.S. Pueblo.  Notice,

Determination Pursuant to § 6(i) of the Export Administration Act of 1979; North Korea, 53 Fed.

Reg. 3477/01 (Feb. 5, 1988), *see also Massie*, 592 F. Supp. 2d at 74 (concluding that North

Korea's original designation as a State Sponsor of Terrorism was in part based on its treatment of

the U.S.S. Pueblo crew).  On October 11, 2008, North Korea was de-designated as a State

Sponsor of Terrorism pursuant to a now-defunct agreement with the United States seeking

decommission of North Korea's nuclear reactor and plutonium reprocessing facilities.  *See* Mark

E. Manyin, Emma Chanlett-Avery, Dianne Rennack, Ian Rinehart & John Rollins, Cong. Rep.

No. R43865, *North Korea: Back on the State Sponsors of Terrorism Lists?* at 4 (2015).

But on November 20, 2017, North Korea was re-designated as a State Sponsor of

Terrorism, pursuant to section 6(j) of the Export Administration Act, section 40 of the Arms

Export Control Act, and section 620A of the Foreign Assistance Act.  *See* U.S. Dep't of State,

"State Sponsors of Terrorism," available at https://www.state.gov/j/ct/list/c14151.htm (last

accessed Feb. 23, 2019) (U.S. Department of State website listing North Korea as a State

Sponsor of Terrorism as of November 20, 2017).  President Trump laid the groundwork for the

re-designation announcement by indicating a few weeks earlier that the White House would soon

be enacting concrete efforts to "downgrade diplomatic relations with North Korea" referencing

acts such as "[North Korea's] capture and torture of the brave American soldiers of the USS

Pueblo."  Remarks by President Trump to the National Assembly of the Republic of Korea (Nov.

7, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-

assembly-republic-korea-seoul-republic-korea/ (last accessed February 27, 2019).  For these

reasons, North Korea is a State Sponsor of Terrorism as described in FSIA § 1605A(a)(2)(A)(i).

### B.  Plaintiffs Have Standing to Assert a Private Right of Action Against North Korea for Compensatory Damages Under FSIA § 1605A(a) and § 1605A(c)

As elaborated below, each Plaintiff, including the estate of each deceased Crew or Family

Member represented by a personal representative, has a valid claim under the federal cause of

action created by FSIA § 1605A.  This Court's jurisdiction is based on § 1605A(c) and each

Plaintiff's standing to assert such a claim is properly based on FSIA § 1605A(a)(2).

### 1.  FSIA § 1605A(c) Grants a Federal Cause of Action to All Plaintiffs

On January 28, 2008, Congress created a new federal cause of action on which all

Plaintiffs here are entitled to a partial default judgment holding North Korea liable for the

injuries sustained by either Crew Members of the Pueblo or their immediate family members.

That new federal cause of action is set forth in FSIA § 1605A(c):

> (c) Private Right of Action.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), . . . shall be liable to—
>
> (1) a national of the United States,
>
> (2) a member of the armed forces,
>
> (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages . . .

All of the surviving Crew Member and Family Member Plaintiffs, and all the personal representatives of the estates of deceased Crew and Family Members, may use this federal cause of action because as explained *infra*, all of the Plaintiffs in this lawsuit have shown they are U.S. citizens.

### 2.   FSIA § 1605A(a)(2) Confers Standing on All Plaintiffs

In enacting the new federal cause if action, Congress conferred standing on all persons enumerated in § 1605A(c) to bring such claims against a state sponsor of terrorism:

> The court <u>shall</u> hear a claim under this section if ... (ii) the claimant or the victim was, at the time the [terrorist] act described ... occurred – (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States....

FSIA § 1605A(a)(2) (emphasis added).

All of the surviving Crew Member and Family Member Plaintiffs, and all the personal representatives of the estates of deceased Crew and Family Members, have standing to assert the new federal cause of action in FSIA § 1605A(c) because as explained *infra*, at the time of the terrorist act all of them were either U.S. citizens or a member of the armed forces, or have claims that derive from victims who were U.S. citizens or members of the armed forces.

### 3.   All Plaintiffs Are U.S. Citizens or Representatives of Estates of U.S. Citizens

All living Plaintiffs have provided evidence of their U.S. citizenship in the form of birth certificates, U.S. passports, and/or naturalization papers. *See generally* exhibits to declaration included in Ex. 1, Vols. 1-10.  Estate Plaintiffs have provided evidence of the decedents'

citizenship in the form of birth certificates, U.S. passports, naturalization papers, and/or death certificates that record the decedents' date and place of birth.  *See generally* exhibits to declarations included in Ex. 1, Vols. 9-10. *See* Ex.1 Vol. 1 at 10, 31, 40, 55, 63; Vol. 5 at 7, 11, 15, 17-20; Vol. 6 at 11, 15-18, 23, 25-26.  *See*, e.g., Ex. 1, Vol. 7 at 187-191, 195-197, 208-210, 212-217; Vol. 8 at 226, 230; Vol. 10 at 52, 61, 63, 67-68.

Nearly all of the Plaintiffs are U.S. citizens by birth, and thus were U.S. citizens in 1968 when North Korea attacked the Pueblo.  The few Plaintiffs who were not citizens at birth have become so since.  Specifically:

1.  Two Crew Member Plaintiffs, John Doe A-2 and John Doe A-44, were foreign nationals by birth and, as documented in their declarations and supporting exhibits, naturalized either before or shortly after the 1968 incident.  Ex. 1, Vol. 1 at 25, 31 (including certificate of naturalization), and Vol. 4 at 35, 43 (including certificate of naturalization).  Both of these Crew Members were serving in the U.S. armed forces (the Navy) aboard the Pueblo when it was attacked in 1968. *Id.*

2.  Four Family Member Plaintiffs were foreign nationals at the time of the Pueblo's capture, but are U.S. citizens now:

    a.  Plaintiff Family Members Jane Doe B-46 and Jane Doe C-9 (wives of Crew Member Plaintiffs, who are U.S. citizens by birth) became naturalized U.S. citizens in 1968 shortly after the attack on the Pueblo but during the time North Korea still held the crew hostage.  Ex. 1, Vol. 7 at 8, 31, 190, 247.

    b.  Plaintiff Family Member Jane Doe B-83, the adopted daughter of a U.S. citizen Crew Member Plaintiff, became a naturalized U.S. citizen after the

Pueblo attack. *See* Ex. 1, Vol. 8 at 156, 160. While the precise date of naturalization is uncertain, her U.S. passport demonstrates that she is a citizen now. *See* Ex. 1, Vol. 8 at 156-57.

c. Plaintiff Family Member Jane Doe B-69, who was a foreign national by birth, became a U.S. citizen several years after the Pueblo Incident. She was at the time of capture (and remains) the wife of one of the Crew Member Plaintiffs. Ex. 1, Vol. 4 at 38, 43, 47.

