# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE A-1, *et al.* <br><br>         *Plaintiffs*, <br><br>    v. <br><br> DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA Ministry of Foreign Affairs Jungsong-Dong, Central District, Pyongyang, Democratic People's Republic of Korea, <br><br>        *Defendant.* | No. 18-cv-0252 (DLF) |

## <u>MEMORANDUM OPINION</u>

This case arises from the kidnapping, imprisonment, and torture of United States servicemen aboard the USS Pueblo (Pueblo) by agents of the Government of the Democratic People's Republic of Korea (North Korea) in 1968. For almost a year, North Korea held hostage eighty-two crew members; subjected them to beatings, sleep deprivation, interrogations, and unsanitary living conditions; and forced them to facilitate North Korean propaganda. The Pueblo's crew members, their families, and estates of both groups bring this suit. Their action is pursuant to the private cause of action against foreign State Sponsors of Terrorism provided by the Foreign Sovereign Immunities Act (FSIA). *See* 28 U.S.C. § 1605A. Before the Court is the plaintiffs' Motion for Partial Default Judgment on Liability under *Id.* § 1608(e), Dkt. 48. For the following reasons, the Court will grant the plaintiffs' motion and hold North Korea liable to all plaintiffs under the state sponsor of terrorism exception to the FSIA.

# I.     BACKGROUND

## A.     Procedural Background

### 1.     Massie *Litigation*

This case is not the first of its kind.  In *Massie v. Democratic People's Republic of Korea*, five plaintiffs, including the Pueblo's commander, Commander Bucher, sued North Korea under the FSIA's terrorism exception for the capture and torture of the Pueblo's crew.  592 F. Supp. 2d 57, 75 (D.D.C. 2008).  The *Massie* plaintiffs alleged assault, battery, false imprisonment, intentional infliction of emotional distress, loss of solatium, and economic damages.  *Id.*  After North Korea failed to answer or otherwise respond to the complaint, the Court entered a default judgment and held a two-day damages trial.  *Id.* at 60.  Based on the evidence presented, the Court concluded that the plaintiffs were "entitled to the typical array of compensatory damages that may be awarded against tortfeasors" in the plaintiffs' states.  *Id.* at 77.  It also awarded damages for the "pain and suffering endured by [the plaintiffs] over the eleven months of their captivity [that] was extensive and shocking" and "likely will continue to endure throughout the rest of their lives."  *Id.*  The factual findings in *Massie* supply many of the relevant facts here.

### 2.     *This Action*

The plaintiffs in this case comprise 46 surviving crew members of the Pueblo,[1] 89 of the crew's immediate family members,[2] and 36 estates of deceased crew members or their deceased

---

[1] Plaintiffs A-1, A-2 and A-4 through A-49.  *See* Am. Compl. App'x I, Dkt. 5; Am. Compl. App'x II, Dkt. 13.  The estates of plaintiffs A-3, A-45, and A-37 were substituted for those plaintiffs.  *See* Pls.' Mots. to Substitute at Dkts. 42, 43, and 58.

[2] Plaintiffs B-2 through B-72 and B-74 through B-91.  *See* Am. Compl. App'x I; Am. Compl. App'x II.  Plaintiff B-73's estate was substituted for plaintiff B-73.  *See* Pls.' First Mot. to Substitute.  Plaintiff B-1 voluntarily dismissed her claim without prejudice.  *See* Notice of Voluntary Dismissal, Dkt. 76.

immediate family members.[3]  The identities of the former crew members have been masked, and

any personal identifying information has been sealed.  *See generally* Am. Compl, Dkt. 14.  The

plaintiffs seek money damages for torture, hostage taking, assault, battery, false imprisonment,

intentional infliction of emotional distress, and loss of solatium under § 1605A(c)'s private right

of action for money damages for personal injury caused by state sponsors of terrorism.  Am.

Compl. ¶ 19.

    North Korea was properly served with a summons and copy of the complaint and a

translation of those documents on April 4, 2018.  Summons Returned Executed, Dkt. 19.[4]  Under

28 U.S.C. § 1608(d), North Korea had sixty days—until June 3, 2018—to respond.  After North

Korea failed to either appear or respond, the Clerk of the Court entered a default on June 11,

2018. Clerk's Entry of Default, Dkt. 21.  The plaintiffs then requested that the Court take judicial

notice of the findings in *Massie* and of the expert testimony about the North Korean regime

given in *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C.

2018), and moved for a default judgment.  Pls.' Mot. for Partial J. Liability 1, Dkt. 49 (Pls.'

Mot.).

### B.    Relevant Findings of Fact

    The Court's factual findings are drawn from the plaintiffs' numerous affidavits and

declarations, the public record, and Judge Kennedy's findings in *Massie*.  A court may take

---

[3] Plaintiffs A-3, A-35, A-37, B-73, and C-1 through C-32.  *See* Am. Compl. App'x I; Am.
Compl. App'x II; Pls.' First Mot. to Substitute.  The estates of plaintiffs C-4 and C-32 were
substituted for plaintiffs C-4 and C-32.  *See* Pls.' First Mot. to Substitute; Pls.' Second Mot. to
Substitute, Dkt. 69.

