**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE A-1, *et al.*,<br><br>            Plaintiffs,<br>     v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA<br>Ministry of Foreign Affairs<br>Jungsong-Dong, Central District,<br>Pyongyang,<br>Democratic People's Republic Of Korea,<br><br>            Defendant. | CASE NO. 1:18-CV-00252-DLF |

**PLAINTIFFS' AMENDED MOTION IN SUPPORT OF AN AWARD OF
PUNITIVE DAMAGES TO THE SURVIVING CREW MEMBER PLAINTIFFS**

In response to the Court's Minute Order dated September 21, 2020, Plaintiffs hereby amend their Motion for Partial Final Default Judgment [ECF No. 97] on behalf of the 46 Surviving Crew Member (Group A) Plaintiffs, to request an award of punitive damages.[1]  As the Court's Minute Order makes clear, the U.S. Supreme Court's May 18, 2020 decision in *Opati v. Republic of Sudan*, allows these "plaintiffs [to] pursue punitive damages under Section 1605A of the FSIA for unlawful conduct that occurred prior to 2008."  Minute Order (Sept. 21, 2020) *citing* 140 S. Ct. 1601 (2020).  Below, we explain (1) that an award of punitive damages against North Korea is warranted in this case; (2) the appropriate amount of punitive damages the Court should award based on the record evidence and decisions by other judges on this Court; and (3) that even a very substantial award of punitive damages against the Democratic People's Republic of Korea ("North Korea"), for purposes of retribution and punishment of the defendant for its

---

[1] Plaintiffs have separately requested that the Court supplement the amount of post-release compensatory damages the Special Master recommended be awarded to the Surviving Crew Member Plaintiffs to account for the passage of time up to the date of entry of judgment.  ECF No. 96-3 (redacted) at 8-9.

abhorrent actions and of deterrence of such actions in the future, should not result in a decrease in the Court's award of compensatory damages to these Plaintiffs to remedy their pain and suffering.

## I. Punitive Damages Against North Korea Are Warranted Here

In its liability ruling [ECF No. 77], the Court found, based on a very substantial evidentiary record,[2] that defendant North Korea committed outrageous atrocities against the Pueblo's Surviving Crew Member Plaintiffs, grievously injuring some during the attack, holding hostage and brutalizing all of them continuously for nearly a year, intentionally inflicting intense physical pain and psychological harm on each of them, and causing them to be "permanently scarred." *Id.* at 6-8, 14, 19-24. In the damages phase, the Special Master found – based on a detailed assessment of a large volume of additional evidence[3] – that North Korea's actions caused each of these Plaintiffs severe and lasting harm, which they have endured for more than 50 years. Special Master's First Report, Exs. A-C (ECF Nos. 70-2, 70-3, 70-4).[4] Moreover, North Korea's prolonged and savage treatment of these Plaintiffs was in furtherance of a

---

[2] *See* ECF No. 49 (Plaintiffs' Motion for Partial Default Judgment on Liability (redacted), ECF No. 32-16 (unredacted)), ECF No. 34-1 through ECF No. 34-3 (John Doe Exhibits, Parts 1-3), ECF No. 32-2 through No. 32-14 (Sealed) (John Doe Exs. 1 and 2 containing twelve (12) volumes of testimonial and documentary evidence).

[3] In support of damages claimed by the Surviving Crew Member Plaintiffs, approximately 3,688 pages of written testimonial and documentary evidence were submitted to and considered by the Special Master. These submissions included corroborating testimony from Pueblo crew members and family members, personal diaries and scrapbooks, medical records, military records, other official government records, Congressional hearings, newspaper articles, and other supporting documentary evidence.

[4] The Special Master did not address punitive damages in any of his reports, and he made no recommendations on this issue. That is because the Court limited his mandate to "consider[ing] all issues related to compensatory damages as to each claim made by each Plaintiff . . . and submit[ting] a report to the Court . . . which shall contain findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 23 at 1-2 (Order Appointing A Special Master To Consider Compensatory Damages Awards).

politically-motivated propaganda campaign against the United States. Defendant extracted spurious confessions from the crew as leverage to pressure the United States – as a condition for the release of the Pueblo hostages – into saying that the Pueblo had entered illegally into North Korean territory when in fact it had not done so.[5]

