### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE A-1, *et al.*,<br><br>    *Plaintiffs*,<br><br> v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA Ministry of Foreign Affairs Jungsong-Dong, Central District, Pyongyang, Democratic People's Republic of Korea,<br><br>    *Defendant*. | No. 18-cv-0252 (DLF) |

### <u>MEMORANDUM OPINION</u>

This case arises from the kidnapping, imprisonment, and torture of United States servicemen aboard the USS Pueblo ("Pueblo") by agents of the government of the Democratic People's Republic of Korea ("North Korea") in 1968.  The plaintiffs are the former crew members themselves, as well as their families and estates.  On October 22, 2019, the Court granted the plaintiffs' Motion for Partial Default Judgment on Liability.  *See Doe v. Democratic People's Republic of Korea*, 414 F. Supp. 3d 109, 129 (D.D.C. 2019).  Now before the Court is the plaintiffs' Motion for Partial Final Default Judgment for Damages as to the living crew member plaintiffs, Dkt. 94, the plaintiffs' Amended Motion in Support of an Award of Punitive Damages ("Punitive Damages Mot."), Dkt. 98, and the plaintiffs' Motion for Final Default Judgment as to the remaining plaintiffs, Dkt. 100.  For the reasons that follow, the motions are granted in part and denied in part.

## I.      BACKGROUND

The Court has previously recounted in detail the facts underlying this lawsuit.  *See Doe*, 414 F. Supp. 3d at 116–20.  To summarize the relevant legal framework, the plaintiffs assert claims for damages against North Korea under the private cause of action against foreign state sponsors of terrorism provided by the Foreign Sovereign Immunities Act ("FSIA").  *See* 28 U.S.C. § 1605A.  In granting the plaintiffs' motion for default judgment on liability, the Court concluded that North Korea was liable to the plaintiffs under this provision and its incorporated theories of assault, battery, false imprisonment, intentional infliction of emotional distress, solatium, and wrongful death.  *See Doe*, 414 F. Supp. 3d at 126–29.

For purposes of awarding damages, the plaintiffs in this case fall into three groups: (1) living crew members; (2) the estates of deceased crew members; and (3) living family members and the estates of deceased family members.  The Court previously appointed a Special Master to prepare reports and recommendations regarding the individual damages to be awarded to each plaintiff.  *See* Order of June 26, 2018, Dkt. 23.  The Special Master filed his first report and recommendation, which recommends damages for the living crew members, on September 13, 2019.  *See* Report of Special Master, Dkt. 70.  On August 10, 2020, the Special Master filed his second report and recommendation, which recommends damages awards for the estates of each deceased crew member, *see* Report of Special Master Re: Estate Claims, Dkt. 87, as well as his third report and recommendation, which recommends damages awards for the living family members of each crew member and the estates of the deceased family members, *see* Report of Special Master Re: Solatium Claims, Dkt. 88.

On November 1, 2019, the plaintiffs filed their Motion for Partial Final Default Judgment for Damages as to the living crew members, Dkt. 94, and on November 9, 2020, the plaintiffs

filed their Motion for Final Default Judgment as to the remaining plaintiffs, Dkt. 100.  The Court

held a hearing on November 12, 2020 to consider the motions, and thereafter the plaintiffs filed a

supplemental brief in support of both motions on December 24, 2020, Dkt. 104; *see also* Minute

Order of Nov. 12, 2020.

## II.    LEGAL STANDARD

The FSIA allows plaintiffs to recover "money damages" for personal injury or death

caused by acts of torture and hostage taking committed by foreign sovereigns.  28 U.S.C.

§ 1605A(c).  It further specifies that those "damages may include economic damages, solatium,

pain and suffering, and punitive damages."  *Id.*  To recover for past losses, a plaintiff must

"prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. Dist. of Columbia*,

114 F.3d 1227, 1235 (D.C. Cir. 1997), and must "reasonably prove" the *amount* of damages, *Hill*

*v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  To recover for future losses, a plaintiff

similarly "must prove that the projected consequences are 'reasonably certain' (i.e., more likely

than not) to occur and must prove the amount of damages by a 'reasonable estimate.'"  *Id.* at

681.  These standards mean that a default winner under the FSIA "must prove damages in the

same manner and to the same extent as any other default winner."  *Botvin v. Islamic Republic of*

*Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012) (internal quotation marks omitted).  A court may

"take into account any special problems of proof arising from the defendant's absence . . . ."

*Hill*, 328 F.3d at 685.

III.    ANALYSIS

The Court adopts the Special Master's findings of fact.[1]  To assess the amount of damages that should be awarded to each class of plaintiffs, the Court will consider the Special Master's recommendations, the plaintiffs' objections, and the plaintiffs' requests for prejudgment interest, post-judgment interest, and punitive damages.

### A.    Crew Members

#### 1.    *Pain and Suffering*

As compensation for the pain and suffering that the Pueblo crew members suffered while in captivity, the Special Master recommends a baseline award of $3.35 million for each crew member.  *See* Report of Special Master at 11; Report of Special Master Re: Estate Claims at 11. The plaintiffs urge the Court to adopt this recommended award, which would amount to $10,000 for each of the 335 days that the crew members were held in captivity by the North Koreans.