**4.      All Family Member Plaintiffs Have Standing**

This Court has confirmed that FSIA § 1605A allows immediate family members who were not U.S. citizens at the time of terrorist attack to pursue § 1605 claims if they or their immediate family member qualified under one of the three categories listed in § 1605A(a)(2). *See Estate of Doe*, 808 F. Supp. 2d at 13 ("Plaintiffs satisfy each of the requirements for subject matter jurisdiction . . . [because] all plaintiffs were either themselves U.S. Government employees at the time of the attacks or their claims are derived from claims where the victims were U.S. Government employees at the time of the attack as required by § 1605A(a)(2)(A)(ii)(I)-(III).").  For example, in *Valore v. Islamic Republic of Iran*, this Court observed that:

> Concerning claimants and victims, the Court identifies victims as those who suffered injury or died as a result of the attack and claimants as those whose claims arise out of those injuries or deaths but who might not be victims themselves. In this case, victims include the 241 members of the U.S. armed forces who were killed, the many more who were physically and emotionally injured, and the family members alleging injury suffered from intentional infliction of emotional distress, all of whom are nationals of the United States. Claimants include the same groups or the estates thereof.

700 F. Supp. 2d 52, 68 (D.D.C. 2010); *see also Leibovitch v. Islamic Rep. of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) (holding district court had jurisdiction to hear the claims of foreign national family members of a U.S. citizen who was injured in a terrorist attack because "the plain text and plain meaning of § 1605A(a)(2)(A)(ii) extends jurisdiction to cases where either 'the claimant or the victim was, at the time of the [terrorist] act' a United States citizen.  The claimant and victim need not both be American citizens."), *Flanagan v. Islamic Rep. of Iran*, 190 F. Supp. 3d 138, 168-171 (D.D.C. 2016) (emphasis added) (citing *Leibovitch* with approval and noting that "section 1605A's jurisdictional requirement focuses alternatively on the claimant or the victim").

This Court has jurisdiction over claims of all Crew Members and estates of deceased Crew Member – Crew Members being the "victims" of North Korea's terrorist acts – because, *inter alia*, all Crew Members were U.S. citizens or a member of the armed forces at the time of North Korea's terrorist attack.  And, like in *Estate of Doe* and *Valore*, this Court has jurisdiction over all claims of Family Members and estates of deceased Family Member Estates – even for those Family Members who were not U.S. citizens in 1968 – because they "derive[] from" injuries to Crew Members, who were U.S. citizens and/or members of the U.S. armed forces at the time of North Korea's terrorist attack.  *See Estate of Doe*, 808 F. Supp. 2d at 13.

5.    **Each of the Estate Plaintiffs Properly Asserts a Federal Cause of Action Under FSIA § 1605A(c)**

The Estate Plaintiffs in this case comprise (1) 13 estates of Crew Members who have died since North Korea initiated its attack on the Pueblo and (2) 19 estates of persons who, in 1968, were parents, siblings, spouses, or children of Crew Members.  Each estate is represented in this action by a Personal Representative duly appointed by the probate court with jurisdiction over

the estate, in accordance with applicable state procedural law.  *See* Ex. 3 (Chart of Estate

Plaintiffs and Personal Representatives).[31]

The Personal Representative of each of the listed Estate Plaintiffs has provided

admissible evidence of his/her appointment as personal representative of the corresponding

estate in the form of a certified order of the probate court in the county where the decedent died,

or other suitable evidence of appointment provided by the probate court.  *See, e.g*., Ex. 1, Vol. 7

at 115, 122-123, 127, 187-191, 203-206, 237-240, 249; Vol. 9 at 4, 8, 39, 42-44.  As noted

*supra*, each also has provided admissible evidence establishing the respective decedent's U.S.

citizenship and/or service in the U.S. armed forces as of 1968.  *See supra*, Section VI.B.2.

Their evidence demonstrates that each of the Estates is eligible to assert federal causes of action

provided under FSIA § 1605A(c)(1) (U.S. nationals) and § 1605A(c)(2) (service in the U.S.

armed services), and that each of the Personal Representatives has standing to assert those

causes of action under FSIA § 1605A(c)(4) (legal representative).

It is clear that Congress intended for claims to transfer upon the death of a party to the

decedent's estate, or to duly appointed personal representatives having standing to assert such

claims on behalf of the respective estate, and this Court has done so in past cases.  *See*, *e.g.*,

*Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 23 & n.8 (D.D.C. 2018) (substituting

plaintiff in § 1605A action who "died in a tragic accident" during pendency of the litigation

with his wife in her capacity as personal representative of the deceased plaintiffs' estate); *Bluth

v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 22 & n.17 (D.D.C. 2016) (substituting plaintiff

---

[31] John Doe Exhibit 3, attached to concurrently filed motion to seal, is a list of the Estate
Plaintiffs and Personal Representatives named in the Amended Complaint but revised to also
include additional estates of plaintiffs who died after the Amended Complaint was filed.  The
additions are highlighted in bold.

who passed away during pendency of the action with her estate representative).  Many if not

most of the types of terrorist events covered by § 1605A can, and often do, result in the death of

the victim, either fairly immediately or at a later date, as a result of severe injuries sustained in

the terrorist attack.  Congressional intent is buttressed by the clear and unambiguous statutory

language of § 1605A(c), which creates a federal cause of action "for personal injury or death"

that may be asserted by "a national of the United States" or "a member of the armed forces"

(emphasis added).

Moreover, the Estate Plaintiffs' claims survive under the general federal common-law

standard, under which a claim survives if the statute is remedial and aims to redress an

individual wrong.  *See Murphy v. Household Fin. Corp*, 560 F.2d 206, 209 (6th Cir. 1977);

*Hannabury v. Hilton Grand Vacations Co*., 174 F. Supp. 3d 768, 773-74 (W.D.N.Y. 2016)

(Telephone Consumer Protection Act of 1991 claims survived a decedent plaintiff's death); *see

also Sinito v. United States DOJ*, 176 F.3d 512, 513 (D.C. Cir. 1999) (FOIA claims survived).

It is unnecessary to consider state law because, as the Supreme Court has repeatedly held,

the survivorship of a federal claim is itself an issue of federal law:

> If an action be brought in a federal court, and is based upon some
> act of Congress or arises under some rule of general law
> recognized in the courts of the Union, the question of revivor [or
> survival of the cause of action after the injured party's death] will
> depend upon the statutes of the United States relating to that
> subject.

*Balt. & O. R. Co. v. Joy*, 173 U.S. 226, 229 (1899).  *See also Carlson v. Green*, 446 U.S. 14, 23

(1980) ("*Bivens* actions are a creation of federal law and, therefore, the question of whether

respondent's action survives [her son's] death, is a question of federal law."); *Mallick v. Int'l

Bhd. of Elec. Workers*, 814 F.2d 674, 676 (D.C. Cir. 1987) ("[T]he Supreme Court has stated that

the question of whether a federal statutory claim survives the death of one of the parties is

essentially a question of how to interpret the statute that provides for the action.") (citing *Cox v. Roth*, 348 U.S. 207, 210 (1955)).

The D.C. Circuit has adopted that approach, as well. *See Sinito*, 176 F.3d at 513 (holding that a FOIA request may survive the requester's death and where Congress was silent about survival, the "court's role is to <u>formulate a federal rule of decision that best serves the goals which underlie the federal right of action itself, and thereby effectuate the will of Congress as best it can.</u>" (emphasis added)); *see also Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 413 (7th Cir. 1980) ("Generally speaking, the question of survival of a federal statutory cause of action is one of federal common law, in the absence of a specific federal statutory directive.  For this reason state survival rules have no application." (citing *Bowles v. Farmers Nat'l Bank*, 147 F.2d 425 (6th Cir. 1945))), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982).