[4] Consistent with the requirements of 28 U.S.C. § 1608(a)(3), the Clerk of Courts mailed the
summons and complaint and Korean translations of each to the ministry of foreign affairs of
North Korea using the DHL International service.  *See Gates v. Syrian Arab Republic*, 646 F.3d
1, 4 (D.C. Cir. 2011).

judicial notice of any fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A series of FSIA-related cases will often stem from one terrorist attack, and "[c]ourts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citations omitted). The Court cannot "simply adopt previous factual findings without scrutiny." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014). But it may "rely on the evidence presented in the earlier litigation and make [its] own independent findings of fact based on that evidence." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014). The Court takes notice of the *Massie* record and Judge Kennedy's findings of fact because those findings withstand scrutiny and because this action and *Massie* arose from the same incident: the 1968 capture, imprisonment, and torture of the Pueblo's crew.

1. *Capture of the USS Pueblo*

On January 23, 1968, the Pueblo was carrying eighty-three crew members through international waters 15.5 miles from the North Korean island of Ung-Do. Pls.' Ex. 5 at 1658, Dkt. 34-1; *Massie*, 592 F. Supp. 2d at 60–61. The Pueblo was on a noncombat mission and had orders to stay in international waters, so the U.S. Navy had assessed the Pueblo's deployment risk as "Minimal" and the ship was lightly armed. Pls.' Ex. 12 at 94, Dkt. 34-3; *Massie*, 592 F. Supp. 2d at 61. The Pueblo followed orders and remained in international waters in the Sea of Japan throughout its deployment. Pls.' Ex. 5 at 1658.

At midday, a North Korean submarine chaser approached the Pueblo and signaled the Pueblo to ask about its nationality. *Massie*, 592 F. Supp. 2d at 61. The Pueblo responded by hoisting the flag signal for "hydrographic work in progress" and displaying an American flag.

Pls.' Ex. 7 at 55, Dkt. 34-2. As three North Korean torpedo boats approached "at a high rate of speed," the submarine chaser signaled a demand of "Heave to or I will open fire on you." Pls.' Ex. 7 at 55–57; *Massie*, 592 F. Supp. 2d at 61. The Pueblo checked its location and replied that it was in international waters,[5] but the North Korean ships continued circling the Pueblo and signaled: "Follow in my wake. I have a pilot aboard." Pls.' Ex. 12 at 123–24; Pls.' Ex. 5 at 1666; *Massie* 592 F. Supp. 2d at 61.

When a North Korean vessel approached with armed men ready to board the Pueblo, Commander Bucher attempted to maneuver to the open sea before torpedo boats crisscrossed the Pueblo. Pls.' Ex. 7 at 61; *Massie*, 592 F. Supp. 2d at 61. But as the Pueblo sped up, the North Korean ships fired several 57 mm shells and then "raked the Pueblo with machine gun fire." Pls.' Ex. 7 at 63. At first, the Pueblo complied with the order to follow in the wake of the North Korean submarine chaser. *Id.* at 66. But when the crew needed more time to destroy classified material, the Pueblo stopped again. *Id.* The submarine chaser responded immediately with another two "salvos of 57 mm shells." *Id.* at 67.

### 2. *Death of Duane Hodges*

This second wave of North Korean fire mortally wounded Duane Hodges when a shell explosion "virtually sever[ed] [his] right leg." *Id.* at 67; *Massie*, 592 F. Supp. 2d at 62. Crew members dragged Hodges and another injured seaman to the mess hall and administered morphine and oxygen. Pls.' Ex. 1, Vol. 1 at 26, Dkt. 32-3. But the Hospital Corpsman who attended to Hodges "did not have adequate equipment, supplies or the surgical skills necessary to

---

[5] Alternatively, the monograph "The Capture of the USS Pueblo and Its Effect on SIGINT Operations," produced by the National Security Agency, finds that the Pueblo verified its location but was unable to locate the appropriate flag signal, leading them to instead flash their signal light, which went unacknowledged. Pls.' Ex. 7 at 59.

treat Hodges's wounds: his leg had been nearly sheared off, his abdomen was torn open, his intestines were spilling out and he was bleeding profusely." Pls.' Ex. 1, Vol. 1 at 45. Hodges ██████████████████████████████ hummed and sang hymns. *Id.* at 26. He died approximately 45 minutes after the shell explosion. *Id.* at 46.

3. *Imprisonment and Torture of the Crew*

The North Koreans seized the Pueblo and after reaching shore shoved the Pueblo's crew past an enraged, anti-American crowd—first into buses and then onto a train headed for a detention center. *Massie*, 592 F. Supp. 2d at 62–63. As a U.S. Navy report recounted, "[a]ll crewmen were treated roughly during the first few hours after capture." Pls.' Ex. 14 at 4, Dkt. 34-3. The crew members were repeatedly beaten, kicked, spat on, interrogated, accused of being spies, and denied medical attention. *Massie*, 592 F. Supp. 2d at 62–63.