The heinous character of North Korea's actions, which are hostage-taking, torture, and extrajudicial killing, and their consequences for these Plaintiffs, warrant the award of punitive damages against North Korea in this case. *See*, *e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017) (punitive damages warranted where the plaintiff was held in solitary confinement, beaten, threatened, and psychologically injured for a prolonged period of time); *Bluth v. Islamic Republic of Iran*, 203 F.Supp.3d 1, 25 (D.D.C. 2016) (punitive damages are "awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type") (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 24-25 (D.D.C. 2002)). *See also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012) (*citing In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 29–31 (D.D.C. 2009) ("*Heiser II*"); Restatement (Second) of Torts § 908 (1979). For precisely those reasons, judges in this Circuit typically have awarded punitive damages against state sponsors of terrorism, or their agents, for kidnaping and torture of American citizens.[6]

---

[5] ECF No. 49 at 13-15, 20-25; ECF No. 34-1 at 73 ("Location of U.S.S. Pueblo"); ECF No. 34-2 at 8, 47-50 (testimony of Adm. Thomas H. Moorer, Chief of Naval Operations, U.S. Navy).

[6] *See*, *e.g.*, *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003); *Polhill v. Islamic Republic of Iran*, No. 00-1798, 2001 WL 34157508 (D.D.C. 2001); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222 (D.D.C. 2002), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C. 2003), *vacated on other*

Indeed, other victims of state-sponsored terrorism have obtained punitive damages awards against North Korea for such vicious and barbaric actions in two prior cases. *See Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 59 (D.D.C. 2018) (holding North Korea's detention and brutal beating of Otto Warmbier "justifies the imposition of significant punitive damages"); *Han Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 288-291 (D.D.C. 2015) (awarding punitive damages where missionary was "abducted from China by North Korean agents, and presumably imprisoned, tortured, and killed for his humanitarian efforts"); *cf. Calderon–Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460-85 (D.P.R. 2010) (awarding punitive damages against North Korea for supporting a 1972 terrorist attack on Lod Airport, Israel, in which one American citizen was killed and another was injured; "North Korea's demonstrated and well-known policy to encourage, support and direct a campaign of murder against civilians amply justifies the imposition of punitive damages against it . . . ."). [7]

Accordingly, it is beyond doubt that the actions of North Korea in this case justify the imposition of significant punitive damages.

## II. The Court Should Award Punitive Damages In An Amount Consistent With Awards By Other Judges On This Court In Similar Cases

While § 1605A(c) provides a private right of action for victims of state-sponsored terrorism to recover punitive damages, it does not specify criteria for determining the amount of such damages. As the court in *Flatow* explained:

> The malice associated with terrorist attacks transcends even that of premeditated murder. . . The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve

---

*grounds*, 370 F.3d 41 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 1010 (2005); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002).

[7] Judge Kennedy's opinion in the *Massie* case did not address the issue of punitive damages.

4

political objectives.  Thus, the character of the wrongful act itself increases the magnitude of the injury.  It thus demands a corresponding increase in compensation for increased injury.

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998).

In determining the appropriate amount of punitive damages where plaintiffs bring claims under the federal cause of action in § 1605A, courts consider four factors:  "(1) the character of the defendants' act[ions], (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Doe v. Syrian Arab Republic*, No. 18-0066, 2020 WL 5422844, at *17 (D.D.C. Sept. 10, 2020) (quoting *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)); *see also* Federal Judicial Center, The Foreign Sovereign Immunities Act:  A Guide for Judges (2d ed.), at 123 (2018).

Here, at least the first three, and possibly all four, factors weigh in favor of awarding very substantial punitive damages.  First, North Korea's politically-motivated actions of unlawfully seizing the Pueblo, injuring crew members (and killing one), torturing the crew, and holding them hostage to extract from the U.S. Government a groveling, public apology for a spurious claimed invasion of its territory, was outrageous, and the results have been indisputably tragic. ECF No. 77 at 20-24.

Second, North Korea's inhumane treatment of the Surviving Crew Member Plaintiffs was horrific, intentionally causing them to be "permanently scarred" and to suffer severe and enduring harm.  ECF No. 77 at 6-8, 19-24; ECF Nos. 70-2, 70-3, 70-4.

Third, the deterrence justification here is strong.  "Regardless of the alternative rationales over the years, the consensus today is that [punitive damages] are aimed not at compensation but principally at retribution and deterring harmful conduct."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008).  North Korea's totalitarian regime continues to commit the gravest human

5

rights abuses against American citizens in violation of international law.  *See generally Warmbier*, 356 F. Supp. 3d at 59; *Han Kim*, 87 F. Supp. 3d at 288-291; *see also* ECF No. 64 (Plaintiffs' Supplemental Brief in Support of Their Motion for Partial Default Judgment on Liability) at 11-12.[8]  Now that North Korea has been re-designated to the State Department's List of State Sponsor of Terrorism, and the U.S. Supreme Court's *Opati* decision confirmed that punitive damages may be imposed for conduct predating enactment of FSIA § 1605A, substantial punitive damages can and should be imposed to send a message to North Korea that it will be punished and disgraced for its illegal conduct.