The Court accepts this baseline recommendation.  As outlined in detail in the Special Master's reports, the crew member plaintiffs have proven the fact of their captivity—and the pain and suffering they experienced during it—with reasonable certainty.  *See* Report of Special Master at 8; Report of Special Master Re: Estate Claims at 7–8.  An award of $3.35 million for

---

[1]  The Court recognizes the Special Master for his dedicated efforts and notes his extensive experience in similar cases.  *See, e.g.*, *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *7 (D.D.C. May 21, 2019) (accepting Special Master's damages recommendations in TWA terrorist hijacking case without modification); *Relvas v. Islamic Republic of Iran*, No. 14-cv-1752, 2018 WL 1092445, at *1, 3 (D.D.C. Feb. 28, 2018) (accepting Special Master's damages recommendations in Beirut Marine barracks bombing case without modification, noting that they "conform to the well-established damages frameworks" in FSIA terrorism cases); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 46 (D.D.C. 2016) (accepting Special Master's damages recommendations in suit against Iran and North Korea relating to their participation in 2006 rocket attacks in northern Israel); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 78 (D.D.C. 2010) (adopting Special Master's recommended awards on pain and suffering, including an upward adjustment to one victim, in their entirety).

each crew member plaintiff aligns with this district's "formula for awarding damages" to victims of terrorist attacks held for prolonged periods. *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 268 (D.D.C. 2002). Under this formula, courts in this district award roughly $10,000 "for each day of captivity for the intense suffering experienced by a hostage during captivity." *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 100 (D.D.C. 2003); *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 164 (D.D.C. 2017) (collecting cases). This award is identical to the *per diem* amount awarded to the plaintiffs in *Massie v. Government of the Democratic People's Republic of Korea*, an earlier case in this district also involving the Pueblo attack. *See* 592 F. Supp. 2d 57, 66, 77 (D.D.C. 2008) (awarding $10,000 per day for each of the 335 days spent imprisoned).

As compensation for the crew members' many years of pain and suffering after their release, the Special Master recommends an additional baseline award of $16.75 million for each living crew member plaintiff. *See* Report of Special Master at 13–14. The Special Master also recommends a prorated version of that baseline for the estates of deceased crew members. *See* Report of Special Master Re: Estate Claims at 13.

The Court agrees with the Special Master's conclusion that an additional lump sum award is appropriate here. When "the *per diem* award amount fails to account for their pain and suffering," plaintiffs may receive "an additional lump sum." *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 346 (D.D.C. 2016). In calculating this additional lump sum, courts account for the physical and psychological trauma that plaintiffs experience after release. *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 165 (awarding $10 million for "post-release pain and suffering"); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (awarding $5 million for "post-release pain and suffering"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp.

2d 120, 135–36 (D.D.C. 2005) (awarding $7 million to compensate for damages that would

"likely continue to endure throughout the rest of their lives"); *Acree v. Republic of Iraq*, 271 F.

Supp. 2d 179, 219 (D.D.C. 2003), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004)

(awarding $2 million to $9 million for post-captivity pain and suffering).

Here, the Special Master reviewed thousands of pages of documentary evidence that

included "at least two sworn declarations" submitted on behalf of each crew member plaintiff,

which were "supplemented by medical records, testimony of family members, excerpts from

published accounts, diaries, newspaper articles, and other written material."  Report of Special

Master at 8.  He concluded:

> [A]lthough each survivor presents with an individualized set of
> post-release effects, a common strand runs through their narratives.
> As a result of the barbarity inflicted by the North Koreans, almost
> all required medical and/or psychiatric intervention.  The majority
> have suffered, and continue to suffer, from post-traumatic stress
> disorder, impaired memory, intrusive flashbacks, nightmares,
> hypervigilance, anxiety, anger, depression, guilt, and withdrawal
> from others.  Many have undergone invasive surgical procedures to
> ameliorate the physical damage resulting from the relentless torture
> they underwent as prisoners.  Several have attempted to numb their
> pain through alcohol and drugs, and most have seen their domestic
> and/or professional lives deteriorate.  A few have contemplated
> suicide.

*Id.* at 13.  The court in *Massie* reached similar findings, concluding that the crew member

plaintiffs in that case experienced "severe and permanent" physical and psychological trauma.

*Massie*, 592 F. Supp. 2d at 71.  The Court accepts these findings as proven with reasonable

certainty and agrees with both the Special Master and the court in *Massie* that the *per diem*

award of $3.35 million fails to adequately compensate the crew members for the pain and

suffering they endured following their release.

Although the Special Master's findings support an additional—and substantial—lump

sum award, the Court will not adopt the Special Master's recommended baseline of $16.75

million.  The Special Master arrived at this recommendation after observing that the *Massie*

court's $13.4 million post-captivity pain and suffering award for three living crew member

plaintiffs represented "$335,000 for every year the three Pueblo survivors suffered following

their release."  Report of Special Master at 11.  In keeping with "the *Massie* framework," the

Special Master recommended that each crew member "receive a baseline award of $335,000 per

year," for their post-captivity pain and suffering, which would total $16.75 million for each

living crew member.  *Id.* at 13.  The Court declines to adopt this recommended baseline award

for three primary reasons.