Here, the federal rule of survivorship best serves the goals that underlie the federal right of action in FSIA § 1605A(c) for "for personal injury or death," and best effectuates Congress's will to facilitate recoveries against State Sponsors of Terrorism.  *See* Statement of Sen. Lautenberg, 154 Cong. Rec. S54-01 (daily ed. Jan. 22, 2008) at S55 ("[T]he 2008 amendments were aimed at facilitating recoveries by U.S. nationals, members of the armed services, and Government employees and contractors against foreign governments designated as state sponsors of terrorism.  Congress sought to eliminate unintended barriers to redress under the Flatow Amendment that had [been] created by the courts.").  Furthermore, the fact that FSIA § 1605A created a new federal cause of action to afford relief to a large group of plaintiffs across the country and in foreign countries strongly indicates that the federal statute preempts state law. "[Courts] must generally assume, in the absence of a plain indication to the contrary, that

44

Congress when it enacts a statute is not making the application of the federal act dependent on state law.  That assumption is based on the fact that the application of federal legislation is nationwide."  *Jerome v. United States*, 318 U.S. 101, 104 (1943) (citing *United States v. Pelzer*, 312 U.S. 399, 402 (1941)); *accord Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43-47 (1989) (jurisdictional requirements under federal act controlled, not state law, because the act's plain language and legislative history indicated that "Congress intended a uniform federal law of domicile for the" act).  "[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause," *Perez v. Campbell*, 402 U.S. 637, 652 (1971), "whether or not Congress has used any special 'pre-emptive' language," *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 648 (1990), *superseded by statute as recognized in Ruiz v. Cabrera*, 98 Cal. App. 4th 1198, 1202 n.3 (2002); *see also Bfp. v. Resolution Tr. Corp.*, 511 U.S. 531, 567 (1994).

Notably, in *In re Islamic Republic of Iran Terrorism Litigation,* decided under FSIA § 1605(a)(7), Judge Lamberth acknowledged the importance of federal preemption in dealing with anti-terrorism claims against State Sponsors of Terrorism:

> Given the unbending supremacy of the federal government in matters of foreign relations, combined with the basic aim of the anti-terrorism provision—which is to hold state sponsors of terror accountable for their role in perpetuating terrorist acts that have injured or killed Americans—this Court has long thought it odd that Congress chose to, in effect, rely on state tort law to achieve its national objectives.  Ordinarily, individual state laws must "yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of foreign relations power to the National Government in the first place.  Why then, for purposes of liability under the state sponsor of terror exception, should it matter at all which particular State in the Union the American plaintiff happens to hail from?  But that is precisely the kind of perverse result that § 1605(a)(7) mandates.

659 F. Supp. 2d 31, 77-78 (D.D.C. 2009) (internal citations omitted).  Congress remedied the "perverse result" by enacting a new federal cause of action in FSIA § 1605A and leaving no role for state law in the adjudication of claims against State Sponsors of Terrorism.[32]

In short, FSIA § 1605A(a) and § 1605A(c) control the question of whether personal estates can bring claims under § 1605A, and under that law, this Court has jurisdiction over the Estate Plaintiffs' claims in this case.

### C.    Plaintiffs Seek Money Damages for Personal Injury Caused by North Korea's Acts of Hostage Taking, Torture, and /or Extrajudicial Killing

As stated *supra*, the FSIA removes the immunity of a foreign sovereign "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing . . . [or] hostage taking[.]"  FSIA § 1605A(a)(1). Plaintiffs in this action seek money damages for personal injuries, Am. Compl. at ¶ 3, that were caused by North Korea's torture, hostage taking, and/or extrajudicial killing of Crew Members of the U.S.S. Pueblo.  As explained below, the theories of personal injury tort liability under which Plaintiffs assert their claims include assault, battery, false imprisonment, intentional infliction of emotional distress, solatium, and/or wrongful death.  FSIA § 1605A(c)(4).

### 1.    North Korea Engaged in Torture

The FSIA defines "torture" in reference to Section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350,"  28 U.S.C. § 1605A(h), which states:

---

[32] A few district court decisions in this Circuit have concluded that the survivability of  FSIA § 1605A(c) claims, and the standing of estate representatives to assert those claims on behalf of the estate, is determined "by the particular state law relevant to each deceased plaintiff which governs the survival of rights of action after death."  *See*, *e.g.*, *Worley v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311, 337 (D.D.C. 2014) (Lamberth, J.).  However, as explained above, substantial precedent supports the conclusion that state law does ***not*** apply to claims brought by an estate representative under the federally-created cause of action in FSIA § 1605A(c).

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

In *Massie*, Judge Kennedy held that the Pueblo crew member plaintiffs in that case "were victims of 'torture' as defined in section 3 of the Torture Victims Protections Act of 1991" at the hands of North Korea during their time in captivity in North Korea. *Massie*, 592 F. Supp. 2d at 74.

The Plaintiffs in this case suffered the same torture as the *Massie* plaintiffs. During their time as hostages of North Korea, Crew Members were in North Korea's "custody" and "physical control," and suffered severe physical and mental suffering at the hands of their North Korean captors. As described herein and in declarations exhibited hereto, this suffering was inflicted, *inter alia*, in order to obtain false confessions, to punish Crew Members for acts they or their fellow Crew Members had committed, and/or for intimidation and coercion.

For example, shortly after a group of North Korean officers and enlisted military personnel first boarded the U.S.S. Pueblo, they gathered the crew and "forced them to sit blindfolded with their hands and ankles tightly bound." *Massie*, 592 F. Supp. 2d at 62, *see also* Ex. 1, Vol. 2 at 135. In a prescient introduction to the horrific abuse that was to come, crewmembers were "punched, kicked or jabbed . . . with weapons" on the deck of the Pueblo, *Massie*, 592 F. Supp. 2d at 62, *see also* Ex. 1, Vol. 58, and forced to sit in several inches of icy sea water. *Massie*, 592 F. Supp. 2d at 62, *see also* Ex. 1 Vol. 1 at 135. On land, the physical torture escalated almost immediately, when "[t]he crew was taken . . . to a small building where they were beat[en] and severely mistreated . . . " *Massie*, 592 F. Supp. 2d at 62, *see also* Ex. 2,

Vol. 1 at 8.  In transit, North Korea captors "beat the crew with rifle butts and fists and kicked them."  *Massie*, 592 F. Supp. 2d at 62-63.  On the train, captors forced them into painful sitting positions while they interrogated other Crew Members.  Ex. 2, Vol. 1 at 157-58.  They beat Crew Members who did not comply.  *Massie*, 592 F. Supp. 2d at 63; Ex. 2, Vol. 2 at 55; *see also* Ex. 1, Vol. 1 at 101-02, 122.  Along the way, the crew was informed that they were being held as civilian prisoners in violation of North Korean criminal espionage laws, *Massie*, 592 F. Supp. 2d at 63, *see also* Ex. 1, Vol. 1 at 70, 180, and were repeatedly accused of being spies, *Massie*, 592 F. Supp. 2d at 63, *see also* Ex. 2, Vol. 2 at 3.