Upon reaching the detention center, later nicknamed "the Barn," and the subsequent detention location, nicknamed "the Farm," the brutal treatment continued. *Id.* at 62–66. Crew members were regularly seen "with red faces, bleeding noses, and busted lips, or holding their side from being punched." Pls.' Ex. 1, Vol. 1 at 67. In one episode, a crew member was beaten for 19 hours with a two-by-four, had his throat and groin stomped on, and was left unable to stand for nearly a week. Pls.' Ex. 14 at 28–30. The primitive and unsanitary conditions at the Barn and the Farm included bedbug attacks, infrequent bathing, and poor-quality food, water, and medical care that routinely caused dysentery. Pls.' Ex. 1, Vol. 1 at 52, 60, 99. The North Koreans banned the prisoners from speaking to each other or leaving the building for any reason. Pls.' Ex. 1, Vol. 1 at 108; *Massie*, 592 F. Supp. 2d at 64.

The North Koreans also forced the crew members to facilitate North Korean propaganda, including by writing false letters home to families and politicians, and supplied extreme

consequences when the crew resisted. *See, e.g.*, Pls.' Ex. 1, Vol. 1 at 107. In one example, when two crew members refused to participate in a propaganda radio broadcast, the North Koreans threatened to execute them the next morning. *Id.* at 106. When morning came, the North Koreans took the two crew members to a firing squad but at the last moment called the execution off. *Id.* The North Koreans repeated this psychological torture the next day. *Id.* at 106. In another example, the North Koreans took propaganda photos of crew members, who subtly resisted by extending their middle fingers in one photo as part of what they told their captors was a "Hawaiian Good Luck sign." *Id.* at 27. After *Time Magazine* published the photo with an explanation of the photo's true meaning, the embarrassed North Koreans initiated "Hell Week." *Massie*, 592 F. Supp. 2d at 67–68. During "Hell Week," crew members were sometimes beaten to the point of unconsciousness, Pls.' Ex. 1, Vol. 1 at 178; Pls.' Ex. 1, Vol. 2 at 136, Dkt. 32-4, and were forced to hold up chairs in the air for extended periods while being beaten, *Massie*, 592 F. Supp. 2d at 68.

In mid-December 1968, the beatings stopped, and the prisoners received new clothes and hardboiled eggs, which were meant to break up blood clots caused by the beatings. *Massie*, 592 F. Supp. 2d at 68. Though the U.S. and North Korea had reached an agreement for the crew's release after eleven months in captivity, *see* Pls.' Ex. 5 at 1628, the crew was threatened one last time: As the men crossed the "Bridge of No Return" one-by-one, the North Koreans told them that if they said anything as they crossed the bridge, the remaining hostages would be shot. *Massie*, 592 F. Supp. 2d at 69.

4.   *Additional Injury Sustained by the Crew Members and Their Families*

The eleven months in captivity permanently scarred the crew members—literally for some, figuratively for all. Men who once had been outgoing fathers, husbands, and friends

became angry, reclusive, or withdrawn. *See, e.g.*, Pls.' Ex. 1, Vol. 5 at 4, Dkt. 32-7; *id.* at 32; *id.* at 55. Some remained "captive emotionally and psychologically long after" being physically freed. *Id.* at 5. Many suffer from post-traumatic stress disorder and a variety of muscular, spine, and joint ailments. *See, e.g.*, Pls.' Ex. 1, Vol. 1 at 60.

The crew's families also suffered. As their loved ones endured prolonged captivity, family members "lived in constant and torturous fear" and "suffered severe distress at the thought of never seeing [them] again." Pls.' Ex. 1, Vol. 5 at 61; *see also id.* at 68. After the crewmen returned, their family members' distress often continued with "recurring nightmares," "separation anxiety," and a belief of being "robbed of [a] childhood" due to the difficulty of building a relationship with a frequently angry father. *Id.* at 32, 54, 74.

## II.      LEGAL STANDARDS

Before entering default judgment, the Court must determine whether the plaintiffs have established their claims by satisfactory evidence. To recover under the FSIA's private cause of action against foreign state sponsors of terrorism, the plaintiffs must establish subject matter jurisdiction, personal jurisdiction, standing, and liability.

### A.      Default Judgment

A plaintiff can obtain default judgment by "establish[ing] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This standard "mirrors" Federal Rule of Civil Procedure 55(d), which governs default judgements against the U.S. government. *Owens v. Republic of Sudan* (*Owens I*), 864 F.3d 751, 785 (D.C. Cir. 2017). Though this requirement "provides foreign sovereigns a special protection" before a court reaches default judgment, *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014), "neither Rule [55(d)] nor § 1608(e) relieves the sovereign from the duty to defend cases," *Commercial Bank of Kuwait*

*v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (citations omitted).  In fact, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true."  *Warmbier*, 356 F. Supp. 3d at 42; *see also Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006).  And default judgments under § 1608(e) may rely on the plaintiffs' affidavits and declarations and on public record evidence because so "long as the evidence itself is admissible" the uncontroverted evidence's "form or type is irrelevant . . . as to whether [the plaintiffs] have satisfied their burden of production."  *Owens I*, 864 F.3d at 788–89.

### B.    Subject Matter Jurisdiction

This Court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330(a).  The decisive issue here is whether North Korea, a foreign state, is entitled to immunity.