As for the fourth factor, North Korea is believed to have vast, untapped mineral wealth.[9]  The regime apparently squanders its money gleaned from illegal mineral sales in furtherance of its illegal nuclear weapons ambitions, for which it has been subject to crippling economic sanctions imposed by the United Nations, the United States, and various other nations.[10]

Judges on this Court have adopted a framework for calculating punitive damages in state-sponsored terrorism cases, which allows for both flexibility and consistency (depending on the circumstances and available information).  *See Doe,* 2020 WL 5422844, at *18; *Warmbier*, 356 F. Supp. 3d at 59-60.  One approach has been to apply one of several multipliers to the amount of compensatory damages awarded.  *See*, *e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105-106 (D.D.C. 2017) (calculating punitive damages by multiplying compensatory damages by

---

[8] *See also* Patricia Goedde and Andrew Wolman, "North Korean Detention of U.S. Citizens: International Law Violations and Means for Recourse," 51 Cornell Int'l L.J. 147 (2018).

[9] North Korea likely is sitting on a vast wealth of mineral deposits.  "Some of these stockpiles are among the largest in the world, and North Korea, a tiny and cash-strapped nation, frequently uses them to bring in additional revenue — no matter the laws against doing so.  The total value of these minerals lies somewhere between $6 trillion and $10 trillion." Chris Weller, *North Korea is sitting on a stockpile of minerals worth trillions*, Business Insider (June 29, 2017), available at https://www.businessinsider.com/north-korea-stockpile-minerals-worth-trillions-2017-6, (last visited Oct. 13, 2020).

[10] *Id*.

three); *Doe*, 2020 WL 5422844, at *18 (same); *Hamen v. Islamic Republic of Iran,* 407 F. Supp. 3d 1, 11 (D.D.C. 2019) (multiplying compensatory damages by two); *Hekmati*, 278 F. Supp. 3d at 167 (awarding punitive damages equal to compensatory damages); *Christie v. Islamic Republic of Iran*, No. 19-1289, 2020 WL 3606273, at *22 (D.D.C. July 2, 2020) (same); *Sheikh v. Republic of Sudan*, No. 14-2090, 2020 WL 5203496, at *12 (D.D.C. Aug. 31, 2020) (same). With that approach, the punitive damages award in this case could be in the range of $1-3 billion.

      A second approach has been to award a fixed punitive damages amount of $150,000,000 per victim or per affected family. *See*, *e.g.*, *Warmbier*, 356 F. Supp. 3d at 60 (awarding $450,000,000 in punitive damages, or $150,000,000 each to Warmbier's estate, his father, and his mother); *Han Kim*, 87 F. Supp. 3d at 291 (awarding $150,000,000 in punitive damages to the son and brother of missionary); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012), *aff'd* 554 F. App'x 16 (D.C. Cir. 2014) (awarding $300,000,000 in total to two victims and their families); *Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48, 86 (D.D.C. 2011) (awarding $150,000,000 each to families of three deceased victims); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008), *aff'd,* 646 F.3d 1 (D.C. Cir. 2011) (awarding $150,000,000 each to the estates of two victims). The court in *Doe v. Syrian Arab Republic* noted that a lump sum award of $150 million in punitive damages per victim is appropriate "in cases where … at least one of the plaintiffs dies." *Doe*, 2020 WL 5422844, at *17.[11] That approach is relevant here, inasmuch as North Korea's attack on the Pueblo resulted

---

[11] *See also Cronin*, 238 F. Supp. 2d 222 ($1.2 million in compensatory damages and $300 million in punitive damages awarded to an individual who, while he was a graduate student in Lebanon in 1984, was kidnapped and tortured for four days by Hezbollah and two other paramilitary groups which the court found to have been organized, funded, trained, and controlled by Iran); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002) ($18.96 million in compensatory damages and $300 million in punitive damages awarded to the widow and sister of CIA agent William Buckley who was kidnaped in Beirut and tortured for 14

in the death of one crew member.  Granted, however, $150 million for each of the 46 Surviving Crew Member victims, and for the other 125 Plaintiffs (estates and family members) whose claims are yet to be addressed by the Court, yields a very large total.[12]

A third method has been to multiply the State Sponsor's expenditures on terrorism over a relevant period by a factor between three and five.  *See*, *e.g.*, *Baker,* 775 F. Supp. 2d at 85.  However, this approach is ill-suited to this case as it "requires knowing how much North Korea spends on terrorist activities, and that information is not available."  *Warmbier*, 356 F. Supp. 3d at 60, *citing Han Kim*, 87 F. Supp. 3d at 291 (explaining that "[n]o such information for North Korea is readily accessible, . . . if it is accessible at all").