To start, courts in this district have declined to embrace *Massie*'s post-captivity pain and

suffering award as a baseline award in recent years.  *See, e.g.*, *Azadeh v. Gov't of Islamic*

*Republic of Iran,* No. 16-cv-1467, 2018 WL 4232913, at *19–20 (D.D.C. Sept. 5, 2018);

*Hekmati*, 278 F. Supp. 3d at 164.  This is due, in part, to the fact that the *Massie* court did not

explain the methodology it used to calculate the post-captivity pain and suffering damages it

awarded.[2]  *Hekmati*, 278 F. Supp. 3d at 164; *see also Moradi*, 77 F. Supp. 3d at 70 (noting "it is

apparent that the Court's post-captivity pain and suffering award in Massie was exactly four

times the award for pain and suffering during captivity").  Though the *Massie* court did take into

account that one of the plaintiffs, Commander Lloyd Bucher, died thirty-five years after his

release, it did not appear to consider whether any departures from the baseline award were

---

[2] The *Massie* plaintiffs' proposed findings of fact and conclusions of law provide little insight
into the *Massie* court's methodology.  The plaintiffs in *Massie* initially sought $7 million in post-
release damages on the grounds that this was the amount awarded to the plaintiff in *Acree*, 271 F.
Supp. 2d at 220–21.  *See* Pl.'s Initial Proposed Findings of Fact and Conclusions of Law, Dkt. 9,
No. 06-cv-749 (D.D.C. Apr. 9, 2008).  Following an evidentiary hearing, they later requested
$21 million in post-release damages because they had been held in captivity for "more than three
times as long" as plaintiffs in earlier cases, like *Acree*, in which $7 million in post-release
damages was awarded.  *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, Dkt. 13,
No. 06-cv-749 (D.D.C. June 16, 2008).

justified in light of the nature and extent of the plaintiffs' post-release injuries.  *See Massie,* 592 F. Supp. 2d at 77.  *Compare Relvas*, 2018 WL 1092445, at *2 (departing upward from baseline pain and suffering award based on the extent of the victims' post-release injuries).  Indeed, the Special Master recommends, *see* Report of Special Master at 14, and the plaintiffs agree, *see* Pls.' Mot. for Partial Final Default Judgment for Damages at 10, that the Court should depart upwards or downwards from the baseline by $2 million to $7.5 million for certain crew members in order to take into account the varying nature of the plaintiffs' injuries.[3]

Second, adopting *Massie*'s post-captivity pain and suffering award as a baseline here would lead to an award that is out-of-step with more recent cases.  Though it is difficult, if not impossible, to quantify post-captivity damages, courts use awards in similar FSIA lawsuits to "help guide the Court through this delicate terrain."  *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 137 (D.D.C. 2019).  The "primary consideration" in fashioning an appropriate award is that "individuals with similar injuries receive similar awards."  *Moradi*, 77 F. Supp. 3d at 70.  In recent years, courts in this district have applied *Hekmati*'s post-captivity pain and suffering award as a baseline in cases involving post-release injuries "consistent with those at issue in *Massie*," *Azadeh*, 2018 WL 4232913, at *19–20 (D.D.C. Sept. 5, 2018), making appropriate adjustments for differences in plaintiffs' "age[s] at release, life expectanc[ies], and time in captivity," *Abedini*, 422 F. Supp. 3d at 137; *see also, e.g.*, *id.* at 127, 137 (adopting *Hekmati*'s award, adjusted for life expectancy, for a plaintiff who "present[ed] extensive and shocking evidence of the mental and physical torture he endured" during his 1,268 days in

---

[3] As noted *infra* at 14, however, in its recent filing, the plaintiffs ask the Court to consider "less severe" downward departures than the Special Master recommends.  *See* Pls.' Mot. for Final Default Judgment at 16.

captivity and suffered from both PTSD and clinical depression as a result).  These recent awards weigh against adopting a $16.75 million baseline here.

And separately, simply awarding a fixed amount for each year of post-release pain and suffering would compensate the living crew members exclusively for their *past* pain and suffering.  Yet, it is clear that post-captivity pain and suffering awards also are designed to compensate victims for anticipated *future* pain and suffering.  *See, e.g., Hekmati*, 278 F. Supp. 3d at 164; *Price*, 384 F. Supp. 2d at 136.  Indeed, the plaintiffs concede that the award in *Massie* itself was intended to compensate surviving crew members "for both past *and* future pain and suffering."  Pls.' Supplemental Br. at 7, Dkt. 104 (emphasis in original).  Further, an historically-based, pro-rated award would lead to anomalous results.  Victims of the same attack who incur similar injuries but file suits years apart would receive substantially different awards based solely on the date of their judgments.  It is therefore unsurprising that the Court is unaware of a decision in which a court has awarded a fixed amount for each year following a victim's release.