As detailed above, for the next eleven months the Crew Members were regularly subjected to severe physical and mental abuse that included being punched, kicked, and hit with assorted hard objects for hours at a stretch, often until unconsciousness, and being deprived of heat, proper sanitation, sufficient food, privacy, and sleep.  *See, e.g.*, *supra*, Section B.II.3., *see also Massie*, 592 F. Supp. 2d at 63.  Crew Members were beaten where they could be heard by other Crew Members, making them a tool of intimidation to coerce other Crew Members into compliance.  Ex. 1, Vol.1 at 224; Vol 2 at 57, 62.  Sometimes they made Crew Members clean up blood from the beatings of others.  *Id.*, Vol. 2 at 6; Ex. 1, Vol. 1 at 51, 223.  Some Crew Members were operated on without anesthesia.  Ex. 1, Vol. 3 at 216.  Crew Members were forced to hold painful stress positions for hours on end.  *Massie*, 592 F. Supp. 2d at 63; Ex. 1, Vol. 1 at 122; *see also Massie*, 592 F. Supp. 2d at 64 (a "form of torture [for Pueblo captives] involved requiring the captives to stand against the wall with their arms held out straight.  When their arms started to fall, the guards would hit them.  When they could no longer put their arms up, the guards would beat them").

As concluded by the Court in *Massie*, all of this was done for purposes of intimidation and coercion within the meaning of Section 3 of the Torture Victims Protection Act (quoted above). *Massie*, 592 F. Supp. 2d at 64; *see also*, *e.g.,* Ex. 1. Vol. 1 at 171 ("The beatings were accompanied by intimidation and threats that the crew members would be shot as spies if they did not confess. These threats created a constant fear of execution."); *see also Massie*, 592 F. Supp. 2d at 62, 64-65 ("It is apparent that the captives were treated as they were because their captors wanted to extract confessions from them that they were spying on North Korea in North Korean waters, and not international waters, when the Pueblo was hijacked."); *see also*; Ex. 1, Vol. 1 at 43, Vol. 3 at 58, 166; *supra* Section II.C. (discussing coercion of confession in writing and for the press).

Indeed, Judge Kennedy found that North Korea's mistreatment of the crew was primarily motivated by North Korea's interest "in obtaining confessions and personal history statements from the captives for international propaganda purposes." *Massie*, 592 F. Supp. 2d at 66; *see also* Ex. 1, Vol. 1 at 5, 44; *see also Massie*, 592 F. Supp. at 66 (beatings and torture were inflicted "to exert control over the captives and to coerce additional confessions").[33]

The unspeakably awful conditions in which the Crew Members were held also constituted torture. This Court has ruled that "the deprivation of adequate food, light, toilet facilities, and medical care" for an extended period of time is torture within the meaning of the

---

[33] Coercing confessions from the Crew Members for larger international political gains is part of a longer pattern of conduct by North Korea. Ex. 29, at 31:9, 32:22 ("*Warmbier* Transcript"), testimony of Professor Soon-Yeung Lee (describing coerced confessions of Pueblo Crew Members as part of a pattern of North Korean conduct continuing to the present); *see also id.,* 37:5 –38:1 (Prof. Lee discussing North Korea using "American prisoners as a means of furthering strategically timed foreign relations goals"); *Warmbier*, 2018 WL 6735801, at *14 (citing Prof. Lee's testimony on North Korea's record of hostage taking); *accord id*, at *13 (noting "North Korea's 'pattern' of holding Americans hostage to serve its goal of 'opening dialogue' with the United States").

FSIA.  *Valore*, 700 F. Supp. 2d at 73 (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d

27, 32 (D.D.C. 2001).  The North Korean captors deprived Crew Members of food, light and

basic human necessities in the extreme.  *Massie*, 592 F. Supp. 2d at 65 ("For 40 days, the

captives were not given an opportunity to shower, change clothes or shave. They were covered in

their own blood and in some cases their own feces."); *see also*, *e.g.*, Ex. 1, Vol. 1 at 180; *Massie*,

592 F. Supp. 2d at 65 (noting the insufficient food that was only "marginally able to sustain

life"); *see also supra* Section B.II.3.

  The North Korean captives threatened the men with execution:  "Each man was told that

he must admit his crimes if he hoped to live and someday see his family again.  During the first

few weeks of detention the captives endured individual threats of death, threats to kill others,

severe beatings, torture, both physical and mental, and other means of coercion."  *Massie*, 592 F.

Supp. 2d at 66; *see also e.g.*, Ex. 1, Vol. 1 at 3, 36, *supra* Section II.B.1.  Under these conditions,

the Crew Members felt great anguish at both the reality of their circumstances and at the

anticipation of future physical or mental harm at the hands of their captors.  *See*, *e.g.*, Ex.1, Vol.

at 4, 182.

  Such "mental torture" also constitutes torture under the TVPA.  *See Price v. Socialist*

*People's Libyan Arab Jamahiriya*, 274 F. Supp. 2d 20, 25 (D.D.C. 2003), *aff'd*, 389 F.3d 192,

195-96 (D.C. Cir. 2004) (a claim for "mental torture" is stated through allegations that the

victims were "forced to watch on three separate occasions as fellow prisoners were beaten," were

informed that they would be further tortured or killed "if they refused to confess that they were

guilty of espionage," and were "informed, during an interrogation at which cabinet-level Libyan

officials were present, that they were being afforded one last chance to confess, or they would be

beaten as they had seen their fellow prisoners be beaten."); *Kilburn v. Islamic Republic of Iran*,

699 F. Supp. 2d 136, 152 (D.D.C. 2010) (hostages experienced "torture" in the form of

"beatings, unsanitary conditions, inadequate food and medical care, and mock executions");

*Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91, 97 (D.D.C. 2003) (victim was

"tortured" when his captors regularly beat him, threatened him with death, and confined him in

"deplorable and inhumane conditions"), *abrogated on other grounds by Cicippio-Puleo v.*

*Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).

For all of the above reasons, Plaintiffs have established their claims of torture against

North Korea.

### 2.        North Korea Engaged in Hostage Taking

The FSIA defines the term "hostage taking" by reference to Article 1 of the International

Convention Against the Taking of Hostages, I.A.S. No. 11,081, 1316 U.N.T.S. 205; 28 U.S.C.

§ 1605A(h). That Article states:

> any person who seizes or detains and threatens to kill, to injure or to continue to
> detain another person . . . in order to compel a third party, namely, a State, an
> international intergovernmental organization, a natural or juridical person, or a
> group of persons, to do or abstain from doing any act as an explicit or implicit
> condition for the release of the hostage commits the offence of taking of
> hostages . . .

In *Massie*, Judge Kennedy held that the crew member plaintiffs in that case were "victims

of 'hostage taking' as defined in Article 1 of the International Convention Against the taking of

Hostages." *Massie*, 592 F. Supp. 2d at 74.[34]  Likewise here, this Court should find North Korea

committed hostage taking when they seized the U.S.S. Pueblo, held its Crew captive for eleven

months, physically and mentally abusing them and repeatedly threatened to kill, injure, or

---

[34] In the recent *Warmbier* decision, this Court also described the Pueblo incident as one in which
"North Korea took hostage the USS Pueblo crew to 'extract a public apology' from the United
States, in violation of the FSIA."  Ex. 30 at 29 (emphasis added).

continue to detain them if they, *inter alia*, failed to meet "explicit or implicit condition[s]" set by North Korea.