The Court "begins with a presumption of immunity" for foreign states, and U.S. courts lack subject matter jurisdiction over claims against foreign states unless certain exceptions under the FSIA apply.  *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013); 28 U.S.C. § 1604.  But "if a plaintiff satisfies his burden of production [that an exception to immunity applies] and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches."  *Owens I*, 864 F.3d at 784.

The relevant exception here is the state-sponsored terrorism exception under 28 U.S.C. § 1605A(a)(1).  This exception eliminates sovereign immunity when "(1) 'money damages are sought,' (2) 'against a foreign state' for (3) 'personal injury or death' that (4) 'was caused' (5) 'by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

material support or resources . . . for such an act.'" *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 79 (D.D.C. 2010) (quoting 28 U.S.C. § 1605A(a)(1)).

A federal district court "shall hear a claim" under this exception when three conditions are met. 28 USC § 1605A(a)(2). *First*, the foreign state must have been "designated as a state sponsor of terrorism at the time the act" giving rise to the claim occurred "or was so designated as a result of such act." *Id.* § 1605A(a)(2)(A)(i). *Second*, the claimants must have been either a "national of the United States," a member of the armed forces, or an employee or contractor of the federal government who was acting in the scope of employment. *Id.* § 1605A(a)(2)(A)(ii). A "national of the United States" is either a U.S. citizen or a non-citizen who "owes permanent allegiance to the United States." *Id.* § 1605A(h)(5) (referencing 8 U.S.C. § 1101(a)(22)). *Third*, because the torture of the crew "occurred in the foreign state against which the claim has been brought," the claimants must have "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." *Id.* § 1605A(a)(2)(A)(iii). This offer to arbitrate need not precede the complaint. *See Simpson v. Socialist People's Libyan Aram Jamahiriya*, 326 F.3d 230, 233–34 (D.C. Cir. 2003).

C.      **Personal Jurisdiction**

To exercise personal jurisdiction over a foreign state under the FSIA, the court must have subject matter jurisdiction over the claims, and the foreign state must have been properly served. *See* 28 U.S.C § 1330(b). The standard for subject matter jurisdiction is described above. As for service, the FSIA enumerates four methods for serving foreign states, "in descending order of preference." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 69 (D.D.C. 2010); *see* 28 U.S.C. § 1608(a). The first two methods are unavailable here because there is no "special arrangement for service" between the U.S. and North Korea, *id.* § 1608(a)(1), and North Korea is

not party to an "applicable international convention on service," *id.* § 1608(a)(2). The third method, effected here, requires "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). This Circuit has held that "foreign states are not persons protected by the Fifth Amendment," leaving no need to conduct a minimum contacts analysis. *Price v. Socialist People's Libyan Aram Jahahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (internal quotation omitted).

### D. Standing

A plaintiff's standing under the FSIA once depended on whether the plaintiff could bring its claim under state law. But that is no longer true. Before 2008, "a plaintiff suing a foreign sovereign for acts of state-sponsored terrorism had to rely solely upon state substantive law" because the FSIA provided no federal cause of action. *Owens v. Republic of Sudan* (*Owens II*), 924 F.3d 1256, 1258 (D.C. Cir. 2019) (citing *Owens I*, 864 F.3d at 763–765, 808). The mechanism for such "pass through" liability was § 1606 of the FSIA. If a sovereign immunity exception applied, § 1606 would kick in and subject foreign states to whatever state-law liability a similarly situated private individual would face. 28 U.S.C. § 1606.

But § 1606 expressly applies only to § 1605 and § 1607 of the FSIA. *Id.* § 1606; *see Owens I*, 864 F.3d at 808. And in 2008, Congress moved the exception to sovereign immunity for state sponsors of terrorism—the relevant exception in this case—from § 1605 to the newly created § 1605A. *Owens II*, 924 F.3d at 1258. Not only that, but Congress also included in § 1605A a substantive cause of action against state sponsors of terrorism. *Id.* § 1606.

The upshot of this is twofold: FSIA claims against state sponsors of terrorism are federal causes of action that do not depend on state law. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 60 n.20 (D.D.C. 2009). And the FSIA by its terms gives standing to four groups to bring such claims: nationals of the United States; members of the U.S. armed forces; employees or contractors of the U.S. government acting within the scope of their employment; and the legal representatives of any of these three groups. 28 U.S.C. § 1605A(c).

### E. Liability

As mentioned, § 1605A(c) creates a cause of action against foreign state sponsors of terrorism for money damages resulting from "personal injury or death." The injury or death needs to have been "caused" by the specific "acts" listed in the FSIA, including torture, hostage taking, and extrajudicial killing, committed by a foreign state, which "shall be vicariously liable for the acts of its officials, employees, or agents." *Id.* § 1605A(c).

To assess a plaintiff's theories of "personal injury" under the FSIA, courts reference state common law and often rely on the Restatement (Second) of Torts "as a proxy for state common law." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003); *see also Valore*, 700 F. Supp. 2d at 76; *Worley*, 75 F. Supp. 3d at335. Though the FSIA cause of action contains a statute of limitations that requires an action to be brought within ten years of April 26, 1996 or within ten years of the precipitating event, *see* § 1605A(b), this Court lacks the "authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations," *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114–15 (D.C. Cir. 2019). No party raises it here.