The Court's exercise of discretion in choosing among these alternative approaches should be guided by the fact that North Korea ***directly*** and ***intentionally*** carried out the atrocities against these Plaintiffs, rather than just providing support to third parties.  Further, the Court should strive to award punitive damages consistently with what has been awarded in other cases

---

months by the Islamic Jihad, an entity the court found to be organized and funded by Iran, and who ultimately died while in captivity); *Jenco*, 154 F. Supp. 2d 27 ($14.6 million in compensatory damages and $300 million in punitive damages awarded to the estate and family of a priest who was kidnapped while working in Beirut as the Director of Catholic Relief Services and imprisoned in terrible conditions for a year and a half by Hezbollah); *Polhill*, 2001 WL 34157508 ($31.5 million in compensatory damages and $300 million in punitive damages awarded to the family of an American citizen who was kidnapped while working as a professor in Beirut and held in "deplorable" conditions for more than three years by Hezbollah); *Anderson*, 90 F. Supp. 2d 107 ($41.2 million in compensatory damages and $300 million in punitive damages awarded to a journalist who was kidnapped and held in deplorable conditions for seven years by Hezbollah, which the court found to be funded by Iran); *Sutherland*, 151 F. Supp. 2d 27 ($46.5 million in compensatory damages and $300 million in punitive damages awarded to a professor (and his family) who was kidnapped while teaching at the American University in Beirut and subsequently imprisoned in "horrific and inhumane conditions" for six and a half years by Hezbollah).

[12] The Court at this juncture may also consider both the Crew Member Estate Plaintiffs and the Family Member Plaintiffs, for whom an award of punitive damages also will be warranted.

involving the kidnapping, torture, and murder of American citizens. *See*, *e.g.*, *Warmbier*, 356 F. Supp. 3d at 60 ("a larger award is appropriate to punish and deter North Korea").

Consistent with these approaches, Plaintiffs respectfully request an award of punitive damages to each Surviving Crew Member Plaintiff in the amount of $150,000,000 or, in the alternative, between two and three times the total compensatory damages the Court awards to each Surviving Crew Member Plaintiff.

### III.     The Award of Punitive Damages Should Not Reduce the Court's Award of Compensatory Damages to These Plaintiffs

It is well-established that punitive damages may be awarded against North Korea separate and apart from the compensatory damages the Special Master recommended for each of these Plaintiffs.  "Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Han Kim*, 87 F. Supp. 3d at 290 (internal quotation marks and citations omitted); *see also* Restatement (Second) of Torts § 908 (1979).  By contrast, the Special Master's recommendations of compensatory damages awards for these Plaintiffs are based on established benchmarks and a close reading of the damages evidence, with the goal of fairly compensating each Surviving Crew Member Plaintiff for the individual harm he suffered.

As Plaintiffs explained in their prior submissions, an award for punitive damages is not recoverable from the U.S. Victims of State Sponsors of Terrorism Fund and therefore will not deplete the limited amounts available to partially compensate eligible victims of terrorism over the 10-year life of the Fund.  Furthermore, enforcement of a punitive damages award against North Korean assets, wherever they may be found, is complicated by the inevitable difficulties in

9

trying to enforce in a foreign court a U.S. court's punitive damages award.[13]  Plaintiffs therefore respectfully urge the Court to render its final judgment on compensatory damages in the amounts recommended by the Special Master without any reduction on account of the punitive damages award the Court decides is appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request a punitive damages award in the amount of $150,000,000 to each Surviving Crew Member Plaintiff or, alternatively, between two and three times the total compensatory damages the Court awards to each of these Plaintiffs.

DATED:  October 14, 2020                           Respectfully submitted,


/s/ Mark N. Bravin
Mark N. Bravin (D.C. Bar No. 249433)
Jean P. Nogues (pro hac vice)
Albina Gasanbekova (N.Y. Bar No. 5422530)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street, NW, 7th Floor
Washington, DC 20036-2406

Telephone: (202) 355-7900
Facsimile: (202) 355-7899

*Counsel for Plaintiffs*

---

[13] *See*, *e.g.*, Art. 10(1) of the Convention on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters ("The Hague Judgments Convention"), dated July 2, 2019, and not yet entered into force ("Recognition or enforcement of a judgment may be refused if, and to the extent that, the judgment awards damages, including exemplary or punitive damages, that do not compensate a party for actual loss or harm suffered."), available at https://assets.hcch.net/docs/806e290e-bbd8-413d-b15e-8e3e1bf1496d.pdf (last visited Oct. 13, 2020).