In their supplemental brief, the plaintiffs propose an alternative time-based damages benchmark of $313,390 per year, which they derive from the post-captivity pain and suffering award given to Commander Bucher's estate in *Massie*.[4]  *See* Pls.' Supplemental Br. at 7–8.  But this approach employs essentially the same methodology that the Special Master recommends, *see id.* at 7, and the reasons for declining to adopt the Special Master's recommended baseline apply almost as forcefully to the proposed alternative.  The proposed award would still be out-of-step with recent awards in this district, *see, e.g.*, *Azadeh,* 2018 WL 4232913, at *19–20 (D.D.C.

---

[4] The plaintiffs arrived at this figure by dividing *Massie*'s $11 million damages award to the Estate of Commander Bucher by the 35.1 years that Commander Bucher lived after the Pueblo crew members' release.  *See* Pls.' Supplemental Br. at 8.

Sept. 5, 2018), and disproportionately affected by the date on which final judgment is entered, *see supra* at 9. The Court therefore declines to adopt the plaintiffs' proposed alternative.

Recognizing the inherent difficulty in "putting a number on" pain and suffering, *Moradi*, 77 F. Supp. 3d at 70, this Court will weigh two factors that courts routinely consider when calculating post-captivity awards: (1) the "length and severity" of the plaintiff's torture and detention and (2) the "extent of the plaintiff's lasting physical and mental injuries." *Azadeh*, 2018 WL 4232913, at *19; *see also Hekmati*, 278 F. Supp. 3d at 164. In this case, however, a third factor courts typically consider—the ages and life expectancies of the plaintiffs *at the time of releas*e—has little bearing on the crew members' post-release awards. Although their ages varied at the time of release,[5] most crew members lived more than fifty years after their captivity. The Court will nonetheless differentiate their awards by considering each crew member's actual and anticipated years of suffering.

The Court will also adopt the *Hekmati* post-captivity pain and suffering award as a baseline, as other courts have done in cases involving post-release injuries like *Massie*. *See Azadeh*, 2018 WL 4232913, at *19–20; *Abedini*, 422 F. Supp. 3d at 137. The Pueblo crew members were detained for less than a year (335 days), *see Massie*, 592 F. Supp. 2d at 77, and just one-fifth as long as the *Hekmati* plaintiff, who spent 1,602 days of captivity in Iran's Evin prison. 278 F. Supp. 3d at 149, 163–64. But they endured similar conditions and abuse. *See Doe*, 414 F. Supp. 3d at 119. And they too sustained severe and pervasive long-term injuries. *See, e.g.*, Report of Special Master at 3–5, 13. ██████████████████████

---

[5] The vast majority of the Pueblo crew members were in their twenties at the time of their release, *see, e.g.*, Report of Special Master Ex. A at 34, Dkt. 70-2 (twenty years old); *id.* at 57 (twenty-one years old), though several of the crew members were older, ranging from thirty, *see* Report of Special Master Ex. B at 10, Dkt. 70-3, to forty-one years of age, *see* Report of Special Master Ex. A at 49.

███████████████████████████████████████

██████████████████ Report of Special Master at 13.

The Court will therefore adopt *Hekmati*'s $10 million award for two Pueblo crew members who endured five decades (fifty years) of post-release pain and suffering.  Though they spent significantly less time in captivity than the *Hekmati* plaintiff, their 50-year life span exceeded his 45-year life expectancy.  And the nature and extent of their post-release injuries are, on balance, sufficiently similar to award $10 million in post-release pain and suffering damages.  *See Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 180 (D.D.C. 2019).

Consistent with the Special Master's recommendations, *see* Report of Special Master at 4, 13–14, however, the Court will depart from this $10 million baseline award for several crew member plaintiffs based on the *nature and extent* of their post-release injuries.  *See supra* at 7–8; *see also Relvas*, 2018 WL 1092445, at *2.  The Court will also deviate from the $10 million baseline to take into account the *years of suffering* that each crew member has actually endured, and the years of future pain and suffering that each living crew member is expected to endure.

For the deceased crew member plaintiffs, the Court will adjust the $10 million post-release pain and suffering award upwards and downwards by $200,000 for the *actual* number of years of suffering each endured.  The chart below reflects these baseline awards:

| Deceased Crew Members' Baseline Awards | | |
|---|---|---|
| Plaintiff | Years of Post-Release Pain and Suffering | Baseline Award for Post-Release Pain and Suffering |
| A-03 | 50 | $10,000,000 |
| A-04 | 52 | $10,400,000 |
| A-16 | 51 | $10,200,000 |
| A-18 | 51 | $10,200,000 |
| A-23 | 51 | $10,200,000 |
| A-35 | 49 | $9,800,000 |
| A-37 | 50 | $10,000,000 |
| C-01 | 25 | $5,000,000 |

| C-04 | 51 | $10,200,000 |
|------|----|-----|
| C-08 | 44 | $8,800,000 |
| C-10 | 24 | $4,800,000 |
| C-14 | 20 | $4,000,000 |
| C-16 | 45 | $9,000,000 |
| C-20 | 44 | $8,800,000 |
| C-24 | 25 | $5,000,000 |
| C-25 | 46 | $9,200,000 |
| C-29 | 1 | $200,000 |
| C-30 | 45 | $9,000,000 |