After armed North Korean officers "boarded the Pueblo" on January 23, 1968, and "forcibly gathered members of the Pueblo crew" on the ship's deck, *Massie*, 592 F. Supp. 2d at 60-61, 62, and throughout the months of captivity, the North Korean captors made *quid pro quo* demands.  For example, North Korean guards and military personnel repeatedly threatened to kill or injure the crew if: (1) they did not sign false confessions of their alleged "crimes" and (2) the U.S. Government did not sign a North Korea-drafted public apology, which claimed the U.S.S. Pueblo had intruded into North Korea's territory.  *Massie*, 592 F. Supp. 2d at 67; *see also* Ex. 1, Vol. 1 at 67-68.  As discussed above, *see*, *e.g.*, Section II.C., the captors also forced the Crew Members to write letters home in which, *inter alia*, they called upon their families to pressure the U.S. Government into making an apology or else the Crew Member might lose his life. *See also Massie*, 592 F. Supp. 2d at 67; Ex. 1, Vol. 1 at 163, Vol. 2 at 77, 94.  Once the U.S. Government signed the North Korea-drafted public apology, North Korea promptly released the Crew Members.  *Id*.

These actions by North Korea demonstrate that it was, *inter alia*, using the Crew Members in order to compel third parties – including the U.S. Government – to take certain actions.  *See Simpson ex. rel. Estate of Karim v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359-361 (D.C. Cir. 2006) (the required *quid pro quo* element of hostage taking does not require that a hostage-taker issue demands to a third party or to the outside world, but that such demands for terms of release are evidence of the hostage-takers' required intention to compel a third party to do, or abstain from doing, some specific act).  North Korea's actions violate § 1605A, and thus it should be found liable to Plaintiffs for hostage taking.

### 3.      North Korea Engaged in Extrajudicial Killing

The FSIA refers to Section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C.

§ 1350, to define "extrajudicial killing." 28 U.S.C. § 1605A(h).  Section 3 of that Act defines

"extrajudicial killing" as "a deliberated killing not authorized by a previous judgment

pronounced by a regularly constituted court affording all the judicial guarantees which are

recognized as indispensable by civilized peoples.  Such term, however, does not include any

such killing that, under international law, is lawfully carried out under the authority of a foreign

nation."  28 U.S.C. § 1350, Sec. 3.  This Court has applied this language to conclude that an

extrajudicial killing was one "not authorized by a previous judgment pronounced by a regularly

constituted court."  *Owens*, 864 F.3d at 770.

The D.C. Circuit has held that to prove extrajudicial killing, plaintiffs "need demonstrate

only that the DPRK killed the [victim] without due process."  *Han Kim*, 774 F.3d at 1050

(concluding that North Korea committed extrajudicial killing outside the formal process).  And

this Court has held that victims killed by a terrorist attack were victims of extrajudicial killing

because they "were killed outside the judicial system, and neither was afforded 'indispensable'

judicial guarantees."  *See*, *e.g.*, *Thuneibat v. Syrian Arab Republic*, 167 F Supp. 3d 36, 39

(D.D.C. 2016); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 77, 83 (D.D.C.

2017); *Warmbier*, 2018 WL 6735801, at *15-16.

No such "due process" or "judicial guarantees" were present here ████████████

████████████████████████████████████████████████████████████████████

████████████████ .  *Accord Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974) (stating that

the minimum requirements of due process require advance written notice of the claimed

violation, a written statement of the factfinders as to the evidence relied upon and the reasons for

the disciplinary action taken, and the opportunity to call witnesses and present documentary

evidence in his defense); *c.f. Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 263 (1st Cir. 1987) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)) (explaining that the opportunity to appeal after being informed of the action is constitutionally inadequate; due process requires being given notice of the charges and an opportunity to respond *before* the action is taken); see also *Gillard v. Culclager*, No. 5:14CV00216 JM/JTR, 2014 WL 11516259, at *2 (E.D. Ark. Aug. 14, 2014) (stating that where a liberty interest exists, due process requires a prisoner receive notice, a hearing, written finding, and the opportunity to appeal).  Rather, as described *supra*, North Korea took deliberate and intentional steps to confront the ship and attempt to control its path of passage, and then made the deliberate decision to open fire with 57mm weapons that pierced the vessel's hull.  *See supra* Section II.A.1.  That North Korean forces started and stopped their fire at particular points as they escalated the confrontation demonstrates that their actions were intentional and controlled.  But at no point were any due process mechanisms at work.

Moreover, just because the Crew Members were being attacked on a U.S. military vessel does not make the attack legal under international law, nor allow North Korea to escape liability under § 1605A(c) for extrajudicial killing.

North Korea's attack was not justified under international law.  The Pueblo was not engaged in combat operations, and what few weapons it had were unused and unmanned.  *See supra*, *id*.  The Pueblo did not fire first (or at all), and in fact, in conformity with its orders and mission, took affirmative steps to avoid confrontation with North Korea.  *Id.*  Indeed, given that Pueblo was outside the accepted territorial sea delineation (whether one accepts the North Korean or United States' location of the Pueblo at the time of the confrontation),[35] its "presence

---

[35] Ex. 27 at 459-60.

… can under no circumstances be considered unlawful or a use of force, which would have entitled the DPRK to take enforcement measures" under international law. Ex. 27 at 460. It was not until North Korea fired that an armed conflict – to the extent there even was one – began. Ex. at 460 (analyzing the Pueblo situation under, *inter alia,* of international humanitarian law).[36]

U.S. courts have found State Sponsors of Terrorism liable for extrajudicial killings of military personnel on numerous occasions, even when at the time of the attack those personnel were in active service on military property. *See Flanagan v. Islamic Rep. of Iran*, 190 F. Supp. 3d 138, 166 (D.D.C. 2016) (concluding that deaths of U.S. military personnel aboard the U.S.S. Cole as a result of a terrorist bombing constituted an "extrajudicial killing" even within the meaning of § 1605A); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (concluding killing of servicemen during the Khobar Towers bombing, who were serving on a military base, qualified as extrajudicial killing); *Estate of Heiser*, 466 F. Supp. 2d at 255 (killing of U.S. army sergeant stationed in Dhahran and resided in the Khobar Towers was extrajudicial).

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[36] In any event, North Korean officials said they understood the Crew Members to be civilians and non-combatants, telling one of the *Massie* plaintiffs that "the Geneva convention did not apply because the crew was held as civilian prisoners in violation of North Korean criminal espionage laws." *Massie*, 592 F. Supp. 2d at 63; see also Ex. 1, Vol. 1 at 180; Vol. 9 at 11. But the Geneva Conventions – to which North Korea is a party – also protect civilians from, *inter alia*, "violence to life and person, in particular … murder of all kinds, … and torture," the "taking of hostages," "outrages upon personal dignity, in particular humiliating and degrading treatment," and "the passing of sentences and the carrying out of execution without judgment pronounced by a regularly constituted court." *See*, *e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 75 U.N.T.S 287, art. 3 (Aug. 12, 1949) (Geneva IV), available at: https://treaties.un.org/pages/showdetails.aspx?objid=0800000280158b1a (showing North Korea's accession to the treaty effective on February 27, 1958) (last accessed February 25, 2019).