Under Federal Rule of Civil Procedure 55(b)(2), this Court may enter a default judgment on the plaintiff's claims if one party applies to the Court for that outcome. But a default judgment is "not automatic" and requires (1) that plaintiffs make a prima facie showing of

personal jurisdiction, *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and (2) that the plaintiffs "establish[] [their] claim[s] or right[s] to relief by evidence satisfactory to the Court," 28 U.S.C. § 1608(e).

## III.    CONCLUSIONS OF LAW

### A.    Subject Matter Jurisdiction

The Court has subject matter jurisdiction over these claims.  A federal district court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  *Id.* § 1330(a).

These four conditions are present.  *First*, this is a nonjury civil action—"all federal appellate courts which have considered the issue . . . have held that jury trials are not available in suits brought under the [FSIA]."  *Universal Consol. Cos., Inc. v. Bank of China*, 35 F.3d 243, 245 (6th Cir. 1994); *see also Valore*, 700 F. Supp. 2d at 65.  *Second*, North Korea is a foreign state.  *Third*, this action is in personam because the Court will exercise "personal jurisdiction over the defendants as legal persons, rather than property."  *Valore*, 700 F. Supp. 2d at 65; *see infra* Part III.B.

*Fourth*, the exception to sovereign immunity for state-sponsored terrorism applies.  That exception waives sovereign immunity for foreign states when five conditions exist: "(1) 'money damages are sought,' (2) 'against a foreign state' for (3) 'personal injury or death' that (4) 'was caused' (5) 'by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act.'"  *Anderson*, 753 F. Supp. at 79 (quoting 28 U.S.C. § 1605A(a)(1)).  Those conditions are present here.  The plaintiffs seek money damages for personal injury under FSIA § 1605A(c).  Am. Compl. ¶ 15.  This satisfies

conditions (1) and (3). The plaintiffs' suit and the Clerk of Court's entry of default are against

North Korea itself, which is a "foreign state" under the FSIA. Clerk's Entry of Default; 28

U.S.C. §§ 1603(a), 1608. This satisfies condition (2). And the plaintiffs seek money damages

for alleged "acts of torture, hostage taking, and personal injury (including assault, battery, false

imprisonment, intentional infliction of emotional distress, and loss of solatium) committed

against the crew members and their immediate family members." Am. Compl. ¶ 19. This

satisfies condition (5). That leaves condition (4)—causation. The plaintiffs allege acts of torture

and hostage taking that "caused physical and psychological injuries." Am. Compl. ¶¶ 36; 16–19.

To establish causation, the plaintiffs must make "only a showing of proximate cause," which

exists so long as there is "some reasonable connection between the act or omission of the

defendant and the damage which the plaintiff has suffered." *Kilburn v. Socialist People's Libyan*

*Arab Jamahiriya,* 376 F.3d 1123, 1128 (D.C. Cir. 2004) (internal quotations omitted). The

plaintiffs have made this showing. There are clear, reasonable connections between the alleged

actions of the North Koreans and the injuries suffered. For example, North Korea's capturing of

the crew members and holding them as hostages was directly connected to the physical and

psychological harms of false imprisonment. And the crew's torture at North Korea's hands

involved repeated beatings that were directly connected to injuries that resulted from the assault.

*See supra* Part I.B.2.ii. With all five conditions met, the state-sponsored terrorism exception

applies.

    Not only does the Court have subject matter jurisdiction, it must exercise that

jurisdiction. Under the FSIA, the Court "shall hear a claim" when (1) the state had been

designated a state sponsor of terrorism at the time the act occurred or "as a result of such act";

(2) the plaintiffs were U.S. nationals, servicemen, employees or contractors for the U.S.

government; and (3) the plaintiffs allowed the foreign state a reasonable opportunity to arbitrate the claims. 28 U.S.C. §1605A(a)(2).

Those requirements are met here. *First*, North Korea was re-designated a state sponsor of terrorism "as a result" of its actions against the Pueblo's crew. Courts in this district have held that "as a result" in this context means wholly or *in part* as a result. *See Massie*, 592 F. Supp. 2d at 74 ("North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the Pueblo."); *Warmbier*, 356 F. Supp. 3d at 44–45 (finding that the re-designation of North Korea as a State Sponsor of Terrorism was "at least in part" a result of the capture of Otto Warmbier); *see also Valore*, 700 F. Supp. 2d at 67 (concluding that Iran was designed a State Sponsor of Terrorism "in partial response" to a terrorist attack); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 65 (D.D.C. 2010) (similar). Just two weeks before re-designating North Korea, President Trump cited the "capture and torture of the brave American soldiers of the USS Pueblo" as among the most-significant of North Korea's terrorist actions.[6] These remarks, coupled with the evidence cited in *Massie* that the Pueblo attack also partly motivated the 1988 designation,[7] satisfies the plaintiffs' "initial burden of production." *Owens I*, 864 F.3d

---

[6] Remarks by President Trump to the National Assembly of the Republic of Korea (Nov. 7, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-assembly-republic-korea-seoul-republic-korea/; *see also* Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56100-01 (Nov. 27, 2017).