Similarly, for the living crew member plaintiffs, the Court will deviate from the baseline to take into account the total number of years each living crew member is *expected* to suffer, as well as the number of years that each has suffered already. *See Azadeh*, 2018 WL 4232913, at *19–20; *Abedini*, 422 F. Supp. 3d at 127, 137. To estimate each living crew member's life expectancy, the Court relies on a CDC National Vital Statistics Report that the plaintiffs recommend for their economic damages calculations. *See* Appraisal of Value of Economic Life on ██████████ at 4, 18–20, Dkt. 99-1; Appraisal of Value of Economic Life on ██████ ██████████ at 4, 16–18, Dkt. 99-2; *see also* United States Life Tables 2014, 66 Nat'l Vital Stats. Reps., no. 4 (2017); *Abedini*, 422 F. Supp. 3d at 137 (relying on National Vital Statistics Reports to adjust plaintiff's post-captivity pain and suffering award based on estimated life expectancy). The total number of years each living crew member is estimated to suffer and the resulting baseline award are reflected in the following chart:

| Living Crew Members' Baseline Awards | | | | | |
|---|---|---|---|---|---|
| Plaintiff | Age | Years Since Release from Captivity | Estimated Life Expectancy (Current Day) | Estimated Total Number of Years of Post-Release Pain and Suffering | Baseline Award for Post-Release Pain and Suffering |
| A-01 | 83 | 52 | 7 | 59 | $11,800,000 |
| A-02 | 81 | 52 | 8 | 60 | $12,000,000 |
| A-05 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-06 | 72 | 52 | 13 | 65 | $13,000,000 |

| A-07 | 75 | 52 | 11 | 63 | $12,600,000 |
| A-08 | 93 | 52 | 3 | 55 | $11,000,000 |
| A-09 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-10 | 75 | 52 | 11 | 63 | $12,600,000 |
| A-11 | 77 | 52 | 10 | 62 | $12,400,000 |
| A-12 | 76 | 52 | 11 | 63 | $12,600,000 |
| A-13 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-14 | 78 | 52 | 10 | 62 | $12,400,000 |
| A-15 | 78 | 52 | 10 | 62 | $12,400,000 |
| A-17 | 76 | 52 | 11 | 63 | $12,600,000 |
| A-19 | 72 | 52 | 13 | 65 | $13,000,000 |
| A-20 | 77 | 52 | 10 | 62 | $12,400,000 |
| A-21 | 84 | 52 | 6 | 58 | $11,600,000 |
| A-22 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-24 | 79 | 52 | 9 | 61 | $12,200,000 |
| A-25 | 76 | 52 | 11 | 63 | $12,600,000 |
| A-26 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-27 | 83 | 52 | 7 | 59 | $11,800,000 |
| A-28 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-29 | 72 | 52 | 13 | 65 | $13,000,000 |
| A-30 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-31 | 82 | 52 | 7 | 59 | $11,800,000 |
| A-32 | 76 | 52 | 11 | 63 | $12,600,000 |
| A-33 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-34 | 77 | 52 | 10 | 62 | $12,400,000 |
| A-36 | 80 | 52 | 8 | 60 | $12,000,000 |
| A-38 | 75 | 52 | 11 | 63 | $12,600,000 |
| A-39 | 73 | 52 | 13 | 65 | $13,000,000 |
| A-40 | 72 | 52 | 13 | 65 | $13,000,000 |
| A-41 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-42 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-43 | 87 | 52 | 5 | 57 | $11,400,000 |
| A-44 | 86 | 52 | 6 | 58 | $11,600,000 |
| A-45 | 75 | 52 | 11 | 63 | $12,600,000 |
| A-46 | 90 | 52 | 4 | 56 | $11,200,000 |
| A-47 | 74 | 52 | 12 | 64 | $12,800,000 |
| A-48 | 75 | 52 | 11 | 63 | $12,600,000 |
| A-49 | 72 | 52 | 13 | 65 | $13,000,000 |

As noted, the Special Master identified ten crew members who underwent particularly brutal treatment, including barbaric surgical procedures, that caused exceptional post-captivity pain and suffering. *See* Report of Special Master at 4, 13–14. In such "severe instances of

physical and psychological pain," upward adjustments from the baseline lump sum award are

appropriate. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010); *see*

*Relvas*, 2018 WL 1092445, at *2; *see also* Pls.' Mot. for Partial Final Default Judgment for

Damages at 10–11 (expressing no objection to Special Master's recommended departures); Pls.'

Mot. for Final Default Judgment at 15–16 (same).  The Court therefore finds that these ten crew

members are entitled to the upward departures specified in the Special Master's reports.[6]

The Special Master also recommends a downward departure for three crew members who

"admitted suffering from fewer post-release complications."  Report of Special Master at 14.