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

For all these reasons, ███████████████████████████████

███████████████████████████████████████████████

████████████████ North Korea should be found liable for extrajudicial killing here.  *Worley*, 75 F. Supp. 3d at 325 (holding that the deaths of U.S. Marines in the bombing of their barracks in Beirut were the result of extrajudicial killings); *see also*, *Owens v. Rep. of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017) (killing many government employees during the 1998 embassy bombings qualified as "extrajudicial killing" and did not fall within the international law exception because the bombings were "deliberated" in that they involved substantial preparation and were neither authorized by any court nor by the law of nations).

## VII.   NORTH KOREA IS LIABLE TO PLAINTIFFS UNDER FSIA § 1605A(c) AND RECOGNIZED TORT THEORIES FOR ASSAULT, BATTERY, FALSE IMPRISONMENT, EMOTIONAL DISTRESS AND/OR SOLATIUM

### A.   Applicable Standard

In addition to establishing subject matter jurisdiction, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding the defendant liable for the injuries that the Plaintiffs have suffered.  *Worley*, 75 F. Supp. 3d at 334-335 (quoting *Valore*, 700 F. Supp. 2d at 73).  Courts define the theory of "personal injury" needed to prevail on a § 1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery." *Id.* at 335 (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).

As discussed *supra* in Section VI., Plaintiffs herein present sufficient evidence that North Korea engaged in hostage taking, torture, and extrajudicial killing that caused Plaintiffs' harm.[37] These terrorist acts include conduct that satisfies all of the elements of the Plaintiffs' tort claims for assault, battery, false imprisonment, intentional infliction of emotional distress, solatium, and/or wrongful death according to the elements articulated by the Restatement (Second) of Torts.  Am. Compl. at ¶¶ 3-4.  Crew Member Plaintiffs bring claims under the first four of these theories.  Family Member Plaintiffs bring claims for intentional infliction of emotional distress and solatium.  Plaintiff C-17 brings a claim for wrongful death.  All of the Plaintiffs' declarations, attached to the Declaration of Alexandra A.K. Meise together as Exhibit 1, Vols. 1 – 10; *see also* Ex. 2, Vols. 1-2, make out the elements of the applicable tort theories corresponding to their claims, according to the specific facts of their unique experiences.  Additionally, as discussed *supra* in Section VI.B.4., the Estate Plaintiffs comprised of deceased Crew Members and Family Members, who were victims or claimants, have standing to bring their respective estate's claims under § 1605A.

> **B.      Plaintiffs' Theories of Tort Recovery**
>
> **1.      Crew Members Have Established Their Assault Claims**

"An assault occurs when one person (a) 'acts intending to cause a harmful or offensive contact with the person of the other.., or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.'"  *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21).  "'Harmful contact' is that which causes 'any physical impairment of the condition of another's body, or

---

[37] As noted *supra* at n.8, so long as the Court is satisfied at least one Plaintiff has established the relevant elements for claim recovery, this Motion can be granted with instructions to the Special Master to satisfy himself that all Plaintiffs have established their theories of recovery.

physical pain or illness[.]'"  *Stansell*, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of

Torts § 15).

Here, Defendant North Korea is liable to all Crew Member Plaintiffs for numerous acts

of assault because, as established by the declarations submitted in support hereof, North Korea's

officials, employees, service members, and/or agents intentionally threatened crew members'

lives and their well-being, including but not limited to by pointing guns at them, *see e.g.*, Ex. 1,

Vol. 1 at 51, 66, 98, 107, 148, 163, 223; Vol. 2 at 144, 212, threatening to execute them as spies,

*see, e.g.*, Ex. 1, Vol. 9 at 11; Vol. 3 at 199; Vol. 2 at 11, 135; Vol. 4 at 36; striking and hitting

them with fists, sticks and other inanimate objects, and kicking them with boots, *see, e.g.*, Ex. 1,

Vol. 1 at 35, 122, 148, 204; Vol. 2 at 53; and hitting them severely with rifle butts, *see, e.g.*, Ex.

1, Vol. 1 at 27, 157, 163, 178-79, 215; Vol. 2 at 101-02; Vol. 4 at 12.  All of the Crew Member

Plaintiffs also suffered imminent apprehension of death when North Korea's forces threatened to

execute the crew or severely beat them if they refused to sign false confessions, attempted to

escape, or refused to cooperate in propaganda efforts.  Ex. 1, Vol. 1 at 5-6, 106, 163, 170-71,

178; Vol. 2 at 11-12, 151; Vol. 3 at 185.

As a result, North Korea should be found liable for the pain and suffering caused by its

unrelenting acts of assault on Crew Member Plaintiffs.  *Massie*, 592 F. Supp. 2d at 75 ("The

agents of North Korea committed multiple and incessant assaults on crew members between

January 23, 1968 and December 23, 1968"); *see also Stansell*, 217 F. Supp. 3d at 343 (mock

executions and threats to kill hostages if they attempt to escape constitute acts of assault).

### 2.    Crew Members Have Established Their Battery Claims

Under general principles of law, "[b]attery occurs when one person (1) 'acts intending to

cause a harmful or offensive contact with the person of the other . . . or an imminent

apprehension of such a contact, and (2) a harmful contact with the person of the other directly or

indirectly results.'"  *Stansell*, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts

§ 13) (Battery:  Harmful Contact); *see also* Restatement (Second) of Torts § 18 (Battery:

Offensive Contact).  "'Harmful contact' is that which causes 'any physical impairment of the

condition of another's body, or physical pain or illness[.]'"  *Stansell*, 217 F. Supp. 3d at 342

(quoting Restatement (Second) of Torts § 15) (internal citations omitted)).  And, "bodily contact

is offensive if it offends a reasonable sense of personal dignity."  Restatement (Second) of Torts

§ 19.

Here, Defendant North Korea committed battery when it committed numerous acts of

physical abuse and torture on Crew Members, which included direct, intentional, harmful and

offensive contacts.  As established by the declarations submitted in support thereof, North

Korea's officers, employees, and/or agents repeatedly beat, kicked, hit, struck, punched and

otherwise physically abused crew members to the face, back, knees, ankles, head, the groin area

and other parts of the body, sometimes for hours in a row to coerce them into signing false

confessions.  *See*, *e.g.*, Ex. 1, Vol. 1 at 4, 26-27, 35, 58, 66, 122, 97, 148, 156, 170, 179-80, 204-

05; *see also Massie*, 592 F. Supp. 2d at 68.  North Korea also committed battery when it fired

upon the ship, killing one Crew Member and injuring several others, and when its officers,

employees and/or agents armed with AK-47 assault rifles unlawfully took over the ship and

kidnapped the crew.  The act of taking over the ship operating in international waters constituted

intentional, harmful contact to all Crew Members onboard.  *See Stansell*, 217 F. Supp. 3d at 342

("'Harmful contact' . . . can be caused by contacting either another's person directly or an

instrumentality that acts as an extension of the individual's person, such as a car or airplane[.]").