[7] In *Massie*, Judge Kennedy concluded that North Korea's 1988 designation was at least partly the result of the Pueblo incident. *See Massie*, 592 F. Supp. 2d at 74. Though North Korea was de-designated since *Massie* and then re-designated in 2017, at least one other court in this district has considered evidence connected to the 1988 designation in ascertaining the basis for the 2017 re-designation. *See Warmbier*, 356 F. Supp. 3d at 44–45 (citing *Massie*, 592 F. Supp. 2d at 74).

at 784.  And because North Korea has "fail[ed] to present any evidence in rebuttal," this first element is met.  *Id.*

*Second*, all but two of the crew member plaintiffs were U.S. citizens by birth.  *See, e.g.*, Ex. 1, Vol. 1 at 10.  And even those two exceptions, plaintiffs A-2 and A-44, were U.S. servicemen, enlisted in the Navy as a ███████████████████████████████, respectively, and thus satisfy the second element.[8]  Pls.' Ex. 1, Vol. 1 at 25; Pls.' Ex. 1, Vol. 4 at 35, Dkt. 32-6.  For the family member plaintiffs, all but four of them were U.S. citizens at the time of the Pueblo's capture.  *See, e.g.*, Pls.' Ex. 1, Vol. 5 at 2.  And as to those four non-U.S. citizens, the "plain text and plain meaning" of the provision indicate that "[t]he claimant and victim need not both be American citizens."  *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012).  Instead, plaintiffs must either satisfy the requirements for standing themselves or have "claims [that] are derived from claims where the victims were U.S. government employees at the time of the attack."  *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 13 (D.D.C. 2011).  Because the family member plaintiffs' claims all derive from U.S. nationals or U.S. armed forces members, the Court must hear their claims.  Similarly, the estate plaintiffs' claims shall be heard because the "victim[s]" were either U.S. nationals or members of the U.S. armed forces.  28 U.S.C. § 1605A(a)(i)(2).

*Third*, the claimants "afforded the foreign state a reasonable opportunity to arbitrate."  *Id.* § 1605A(a)(2)(A)(iii).  The claimants sent an offer to arbitrate and its Korean translation to the defendants, which, relying on the language of *Simpson*, offered to submit the matter to a "third-party organization . . . with extensive experience arbitrating international disputes."  Arb. Offer

---

[8] Plaintiff A-44 was a naturalized citizen at the time of the Pueblo's capture.  Pls.' Ex. 1, Vol. 4 at 35.  Plaintiff A-2 became a naturalized citizen in 1970.  Pls.' Ex. 1, Vol. 1 at 25.

Ex. 4, Dkt. 33-1 (quoting *Simpson*, 326 F.3d at 232).  The arbitration offer accompanied the service package, but the offer need not precede the complaint.  *See Simpson*, 326 F.3d at 233–34.

## B.   Personal Jurisdiction

The Court also has personal jurisdiction over North Korea.  To have personal jurisdiction over a foreign state under the FSIA, a court must have subject matter jurisdiction over the claims, and the foreign state must have been properly served.  *See* 28 U.S.C § 1330(b).  As explained, this Court has subject matter jurisdiction over all claims presented here.  And North Korea was properly served.  The first two methods for service prescribed by § 1608(a) are inapplicable here, *see supra* Part II.B, meaning that the claimants needed to try to serve North Korea "by any form of mail requiring a signed receipt," *id.* § 1608(a)(3).  The service package was delivered using DHL International to the Ministry of Foreign Affairs of North Korea where it was signed for and accepted.  Return Serv., Ex. 9, Dkt 33-1.  This method of service satisfies § 1608(a)(3).  *See Gates v. Syrian Arab Republic*, 646 F.3d 1, 4 (D.C. Cir. 2011).

## C.   Standing

Four groups have standing to bring a cause of action under § 1605A(c): nationals of the United States; members of the U.S. armed forces; employees or contractors of the U.S. government acting within the scope of their employment; and the legal representatives of any of these three groups.  28 U.S.C. § 1605A(c).  The plaintiffs in each group—crew members, family members, and their estates—have such standing.

*Crew members*.  All crew member plaintiffs were either U.S. nationals or members of the armed forces.  Thus, plaintiffs A-1, A-2, A-4 through A-34, A-36, and A-38 through A-49 have standing to bring this cause of action.

*Family members*.  All family member plaintiffs are currently U.S. nationals and thus also have standing.[9]  While foreign family members "need" state tort law to bring claims, U.S. nationals can rely upon § 1605A(c).  *Owens I*, 864 F.3d at 809.  *Compare* 28 U.S.C. § 1605A(c) (omitting the requirement for a plaintiff to satisfy the requirement of being a U.S. national at time of occurrence), *with* 28 U.S.C. § 1605A(a)(2)(ii) (requiring that either the victim or claimant have satisfied the requirement "at the time the act . . . occurred").  Thus, plaintiffs B-2 through B-72 and B-74 through B-91 have standing to bring this cause of action.