Such downward departures have been deemed appropriate in other FSIA terrorism cases.  *See,*

*e.g.*, *Valore*, 700 F. Supp. 2d at 84; *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47

(D.D.C. 2012); *see also* Pls.' Mot. for Partial Final Default Judgment for Damages at 10–11

(expressing no objection to Special Master's recommended departures); Pls.' Mot. for Final

Default Judgment at 16 (same).  *But see id.* (noting the lack of objection but, "after further

consideration," urging the Court to exercise its discretion and adopt a less severe downward

departure).  Based on their admissions, the Court agrees with the Special Master that a

downward departure is appropriate for these crew members' post-release pain and suffering

awards.[7]

---

[6] The upward departures for the ten crew members are as follows: Doe A-11 ($5 million); Doe
A-18 ($5 million); Doe A-20 ($2 million); Doe A-22 ($2 million); Doe A-34 ($2 million); Doe
A-40 ($7.5 million); Doe C-8 ($2 million); Doe C-10 ($2 million); Doe C-20 ($2 million); and
Doe C-25 ($2 million).  *See* Group A Pueblo Survivors–Recommended Damages, Dkt. 70-1;
Group B Pueblo Crewmember Estates' – Recommended Damages, Dkt. 87-2.

[7] The downward departures for the three crew members are as follows: Doe A-32 ($2 million);
Doe A-38 ($5 million); and Doe C-04 ($5 million).  *See* Report of Special Master Ex. B at 121–
22; *see also* Report of Special Master Re: Estate Claims Ex. A at 47–48, Dkt. 87-1.

Finally, the Special Master recommends that the Court award $1 million in compensatory

damages to ███████████████████████████████████████████

███████████████████████████████████████  *See*

Report of Special Master Re: Estate Claims Ex. A at 67; *see also* Pls.' Motion for Final Default

Judgment at 17–18 (expressing no objection to Special Master's recommended award).  The

Court adopts the Special Master's recommended award, which is consistent with awards for

comparable periods of pain and suffering prior to death.  *See, e.g.*, *Braun v. Islamic Republic of

Iran*, 228 F. Supp. 3d 64, 83 (D.D.C. 2017) ("For periods of pain and suffering of [] less than a

minute to a few hours after an attack but prior to death, courts have awarded damages of

$1,000,000.").

In reaching these conclusions, the Court recognizes that the pain and suffering the

Pueblo's crew members endured following their release was "nightmarish."  Pls.' Supplemental

Br. at 5.  Indeed, "[t]here is no monetary award that could adequately compensate them" for that

hardship.  *Acree*, 271 F. Supp. 2d at 219.  Nevertheless, the Court "is charged with providing

compensatory damages even where no award can truly compensate."  *Id.*  In calculating the

amount of post-release pain and suffering damages, the Court has carefully considered the

awards in *Massie* and recent similar cases.  Based on this authority and the facts as found by the

Special Master, the Court will award the Pueblo crew member plaintiffs and their estates post-

release pain and suffering damages as explained above and reflected in the accompanying order.

### 2.    *Economic Damages*

The Court also accepts the Special Master's recommended economic damages award of

$987,798.10 to Doe A-49 and $2,938,375.49 to ████████████.  Report of Special

Master Ex. C at 105–06, Dkt. 70-4; Report of Special Master Re: Estate Claims Ex. A at 69, Dkt.

87-1; *see also* Pls.' Mot. for Partial Final Default Judgment for Damages at 11–12 (expressing no

objection to Special Master's recommended award); Pls.' Mot. for Final Default Judgment at 18–19 (same).

As mentioned, FSIA damages "may include economic damages," 28 U.S.C. § 1605A(c), and Doe A-49 has proven with reasonable certainty that his treatment at North Korea's hands caused severe health problems that prevented him from securing employment post-release, *see* Report of Special Master Ex. C at 104–06, Dkt. 70-4.  The Court also finds that ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████   *See* Report of Special Master Re: Estate Claims Ex. A at 67–69.  Both Doe A-49 and the ██████████████████ have reasonably proven the amount of lost earnings (or "loss of accretions") damages through the expert report of economist Dr. L. Wayne Plumly, who applied an appropriate methodology and reasonable assumptions in calculating the net present value of their economic losses.  *See* Appraisal of Value of Economic Life on ██████████████; Appraisal of Value of Economic Life on ███████████████.

## B.    Family Members

Turning to the families of the crew members, the Court "may presume that spouses and those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Moradi*, 77 F. Supp. 3d at 72.  Each family member plaintiff has established both a relationship to a Pueblo crew member and that their emotional distress was reasonably certain to occur as a consequence of the North Koreans' actions.  *See* Report of Special Master Re: Solatium Claims at 12.  Thus, they are entitled to solatium damages, which are "intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a

decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Moradi*, 77 F. Supp. 3d at 72 (internal quotation marks omitted).