In addition, North Korea's officers, employees, and/or agents forced many Crew

Members to hold uncomfortable positions to the point of pain.  *See also e.g.,* Ex. 1, Vol. 1 at 43,

51, 58, 67, 149; Vol. 2 at 54, 76, 93, 159; Vol. 3 at 192-93, 200; *see also Massie*, 592 F. Supp. 2d at 63, 64.  And, all of the forty-eight surviving Crew Member Plaintiffs and the thirteen Crew Members whose estates are plaintiffs suffered physical injuries and emotional harm from being tortured, beaten, and subjected to constant mental and psychological terror while in captivity, and continue to be affected by numerous disabilities stemming from their captivity.  *See supra*, Section II.B.1-2, 5; *see also*, *supra*, Section II.E.

As a result, Defendant North Korea should be found liable for the pain and suffering caused by these acts of battery.  *See Massie*, 592 F. Supp. 2d at 75.

### 3. The Pueblo Crew Members Have Established Their False Imprisonment Claims

"Under general principles of tort law, a plaintiff may recover for false imprisonment when one person '(a) acts intending to confine the other . . . within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'"  *Stansell*, 217 F. Supp. 3d at 342-43 (quoting Restatement (Second) of Torts § 35).

Here, Defendant North Korea is liable for the false imprisonment of the Crew Member Plaintiffs because through the actions outlined herein and in accompanying declarations, North Korea's employees, agents, and/or officials intended to confine and in fact did confine all of the Crew Members within the fixed boundaries of the U.S.S. Pueblo, the Barn, the Farm, and other locations in North Korea in which they held the Crew hostage for 11 months.  Ex. 1, Vol. 1 at 3, 34, 43; Vol. 2 at 78, 79, 87; *see also Massie*, 592 F. Supp. 2d at 75.  During that time, all of the Crew Members were aware that their captors were holding them against their will and were not free to leave.  Ex. 1, Vol. 2 at 94, 103, 145, 152.  Indeed, North Korea, through its employees, agents, and/or officials, threatened the Crew with harm if they tried to leave.  Ex. 2, Vol. 1 at 16;

*see also* Ex. 1, Vol 1 at 36, 52, 59; Vol. 2 at 54.  All of the Crew Members were also physically and psychologically harmed by their confinement.  *See, e.g.*, Ex. 2, Vol 2 at 60 (describing frequent anxiety attacks, feelings of shame, and various permanent physical injuries), *see also* Ex. 1, Vol. 1 at 27, 37, 45, 53, 60, 100, 151, 172-73.  As a result, Defendant North Korea should be found liable for pain and suffering caused by these acts of false imprisonment.  *See also Massie*, 592 F. Supp. 2d at 75-76.

### 4.     The Pueblo Crew Members Have Established Their Emotional Distress Claims

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*") (quoting Restatement (Second) of Torts § 46(1)); *see also*, Restatement (Second) of Torts § 46, cmt. (j) ("Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that distress has existed.").  "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience:  The more extreme and outrageous, the greater the resulting distress."  *Stethem v. Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (emphasis added); *see also* Restatement (Second of Torts 46, Comment (j)); *see also Massie*, 592 F. Supp. 2d at 76 (citing *Stethem v. Iran*, 201 F. Supp. 2d at 89).

This Court concluded in *Massie* that the pain and suffering endured by Crew Members during their eleven months of captivity was "extensive and shocking."  *Massie*, 592 F. Supp. 2d at 77.  The declarations submitted herewith in support of Crew Members' claims confirm this, describing the various feelings of despair, severe anxiety, horror, and fear of being shot or

tortured to death.  *See*, *e.g.*, Ex. 1, Vol. 1 at 7, 35-36, 43, 51, 58, 157, 179-80; Vol. 3 at 185; Vol. 9 at 13.  All of the declarations in support of Crew Members' claims confirm that because of North Korea's intentional acts, Crew Members experienced severe distress while in captivity, anticipating and experiencing harm to themselves, witnessing and anticipating harm to their fellow shipmates, and worrying and stressing about how their families were coping without them.  Ex. 1, Vol. 1 at 28, 35, 43, 52, 98, 179; Vol. 2 at 3.  These declarations also confirm all of the Crew Members suffered extreme emotional anguish when forcibly placed in tiny cells, denied medical care, prevented from performing basic bodily functions as needed, and regularly being told they would be killed.  *See*, *e.g.*, Ex. 1, Vol. 4 at 4; Ex. 2, Vol. 1 at 10, 19; Ex. 2, Vol. 2 at 55-57; Ex. 1, Vol. 1 at 3; *see also Id*. at 123; Ex. 1 Vol. 4 at 4, 13-14, 75, *see also Stansell*, 217 F. Supp. 3d at 330, 343.

Crew Members also experienced severe emotional distress after returning home, and continued to endure physical and psychological effects of this distress and their trauma until their deaths or continue to do so to the present day.  *See*, *e.g*., Ex. 1, Vol. 1 at 37, 60, 182-83, 206, 216; Vol. 2 at 13, 45, 56, 146, 162, 210; Vol. 3 at 187, 219; Vol. 4 at 14.  The trauma caused great emotional strife and profoundly affected their lives.  *See*, *e.g*., Ex. 1, Vol. 1 at 37, 182-83, 216; Vol. 2 at 13, 45, 146, 162, 201; Vol. 3 at 187, 219.  Indeed, many Crew Member Plaintiffs have been rated disabled by the Department of Veterans Affairs on account of post-traumatic stress disorder, anxiety, or other psychological conditions on account of their time being held hostage by Defendant.  *See*, *e.g.*, *supra* Section II.E.; *see also* Ex. 1, Vol. 1, at 116, 151; Vol. 2 at 56, 78, 104; Vol. 3 at 187; Vol. 4 at 38, 55.

For all these reasons, Defendant North Korea should be found liable for the pain and suffering caused by the acts of intentional infliction of emotional distress. *Massie*, 592 F. Supp. 2d at 76.

### 5.    Family Member Plaintiffs Have Established Their Emotional Distress and/or Solatium Claims

"Courts have uniformly held that a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005). "Where the claimants were not the direct recipient of the 'extreme and outrageous conduct,' the Restatement permits recovery if they are members of the [v]ictim's immediate family and "'the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present.'" *Thuneibat*, 167 F. Supp. 3d at 39 (quoting *Estate of Heiser*, 659 F. Supp. 2d at 27 (finding that "presence" requirement by itself no longer bars the claims of the plaintiffs in the FSIA-terrorism context; family members who were not "present" for a terrorist attack may still assert IIED claims).

Here, Defendant North Korea's conduct, including its unlawful attack on the U.S.S. Pueblo, its taking the Crew Members hostage, its using them for propaganda, its torturing them and subjecting them to severe and inhumane treatment for almost a year, and its use of the crew as political pawns in an international diplomatic and military negotiation between two sovereign powers, constitutes extreme and outrageous conduct that goes beyond the bounds of decency. Accordingly, even though the Family Member Plaintiffs were not physically present during the Pueblo attack and subsequent hostage taking and torture of Crew Members, they may recover for claims of intentional infliction of emotional distress and/or solatium.[38]

---

[38] Courts in this Circuit have recognized the cause of action for loss of solatium under the federal common law by relying upon the Restatement (Second) of Torts § 46.  *See*, *e.g.*, *Massie*, 592 F.