*Estates*.  The estate plaintiffs also have standing under § 1605A.  An estate of a plaintiff who would have had standing to sue "is expressly covered by, and entitled to bring claims under, Section 1605A(c)."  *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78–79 (D.D.C. 2017); *see also* Fed. R. Civ. P. 17(a)(1) and (b)(3) (an estate's executor, administrator, or any other person authorized by statute may bring suit).  The estate plaintiffs' decedents all would have had standing to sue in their own right because they all were U.S. citizens, members of the armed forces, or both.[10]  As such, the estate plaintiffs—plaintiffs A-3, A-35, A-37, B-73, and C-1 through C-32—are the "legal representatives" of claimants who otherwise would have had standing and thus have standing themselves to bring this cause of action.

---

[9] All family member plaintiffs were U.S. citizens by birth, with four exceptions: Plaintiffs B-46 and C-9 became naturalized citizens while the men were held hostage, Pls.' Ex. 1, Vol. 7 at 8, 190, Dkt. 32-9, and plaintiffs B-83 and B-69 became naturalized citizens after the Pueblo incident, *id.* Vol. 4 at 38; Vol. 8 at 156–57, Dkt. 32-10.

[10] *See, e.g.*, Pls.' Ex.1 Vol. 1 at 10, 31, 40, 55, 63; *id.* Vol. 5 at 7, 11, 15, 17–20; *id.* Vol. 6 at 11, 15–18, 23, 25–26; *id.* Vol. 7 at 187–191, 195–197, 208–210, 212–217; *id.* Vol. 8 at 226, 230; *id.* Vol. 10 at 52, 61, 63, 67–68.

**D.    Liability**

      1.    *Acts of Torture, Hostage-Taking, and Extrajudicial Killing*

The FSIA requires that an act of "hostage-taking," "torture," or "extrajudicial killing" caused the plaintiffs' injuries.  28 U.S.C. § 1605(a)(1); *see id.* § 1605A(c).  North Korea committed all three acts and in so doing caused the plaintiffs' injuries.

*Hostage-Taking.*  The FSIA defines "hostage-taking" by reference to the International Convention Against the Taking of Hostages, which defines the term as when one "seizes or detains and threatens to kill, to injure or to continue to detain another person . . . to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  International Convention Against the Taking of Hostages art. 1, Dec. 18, 1979.  The North Koreans detained the crew members, regularly threatened to kill or injure them, and used their capture as leverage to compel the United States to make a false confession as a condition of their release.  Pls.' Ex. 5 at 1628.  North Korea committed acts of hostage taking. *See Massie*, 592 F. Supp. 2d at 74.

*Torture.*  The FSIA defines "torture" as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1605A(h)(7) (citing Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73, § 3(b)(1) (1992), *codified* at 28 U.S.C. § 1350 (note § 3(b)(1))).  The crew members were kept in North Korea's custody in detention centers, endured intense pain and suffering intentionally inflicted upon them, and were intimidated into participating in North Korean

propaganda and making false confessions.  *See supra* Part II.B.  North Korea committed acts of torture.  *See Massie*, 592 F. Supp. 2d at 66.

*Extrajudicial Killing.*  The FSIA's definition of "extrajudicial killing," taken from the Trafficking Victims Protection Act, "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens I*, 864 F.3d at 770. ████████████████████.  Their ships' coordinated maneuvering and shelling reflected the "preparation, meticulous timing, and coordination" required to show deliberation.  *Id.*  And their attack was "neither authorized by any court nor by the law of nations." *Id.*  Nor was the Pueblo "engaged in combat operations," leaving "no colorable argument" that the killing was acceptable under international law.  *Worley*, 75 F. Supp. 3d at 325.  North Korea committed an act of "extrajudicial killing."

        2.     *Theories of Liability*

It is not enough for the plaintiffs to show that the North Koreans caused injuries through those particular acts.  The FSIA requires the plaintiffs to "prove a theory of liability" found in "well-established principles of law, such as those found in the Restatement (Second) of Torts." *Worley*, 75 F. Supp. 3d at 334–35 (citations omitted).  The crew members and their estates, the crew's immediate family members and their estates, and plaintiff C-17 bring claims under different theories of liability.  North Korea is liable under each theory for its acts of torture, hostage-taking, and extrajudicial killing.

        i.     The Crew Members and Their Estates

The crew members and their estates bring claims under the theories of assault, battery, false imprisonment, and intentional infliction of emotional distress.  Am. Compl. ¶¶ 37–40, 44.

Assault "occurs when one person (a) 'acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.'" *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21(1)). "'Harmful contact' is that which causes 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Id.* at 342 (quoting Restatement (Second) of Torts § 15). The North Koreans repeatedly beat, kicked, spat on, and interrogated the crew members, accused them of being spies, and denied them medical attention. *See supra* Part I.B.2. The North Koreans routinely threatened the crew members' lives, causing them to fear death and further violence. Such acts of torture "by their very nature" are meant to cause harm and instill fear of harms to come. *Valore*, 700 F. Supp. 2d at 76. Accepting the uncontroverted evidence that the crew members regularly suffered harmful contact and fear, North Korea is liable to the crew members and their estates for assault. *See Massie*, 592 F. Supp. 2d at 75.