Though solatium damages are "by their very nature unquantifiable," *id.*, the Special Master recommends hewing to the *Heiser* framework, which a majority of courts in this district have adopted. *See* Report of Special Master Re: Solatium Claims at 11. Under that framework, "a spouse, child, or sibling may receive $4 million, $2.5 million and $1.25 million, respectively, for valid claims in which the family member survived the terrorist act," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012), and "the family of a deceased victim typically receives damages in the amount of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling," *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 53–54 (D.D.C. 2020).

The plaintiffs object to the Special Master's recommendation and "request that the Court increase the Special Master's recommended baseline solatium damages by 20-25% for all spouses, parents, and siblings" of the Pueblo crew members. *See* Pls.' Mot. to Modify Special Master's Third Report at 2, 6–7, Dkt. 101. This request appears to be based, at least in part, on the Special Master's recommendation to award the children of the Pueblo crew members $2.5 million in solatium damages as opposed to $1.5 million. *See id.* at 3 (noting that their proposed increase is "less than the 66% increase… recommended for the children of Pueblo crew members"). But the Special Master's recommendation of $2.5 million in solatium damages for the children of Pueblo crew members was not a departure from *Heiser*. *See Barry*, 437 F. Supp. 3d at 54 (noting that under the *Heiser* framework "amounts are halved for the family of an injured victim, with courts generally awarding $4 million to a spouse, $2.5 million to a child or

parent, and $1.25 million to a sibling."); *see also Oveissi v. Islamic Republic of Iran*, 768 F.

Supp. 2d 16, 26 n.10 (D.D.C. 2011).

To be sure, the *Heiser* framework's suggested awards are neither mandatory nor "set in

stone," *Valore,* 700 F. Supp. 2d at 85; *see Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348,

361 (D.C. Cir. 2018).  Although courts previously granted higher awards for family members in

hostage-taking cases, *see* Pls.' Supplemental Br. at 15–16; *see also, e.g.*, *Acree*, 271 F. Supp. 2d

at 222–23 (awarding $10 million to the spouses of surviving hostage victims); *Cicippio v.*

*Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (1998) (same), those awards largely predated the

emergence of the *Heiser* framework.  And in recent years, the *Heiser* framework has "gained

strong precedential support."  *Reed*, 845 F. Supp. 2d at 214.  "[C]ourts have commonly adopted

the *Heiser* framework," without enhancing its proposed baseline awards, even when victims

experienced torture during their captivity and had serious post-release injuries as a result.  *See,*

*e.g.*, *Abedini*, 422 F. Supp. 3d at 127, 133, 140 (no deviation from *Heiser*'s baseline for sibling

of a victim that was held hostage for 1,268 days, repeatedly endured severe torture at the hands

of his captors, and suffered from PTSD and clinical depression as a result); *Reed*, 845 F. Supp.

2d at 208, 213 (D.D.C. 2012) (no deviation from *Heiser*'s baseline for child of a victim that was

"held hostage for 1,330 days," subjected to "electrocution, arsenic poisoning, and countless

beatings," during his captivity, and had severe physical and psychological complications

following his release).

"[B]earing in mind the general precept that similar awards should be given in similar

cases," *Oveissi*, 768 F. Supp. 2d at 26, the Court will adopt the Special Master's recommended

baseline figures "as an anchor from which the Court should deviate to compensate for specific

circumstances," *Christie v. Islamic Republic of Iran*, 19-cv-1289, 2020 WL 3606273, at *26

(D.D.C. July 2, 2020).  Here, the Special Master has recommended upward departures from the solatium damages baseline for two family members.  One was subjected to "beatings and emotional abuse" by her husband who, after returning home from North Korea, struggled with anger issues, drank excessively, and suffered from PTSD.  Report of Special Master Re: Solatium Claims Ex. A at 23, Dkt. 88-1.  The other had a "unique bond with her son," a Pueblo crew member, who provided her physical and emotional support, and lived with her both before and after his time in North Korea.  *See* Report of Special Master Re: Solatium Claims Ex. C at 48–49.  In this district, courts have imposed higher solatium awards where: (1) a victim "survives with severe physical and emotional conditions that continue to cause severe suffering by the spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) "a parent can demonstrate a *particularly* close connection with their child vis-à-vis other parent-child relationships"), *Oveissi*, 768 F. Supp. 2d at 28 (emphasis in original); or (3) "the circumstances of the attack made the suffering particularly agonizing for the family," *Abedini*, 422 F. Supp. 3d at 140.  Based on the Special Master's detailed assessments and this authority, the Court concludes that these two family members are entitled to the upward departures specified in the Special Master's report.[8]

### C.   Interest Awards

#### 1.   *Prejudgment Interest*

Each surviving crew member seeks prejudgment interest of nearly $131 million on the $3.35 million award they each will receive for their time in captivity.  Whether to award prejudgment interest "is subject to the discretion of the court and equitable considerations."

---

[8] The two family members and their upward departures are Doe C-07 ($800,000) and Doe C-26 ($625,000).  *See* Report of Special Master Re: Solatium Claims Ex. D at 1, 6 Dkt. 88-4.

*Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (internal citation omitted). "Prejudgment interest is 'not awarded as a penalty.'" *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 89 (D.D.C. 2019) (quoting *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 197 (1995)). Rather, "[i]t is more aptly defined as delay damages and properly viewed through the lens of unjust enrichment." *Id.* (internal quotation marks and citation omitted). The Special Master did not address the surviving crew members' claims for prejudgment interest.

Courts in this district have taken varying approaches to requests for prejudgment interest. *See* Pls.' Mot. for Partial Final Default Judgment for Damages at 14–15 (cataloging the approaches of various judges in this district). Most courts use prejudgment interest to compensate the plaintiff for the time value of money and thus seem to award it as a matter of course. *See, e.g.*, *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 64 (D.D.C. 2018) (explaining that "prejudgment interest is appropriate to account for the time that [the plaintiffs] have not had access to [the] full amount" of their award). Others calculate their awards to be "fully compensatory" and generally decline to award prejudgment interest. *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214, 2019 WL 3037868, at *10 (D.D.C. July 11, 2019); *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 42–43 (D.D.C. 2012); *Maupin*, 405 F. Supp. 3d at 97–98 (collecting cases where courts have denied prejudgment interest "in the absence of any obstructive conduct"). In *Massie*, 592 F. Supp. 2d 57, the plaintiffs did not request, and the Court did not award, prejudgment interest.

The Court follows those courts that have declined to award prejudgment interest. Because the Court has determined that $3.35 million in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity, prejudgment interest is

unnecessary to compensate victims for the lost time value of money.  *See Price*, 384 F. Supp. 2d at 135 (declining to award prejudgment interest on damages award for plaintiffs' pain and suffering in captivity, even though "the wrongful acts took place decades before the litigation," because the award, calculated pursuant to this district's *per diem* formula, was "fully compensatory").  In addition, North Korea, "having never even appeared in this case, [has] not prolonged the litigation." *Wultz*, 864 F. Supp. 2d at 43.  The Court thus declines to award prejudgment interest.

### 2. *Post-Judgment Interest*

The plaintiffs' amended complaint also seeks an award of post-judgment interest.  Am. Compl. ¶ 57, Dkt. 14.  The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and that such interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  The statute further provides that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually." *Id.* § 1961(b).  As the use of the word "shall" suggests, an award of post-judgment interest under this statute is mandatory, not discretionary. *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012).  The Court will therefore grant this portion of the plaintiffs' motions and award post-judgment interest at the statutory rate.

### D. Punitive Damages

Finally, the plaintiffs' amended complaint seeks an award of "punitive damages . . . in the amount the Court may determine to be just."  Am. Compl. ¶ 57.  At the time that the plaintiffs

filed their motion for partial default judgment on damages with respect to the living crew member plaintiffs, an award of punitive damages for conduct occurring prior to the enactment of Section 1605A in 2008 was foreclosed by the D.C. Circuit's decision in *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  But the Supreme Court recently held in *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), that plaintiffs can recover punitive damages under § 1605A for unlawful conduct occurring prior to 2008.  *See id.* at 1608 ("Congress was as clear as it could have been when it authorized plaintiffs to seek and win punitive damages for past conduct using § 1605A(c)'s new federal cause of action.").

"Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  *Oveissi*, 879 F. Supp. 2d at 55–56.  They are not intended to compensate victims, but rather to award "an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future."  *Id.* at 56.  "Courts routinely award punitive damages in cases brought under the terrorism exception to the Foreign Sovereign Immunities Act."  *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020).  In light of the North Koreans' heinous treatment of the Pueblo crew members, the Court has no trouble concluding that punitive damages are warranted in this case.

Courts consider four factors to determine the amount of a punitive damages award: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 59 (D.D.C. 2018).  "Taking these factors into account," courts in this district have generally taken three approaches in calculating appropriate punitive damages awards in state-sponsored terrorism cases.  *See id.* at 59–60 (discussing each approach and collecting cases).  The first approach,

often used in exceptionally deadly attacks, is to multiply the foreign state's yearly expenditures on terrorism by a factor between three and five.  *Id.*  A second approach ties punitive damages to the compensatory damages award, using a ratio set forth in earlier cases involving similar conduct.  *Id.*  And the final approach awards $150 million to each affected family.  *Id.*

The first approach is not appropriate here because it "requires knowing how much North Korea spends on terrorist activities, and that information is not available."  *Id.* at 60.  And while the plaintiffs urge the Court to adopt the third approach and award $150 million in punitive damages to each plaintiff, that method "is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened here."  *Frost,* 419 F. Supp. 3d at 117.  The Court will therefore tie the punitive damages in this case to compensatory damages.  Recent decisions involving plaintiffs who were held captive and tortured awarded punitive damages in an amount equal to compensatory damages.  *See Abedini*, 422 F. Supp. 3d at 142 (collecting cases); *see also id.* (observing that only in "special circumstance[s]" have courts multiplied compensatory damages under this approach).  The Court will do the same here and award each plaintiff a punitive damages award equal to their compensatory damages.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motions are granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

February 16, 2021

23