Immediate family members include "one's spouse, parents, siblings, and children." *Estate of Heiser v. Iran*, 659 F. Supp. 2d at 28 citing *Jenco*, 154 F. Supp. 2d at 36 n.8; *see also Thuneibat*, 167 F. Supp. 3d at 39 (noting only spouses, parents, siblings, and children are entitled to recover as immediate family members).  Here, the liability declarations submitted in support of the Family Member Plaintiffs' claims establish that they are the spouses, children, siblings, parents or estates of thereof of the victim crew members, and, thus are members of the Crew Members' immediate family.  *See* Alexandra Meise Declaration and Master Index accompanied Plaintiffs' Declarations.

Those declarations also establish that all of the Family Member Plaintiffs suffered from emotional distress as a result of North Korea's actions against the U.S.S. Pueblo and its crew.[39] *See*, *e.g.,* Ex. 1. Vol. 7 at 76-77 (suffered from a panic disorder); Vol. 6 at 4 (felt distressed seeing her brother on TV during North Korean staged conference); *Id.* at 69; Vol. 7 at 76; Vol. 5 at 135; Vol. 6 at 150 (experienced high level of anxiety and taken medication to overcome angst); *Id.* at 46.  *See generally Massie*, 592 F. Supp. 2d at 76.  The Crew Members' capture, prolonged detention and imprisonment, and the lack of information as to their condition while in captivity greatly distressed all Family Members, making it difficult for them to, *inter alia*, focus on work, school, keep up with day-to-day activities, or simply maintain healthy family relationships.  *See*, *e.g.*, Ex. 1, Vol. 5 at 24, 54, 119, 180; Vol. 7 at 114; Vol. 8 at 130.  After

---

Supp. 2d at 76.  "Claims for solatium under the FSIA are nearly indistinguishable from claims for intentional infliction of emotional distress."  *Stansell*, 217 F. Supp. 3d at 344.

[39] Several Family Member Plaintiffs were born in the United States during their father's captivity.  *See*, *e.g.*, Ex. 1, Vol. 5 at 118-19; Vol. 6 at 113-14; Vol. 8 at 121-2.  Although they were not yet born at the time of the U.S.S. Pueblo's capture, they have standing to maintain a cause of action for loss of solatium.  *See*, *e.g.*, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 n.3 (D.D.C. 2000) (awarded compensatory damages to a plaintiff who was born while her father was a hostage in Iran).

captivity, many Family Members continued to be devastated for decades from the experience of living through the captivity themselves and/or due to the impact that the incident had on the Crew Members and their relationships.  *See, e.g.*, Ex. 1, Vol. 7 at 114-15 (describing feeling deprived of a healthy and supportive relationship with her father); Ex. 1, Vol. 5 at 198 (describing negative feelings and flashbacks when he sees or hears news about North Korea); *see also* Ex. 1, Vol. 8 at 207; Vol. 5 at 32, 54, 68, 188; Vol. 6 at 150; Vol. 7 at 9, 46, 76-77, 108-09, 147.

████████████████████████████████████████████████████████

███████████████████████.  This Court has recognized the unique nature of the traumatic loss and grief a death by terrorism can inflict on victims' family members.  *See, e.g.*, *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000) (citing to *Higgins v. The Islamic Republic of Iran*, No. 1:99-cv-00377, 2000 WL 33674311, at *7 (D.D.C. Sept. 21, 2000) ("[D]eath as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding."). ███████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████.  *See*, *e.g.*, Ex. 1, Vol. 8 at 86; Vol. 9 at 181, 192.

All Family Member Plaintiffs were deprived of support, consortium, companionship, affection, comfort, and close relationship with their Crew Member husbands, fathers, sons, and brothers.  *See*, *e.g.*, Ex. 1, Vol. 5 at 135-36, 144, 164-65, 157, 222-23, 230-31; Vol. 6 at 4, 121-22.  Many continue experiencing severe and unconscionable mental anguish to this day from witnessing how their husbands, sons, or fathers struggled to overcome mental and physical pain

resulted from their captivity.  *See*, *e.g.*, Ex. 1, Vol. 5 at 4, 180-81 188; Vol. 6 at 4, 54, 69-70, 150-51.

For all of these reasons, Defendant North Korea should be found liable to the Family Member Plaintiffs for the pain and suffering or solatium caused by the acts of intentional infliction of emotional distress.

### 6. Applicable Plaintiffs Have Established Their Wrongful Death Claim

██████████████████████████████████████████████████████

███████████████████████████

A decedent's heirs, acting through the decedent's estate, may bring an action under § 1605A(c) to seek compensation "for economic losses which result from decedent's premature death," *Valore*, 700 F. Supp. 2d at 78, if they can establish that the State Sponsor of Terrorism defendant caused the decedent's death.  *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 139 (D.D.C. 2018) (finding Iran liable for wrongful death of the decedent when plaintiffs sufficiently demonstrated that the death was a result of extrajudicial killing).

As very recently explained by this Court in *Colvin v. Syrian Arab Republic* ██

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

> It is axiomatic that acts of terrorism under section 1605A—
> including extrajudicial killing or material support thereof—are, by
> definition, wrongful. Any deaths resulting from an act of terrorism
> under section 1605A are properly considered wrongful deaths, and
> a plaintiff's recovery under a wrongful death theory is appropriate.
> Thus, where a foreign state or an agency/instrumentality thereof is
> liable for an extrajudicial killing, or the provision of material
> support thereof, it may be liable for the economic damages
> experienced by the decedents heirs under . . . FSIA.

*Colvin v. Syrian Arab Republic*, No. CV 16-1423 (ABJ), 2019 WL 416462, at *9 (D.D.C. Feb. 1, 2019) (quoting *Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 WL 2399454, at

*18 (D.D.C. June 1, 2017)); *see also*, *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010).  . *See, e.g., Braun v. Rep. of Iran*, 228 F. Supp. 3d at 83 (finding a foreign state liable for pain and suffering endured by a decedent who survived for two hours after the bombing attack and was attended to by medical personnel during that time); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (finding a foreign state liable for wrongful death and minutes of pain and suffering prior to decedent's death); *see also supra* Section II.A.2. (describing his death).

Plaintiffs will address the specific amount of appropriate damages for wrongful death in their subsequent submission(s) on damages.

## VIII.  CONCLUSION

For the reasons stated above, Plaintiffs request that this Court enter default judgment on Liability against North Korea and find North Korea liable for its torture, hostage taking, and/or extrajudicial killing of Crew Members of the U.S.S. Pueblo, and the resulting harm suffered by Plaintiffs.

DATED:  February 27, 2019                          Respectfully submitted,

By:  _____
Alexandra A.K. Meise (D.C. Bar No. 977173)
Mark N. Bravin (D.C. Bar No. 249433)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, 8th Floor
Washington DC, 20036
(202) 355-7909 (Telephone)
(202) 355-7886 (Facsimile)
akm@msk.com
mnb@msk.com

*Counsel for Plaintiffs*