Battery requires an act "intending to cause a harmful or offensive contact with . . . [another person], or an imminent apprehension of such a contact" and the offensive contact in fact "directly or indirectly results." Restatement (Second) of Torts § 18. And "bodily contact is offensive if it offends a reasonable sense of personal dignity." *Id.* § 19. North Korea committed battery when, over the course of eleven months, its agents repeatedly beat the Pueblo's crew, sometimes to the point of unconsciousness. *See supra* Part I.B.2.iii. This program of repeated torture resulted in acts of intentional, harmful, and offensive contacts, and all crew members suffered physical injuries from the acts of battery they were subjected to in captivity. Again, accepting the uncontroverted evidence that the crew members regularly

suffered severe physical harm as a direct result of harmful and offensive contact, North Korea is liable to the crew members and their estates for battery. *See Massie*, 592 F. Supp. 2d at 75.

False imprisonment exists "when one person '(a) acts intending to confine the other . . . within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." *Stansell*, 217 F. Supp. 3d at 342–43 (quoting Restatement (Second) of Torts § 35). From the moment the North Koreans boarded the Pueblo, they confined the crew members to specific locations, the crew members were aware they were not allowed to leave, and that captivity only worsened, lasting for eleven months. *See supra* Part I.B. The uncontroverted evidence establishes that the crew members endured forced captivity, were conscious of their captivity, and were harmed by it. North Korea is liable to the crew members and their estates for this false imprisonment. *See Massie*, 592 F. Supp. 2d at 75–76.

Finally, "one who by extreme and reckless conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citations omitted). The "intensity and the duration of the distress are factors to be considered in determining its severity." Restatement (Second) of Torts § 46 cmt. j. For eleven months, the crew members were forced to watch the North Koreans torture their fellow crewmen while anticipating their own forthcoming torture or possible execution. *See supra* Part I.B. When they returned home, the trauma that these men withstood left lasting psychological damage—many suffer from post-traumatic stress disorder.

*See supra* Part I.B.2.iv. The uncontroverted evidence shows that for nearly a year these men suffered extremely intense physical and emotional distress that has had lasting effects on their lives. North Korea is liable to the crew member plaintiffs and their estates for this intentional infliction of emotional distress. *See Massie*, 592 F. Supp. 2d at 76.

ii.    Family Members and Their Estates

Section 1605A(c) "expressly contemplates the award of solatium damages to the close relatives of terrorism victims." *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 61–62 (D.D.C. 2018) (citing 28 U.S.C. 1605A(c)). The "legal representatives" of those close relatives—here, their estates—also may bring solatium claims on their behalf. 28 U.S.C. § 1605A(c); *see, e.g.*, *Allan v. Islamic Republic of Iran*, No. 17-cv-0338, 2019 WL 2185037, at *7 (D.D.C. May 21, 2019) (awarding solatium damages to estate plaintiff); *Relvas v. Islamic Republic of Iran*, No. 14-cv-01752, 2018 WL 1092445, at *5 (D.D.C. Feb. 28, 2018) (same); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 45, 47 (D.D.C. 2018) (same); *Stansell*, 217 F. Supp. 3d at 332, 334, 344–45 (same).

Under the FSIA, solatium is "indistinguishable from an [intentional infliction of emotional distress] claim." *Valore*, 700 F. Supp. 2d at 85; *see also Estate of Heiser,* 659 F. Supp. 2d at 27 n.4. While the Restatement appears to limit claims to those who were "present at the time," Restatement (Second) of Torts § 46(2), it also suggests in a caveat that an actor may be liable in "other circumstances" to someone who was not present at the time, Restatement (Second) of Torts § 46 caveat. "Terrorism, unique among the types of tortious activities in both its extreme methods and aims," is "easily" one such circumstance. *Estate of Heiser*, 659 F. Supp. 2d at 27; *see also Jenco v. Islamic Republic of Iran,* 154 F. Supp. 2d 27, 36 (D.D.C. 2001); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 (D.D.C. 2016). In this Circuit, "relief

in cases of this sort will be limited to 'immediate family' members." *Bettis*, 315 F.3d at 338(excluding nieces and nephews from relief for not fitting the traditional common law definition of "immediate family").  So long as the plaintiffs are immediate family members, there is a "presumption that family members in direct lineal relationship suffer compensable mental anguish, . . . and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (internal quotations omitted and alteration adopted).  The family member plaintiffs in this case are all either spouses, siblings, or children of crew members, satisfying the traditional definition of immediate family. *See generally* Pls.' Mot. 8–18.  The uncontroverted evidence demonstrates that North Korea's actions were extreme and outrageous and were intended to cause—and did cause—extreme distress and terror in the families of the crew members.  North Korea is liable to the family member plaintiffs and their estates.  *See Massie*, 592 F. Supp. 2d at 76.

iii.        ████████████ Wrongful Death Claim

As this Court has recently explained, "[a]ny deaths resulting from an act of terrorism under section 1605A are properly considered wrongful deaths." *Colvin v. Syrian Arab Republic*, No. 12-cv-0508, 2017 WL 2399454, at *9 (D.D.C. June 1, 2017). ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████. *See, e.g.*, *Braun*, 228 F. Supp. 3d at 83. ████████████

████████████████████████. *See Valore*, 700 F. Supp. 2d at 78.

**CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for partial default judgment is granted. North Korea is liable to all plaintiffs for the claims discussed above. The Court will address the plaintiffs' damages in a subsequent opinion. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

October 22, 2019